**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

ASCENTIVE, LLC,

      Plaintiff,

v.

OPINION CORP. d/b/a
PISSEDCONSUMER.COM, MICHAEL
PODOLSKY, JOANNA SIMPSON, and
ALEX SYROV,

      Defendants.

Civil Action No. 1:2010-cv-04433

---

**MEMORANDUM OF LAW IN SUPPORT**
**OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

---

By:   /s/
      Darren H. Goldstein, Esq. (DHG 9804)
      Abbe F. Fletman, Esq. (admitted pro hac vice)
      Alexis Arena, Esq. (admitted pro hac vice)
      FLASTER/GREENBERG P.C.
      1600 John F. Kennedy Blvd., Suite 200
      Philadelphia, PA 19103

Dated: November 23, 2010     *Attorneys for plaintiff Ascentive, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................................iii

INTRODUCTION.............................................................................................1

FACTS...........................................................................................................1

    A.    ASCENTIVE'S SOFTWARE PRODUCTS AND TRADEMARKS....................1

    B.    PISSEDCONSUMER'S USE OF ASCENTIVE'S TRADEMARKS TO
           REAP PROFITS, AND TO BRIBE AND EXTORT ASCENTIVE
           THROUGH ITS WEBSITE PISSEDCONSUMER.COM....................................2

        1.    PissedConsumer Admits It Advertises Itself to the Public as an
             Unbiased Consumer Advocacy Group. .........................................2

        2.    PissedConsumer Encourages Negative Reviews That Induce the
             Victims of the Reviews to Contact PissedConsumer. .................................3

        3.    PissedConsumer's Extortion and Bribery of Ascentive. .............................4

        4.    Contrary to its Claim, PissedConsumer Removes Consumer
             Complaints For Monetary Gain. ................................................8

             (a)    Evidence of Extortion of Davidson Inventegration. .......................8

             (b)    Consumers' Inability to Post Any Complaints About
                  RipoffReport.com Following a Confidential Agreement
                  Between PissedConsumer and RipoffReport.com..........................9

        5.    Consumers Are Further Misled By PissedConsumer's Improper
             "Search Engine Optimization" Tactics..........................................10

        6.    PissedConsumer's Use of Ascentive's Trademarks in
             PissedConsumer's Website Text, Subdomains and Metadata..................11

ARGUMENT...................................................................................................13

    A.    ASCENTIVE IS LIKELY TO SUCCEED ON THE MERITS
           AND SERIOUS QUESTIONS GO TO THE MERITS OF
           ASCENTIVE'S CLAIMS AND MAKE THEM FAIR GROUNDS FOR
           TRIAL. .........................................................................................13

        1.    PissedConsumer is Liable Under the Civil RICO Statute For
             Conducting and Conspiring to Conduct an Enterprise that Engages
             in a Pattern of Racketeering Activity. .........................................13

             (a)    PissedConsumer is Liable Under the Civil RICO Statute
                  For Committing and Conspiring to Commit Predicate Acts
                  of Commercial Bribery Under 18 Pa. C.S. § 4108(b). .................14

**Page**

        (b)     PissedConsumer is Liable Under the Civil RICO Statute
For Committing and Conspiring to Commit Predicate Acts
of Extortion under the Hobbs Act, 18 U.S.C. § 1951 .................... 17

    2.    PissedConsumer is Liable For Trademark Infringement, Unfair
Competition and False Designation of Origin. ........................................ 18

    3.    PissedConsumer is Liable For Tortious Interference With Existing
and Prospective Economic Advantage. ..................................................... 22

B.    ASCENTIVE IS SUFFERING IRREPARABLE HARM. ................................. 23

C.    THE PUBLIC INTEREST AND BALANCE OF HARDSHIPS
STRONGLY FAVOR AN INJUNCTION. .......................................................... 24

CONCLUSION ................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*800-JR Cigar, Inc. v. GoTo.com, Inc.,*
   437 F.Supp.2d 273 (D.N.J. 2006) ........................................................................... 19

*Australian Gold, Inc., v. Hatfield,*
   436 F.3d 1228 (10th Cir. 2006) .............................................................................. 19

*Boyle v. U.S.,*
   129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009) .............................................................. 14

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,*
   No. 95cv1698, 1996 WL 47167 (E.D.Pa. Feb. 2, 1996) ......................................... 15

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.,*
   174 F.3d 1036 (9th Cir. 1999) ................................................................................ 20

*Checkpoint Sys., Inc., v. Check Point Software Techs., Inc.,*
   269 F.3d 270 (3d Cir. 2001) .................................................................................... 19

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,*
   598 F.3d 30 (2d Cir. 2010) ...................................................................................... 13

*DeFalco v. Bernas,*
   244 F.3d 286 (2d Cir. 2001) .................................................................................... 17

*Ecolab, Inc. v. Paolo,*
   753 F.Supp. 1100 (E.D.N.Y.1991) .......................................................................... 23

*Hasbro Inc. v. Lanard Toys, Ltd.,*
   858 F.2d 70 (2d Cir.1988) ....................................................................................... 19

*Hy Cite Corp. v. badbusinessbureau.com, L.L.C.,*
   418 F.Supp.2d 1142 (D.Ariz. 2005) ........................................................................ 17

*Malletier v. Burlington Coat Warehouse Corp.,*
   426 F.3d 532 (2d Cir. 2005) .................................................................................... 19

*Malletier v. Dooney & Bourke, Inc.,*
   561 F.Supp.2d 368 (S.D.N.Y. 2008) ....................................................................... 18

*Metropolitan Taxicab Bd. of Trade v. City of New York,*
   615 F.3d 152 (2d Cir. 2010) .................................................................................... 13

**Page**

*Mobil Oil Corp. v. Pegasus Petroleum Corp.,*
  818 F.2d 254 (2d Cir. 1987) .................................................................................. 19

*National Elevator Cab & Door Corp. v. H & B, Inc.,*
  2008 WL 207843 (E.D.N.Y. 2008) ........................................................................ 23

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.,*
  704 F.Supp.2d 305 (S.D.N.Y. 2010) ..................................................................... 25

*Opticians Assoc. of America v. Independent Opticians of America,*
  920 F.2d 187 (3d Cir. 1990) .................................................................................. 24

*Pierce & Stevens Chemical Corp. v. U. S. Consumer Product Safety Commission,*
  439 F.Supp. 247 (W.D.N.Y. 1977) ........................................................................ 23

*Soil Solutions, Inc. v. Soil Solution Industries Inc.,*
  No. 09-CV-2470, 2009 WL 3753912 (E.D.N.Y. Nov. 6, 2009) ............................ 19

*U.S. v. Brecht,*
  540 F.2d 45 (2d Cir. 1976), *cert denied,* 429 U.S. 1123 (1977) ........................... 17

*U.S. v. Private Sanitation Industry Association of Nassau/Suffolk, Inc.,*
  995 F.2d 375 (2d Cir. 1993) .................................................................................. 24

*Virgin Enterprises Ltd. v. Nawab,*
  335 F.3d 141 (2d Cir. 2003) ............................................................................. 19, 24

*Westlake Plastic Co. v. O'Donnell,*
  182 F.R.D. 165 (E.D.Pa. 1998) ............................................................................. 14

*Zino Davidoff SA v. CVS Corp.,*
  571 F.3d 238 (2d Cir.2009) ................................................................................... 23

**STATE CASES**

*Amaranth, LLC, v. J.P. Morgan Chase & Co.,*
  71 A.D.3d 40, 888 N.Y.S.2d 489 (N.Y. App. Div. 2009) ..................................... 22

**FEDERAL STATUTES**

15 U.S.C. § 1114 ............................................................................................................ 18

15 U.S.C. § 1125(a) ....................................................................................................... 18

iv

**Page**

18 U.S.C. § 1951 ...................................................................................................14, 17

18 U.S.C. § 1961 ...........................................................................................13, 14, 15


**STATE STATUTES**

18 Pa. C.S. § 4108 .................................................................................................14, 15

Plaintiff, Ascentive, LLC ("Ascentive"), seeks a preliminary injunction because it is suffering irreparable harm to its business and reputation resulting from the extortionate scheme of defendants Opinion Corp. d/b/a PissedConsumer.com, Michael Podolsky, Joanna Simpson and Alex Syrov (collectively, "Defendants" or "PissedConsumer") and from false website content regarding Ascentive and its products posted at Ascentive.PissedConsumer.com and FinallyFast.PissedConsumer.com. PissedConsumer has offered to remove negative internet postings only in exchange for Ascentive's payment to PissedConsumer of exorbitant amounts of money, which Ascentive has refused to pay, leading to this lawsuit.

## FACTS

### A.   ASCENTIVE'S SOFTWARE PRODUCTS AND TRADEMARKS

Ascentive develops and sells computer software products that enhance and protect personal computers, including improving system performance, increasing speed, ensuring privacy, and eliminating the threat of spyware.[1]  Schran Decl., ¶ 2.  Over the past decade, Ascentive has developed a reputation as a leader in the personal computer software industry. Ascentive has marketed more than a dozen computer software products, receiving accolades from media outlets including *The Wall Street Journal*, *Newsweek*, *Forbes*, Tech TV and NBC. Schran Decl., ¶ 4.

Ascentive's trademarks are vital assets of Ascentive because approximately 99 percent of its revenues are derived from online sales from its websites.  Schran Decl., ¶ 5.  The majority of these sales occur after consumers search for Ascentive's trademarks online.  *Id*. at ¶ 6.  Ascentive operates a number of websites, including www.ascentive.com and www.finallyfast.com, where its computer software products are advertised, sold, and made available for download.  Schran

---

[1] Spyware is harmful software used to collect information and data from personal computers, which may be downloaded and installed without the computer user's consent.

Decl., ¶ 7.  In addition to investing in significant online advertising, Ascentive develops and airs television advertisements that encourage consumers to search for its software products online by brand name, and subsequently to buy and download these products.  *Id.* at ¶ 8.

Ascentive owns numerous trademark registrations in the United States Patent and Trademark Office.  Ascentive owns a registration for its "ASCENTIVE" trademark, Reg. No. 3,091,824 (issued May 16, 2006).  Schran Decl., Ex. 9.  Ascentive also owns registrations in the United States Patent and Trademark Office for its FINALLYFAST.COM trademark (Reg. No. 3,533,775, issued Nov. 18, 2008), FINALLY FAST trademark (Reg. No. 3,727,610, issued Dec. 22, 2009), and FINALLYFAST trademark (Reg. No. 3,727,611, issued Dec. 22, 2009).  *Id.*

Ascentive is a Microsoft Certified Partner in recognition of Ascentive's technological excellence and impact on customers through Microsoft products and services.  Schran Decl., ¶ 10.  Ascentive's software has been tested by various third parties such as StopBadware.org and these tests have established that Ascentive's software is safe for personal computers.  *Id.*

**B.    PISSEDCONSUMER'S USE OF ASCENTIVE'S TRADEMARKS TO REAP PROFITS, AND TO BRIBE AND EXTORT ASCENTIVE THROUGH ITS WEBSITE PISSEDCONSUMER.COM.**

**1.    PissedConsumer Admits It Advertises Itself to the Public as an Unbiased Consumer Advocacy Group.**

PissedConsumer owns, operates and maintains the website located at www.pissedconsumer.com.  *See* PissedConsumer's Answer to Ascentive's Complaint ("PissedConsumer's Answer"), ¶ 25.  PissedConsumer has published numerous press releases characterizing itself as a "premier consumer advocacy group."  *Id.* at ¶ 28; *see also* Press Releases attached to Arena Decl. as Ex. 1.  PissedConsumer advertises itself to the public as a consumer review website that allows consumers to "make better choices" between competing products and gives consumers an "empowering," "honest" and "unbiased" view of companies

and products.  *See* PissedConsumer's Answer, ¶ 29.  PissedConsumer's press releases state:

"*PissedConsumer prides on its ability to deliver honest opinions* about products and services to

the consumers around the world."  *See* Press Releases, Arena Decl., Ex. 1 (emphasis added).

> **2.      PissedConsumer Encourages Negative Reviews That Induce the Victims of
>           the Reviews to Contact PissedConsumer.**

Any anonymous computer user can post a complaint at www.pissedconsumer.com or

through PissedConsumer's application for mobile phones.  PissedConsumer's Answer, at ¶ 26, ¶

35.  PissedConsumer claims that it does not prevent anyone from posting a complaint and does

not remove complaints, even if they are allegedly false or defamatory.  *Id.* at ¶¶ 35-36.

PissedConsumer makes no attempt to discern which complaints are legitimate and which are

fake or false.  *Id.*

The website invites negativity, stating: "Please describe in 10 words what the Company

or Individual *did to you*."  Printouts from PissedConsumer.com, attached to Arena Decl. as

Exhibit 2. (emphasis added).  PissedConsumer then suggests the consumer may want to pay

PissedConsumer an additional fee to give his or her complaint greater prominence by making his

or her complaint a "promoted" complaint, stating:

> 200,000 people visit [sic] Pissed Consumer every month. Promoted articles have
> better chance of being spotted, so more people will learn about your issue.
>
> Companies tend to look up their names in Google and Yahoo. Our analysis proves
> that promoted articles have greater chance of coming up to the top of search
> results.

*Id.*

PissedConsumer focuses on negative consumer complaints, as its name indicates.  At its

inception in 2007, PissedConsumer apparently intended to launch a companion website to

PissedConsumer.com – www.pleasedconsumer.com.  *See* Archived 2007 Printouts from

PleasedConsumer.com, attached to Arena Decl. as Exhibit 3.  PissedConsumer, however, is not

using this companion website to encourage positive complaints. *See* PleasedConsumer.com Printout, Arena Decl., Ex. 4.

PissedConsumer states that it will refuse to reveal who has posted the complaints or to take action unless required to by law. PissedConsumer's Terms and Conditions, attached to Arena Decl., Ex. 5; PissedConsumer's Answer, ¶ 28. Accordingly, companies cannot determine whether, instead of being posted by actual consumers of the products, the complaints are posted by PissedConsumer itself, or by competitors of the target company that are simply seeking to harm that target company's reputation to increase their own sales. *Id.* PissedConsumer admits that complaints may be posted by a company's competitors. PissedConsumer's Answer, ¶ 28.

PissedConsumer then invites the victims of the reviews to contact PissedConsumer to address the complaints by participating in PissedConsumer's "reputation management program." *Id.* at ¶ 58. *See also* PissedConsumer.com Printouts, Arena Decl., Ex. 2. As described below, contrary to PissedConsumer's claim that it never removes complaints, PissedConsumer does remove complaints if paid to do so. Because PissedConsumer seeks payment of exorbitant sums through its "reputation management program," PissedConsumer has an incentive to encourage the most negative postings it can on its website, display those postings as prominently on the internet as possible, and relate those postings as closely as possible to the companies' brand names. Taking these actions makes it more likely its victims will pay for removal of critical internet postings.

**3.      PissedConsumer's Extortion and Bribery of Ascentive.**

PissedConsumer creates "subdomains," or named domains that are part of its larger "PissedConsumer.com" website, associated with the various companies and individuals that are the victims of its complaints. PissedConsumer's Answer, at ¶ 39. PissedConsumer created two

4

"subdomains" associated with Ascentive, http://finallyfast.pissedconsumer.com and http://ascentive.pissedconsumer.com. *Id.* at ¶ 40.

Around June 2010, false and outdated "complaints" about Ascentive on these pages were brought to Ascentive's attention. Schran Decl., ¶ 11. Ascentive became very concerned about the impact these postings are having on Ascentive's sales and reputation. *Id.* The majority of Ascentive's online sales occur after consumers search for Ascentive's brand names on Google. *Id.* Consumers searching for "Ascentive" view PissedConsumer's website regarding Ascentive very prominently in the search results. *See* Google Search Printout, attached to Arena Decl. as Exhibit 6.

Ascentive noticed that PissedConsumer advertises a "reputation management program" on its website. *See* Declaration of Ian Singer, ¶ 4; PissedConsumer.com Printouts, Arena Decl., Ex. 2. The website states: "In an effort to assist companies and individuals with their online reputation, Pissed Consumer is offering premium reputation management services. Our services allow you to tell your side of the story and address the complaints received from consumers." PissedConsumer's Answer, ¶ 57. The website invited Ascentive to contact PissedConsumer for a "custom quote" for its "reputation management services." *Id.* at ¶ 58.

Ascentive decided to contact PissedConsumer to seek the removal of the complaints at Ascentive.PissedConsumer.com and FinallyFast.PissedConsumer.com, particularly the complaints that are false and defamatory. Schran Decl., ¶¶ 11-13. For example, some of the "complaints" posted on PissedConsumer's website falsely characterize Ascentive's software as harmful to consumers' computers, "a virus," and a "scam." *Id.* These false statements result in damage to Ascentive's software sales and its reputation. *Id.*

Ian Singer contacted PissedConsumer as instructed and was put in touch with Michael Podolsky, chief executive officer of Opinion Corp., on or about June 10, 2010.  Singer Decl., ¶ 5; PissedConsumer's Answer, ¶ 59.  Mr. Podolsky and Mr. Singer had subsequent conference calls on or about June 15, 2010, and June 17, 2010, in which Mr. Podolsky represented that PissedConsumer would remove negative complaints in exchange for payment and Ascentive's participation in its "reputation management program."  Singer Decl., ¶¶ 6-7.

PissedConsumer demanded that Ascentive sign a "non-disclosure agreement" before PissedConsumer would provide Ascentive with the details and price of its "reputation management program."  PissedConsumer's Answer, ¶ 62.  Because it was the only way to get information about the removal of false internet postings that were impairing its business, Ascentive CEO Adam Schran signed the non-disclosure agreement.  *Id.* at ¶ 63.  Mr. Podolsky then forwarded to Ascentive on or about June 21, 2010, documentation including PissedConsumer's "Service Offering,"[2] which revealed the details of its "reputation management program."  *Id.* at ¶ 64.

PissedConsumer represented that it would provide the following services to Ascentive in exchange for substantial sums:

- PissedConsumer would change the display of existing negative complaints on its website so that the text of the complaints would be hidden from website visitors.

- PissedConsumer would notify Ascentive of any future complaints consumers might attempt to post on its website to give Ascentive an opportunity to resolve those complaints ***before the complaints would be published on the website,*** or disable the commenting functionality on Ascentive's webpages, which would prevent consumers from posting new complaints.

---

[2] Ascentive anticipates that PissedConsumer may argue that the non-disclosure agreement is valid and enforceable and prevents Ascentive from publicly-filing PissedConsumer's Service Offering.  Therefore, Ascentive has filed a motion to file the Service Offering under seal in connection with its motion for a preliminary injunction.

- PissedConsumer would collect information about users posting complaints – including contact information – and provide that information to Ascentive. If the user attempting to post the complaint was not willing to provide his or her contact information to Ascentive, PissedConsumer would deem that user's comment "inappropriate" and prohibit the user from posting the complaint on the website.

- PissedConsumer would remove and recategorize negative complaints.

- PissedConsumer would work in cooperation with Ascentive to address any additional suggestions by Ascentive on how complaints could be handled and what additional services PissedConsumer could provide (for a fee).

Singer Decl., ¶ 9.

PissedConsumer explicitly acknowledged that existing comments about Ascentive on its website are negative and adversely affect Ascentive's brand image and consumers' first impression. Singer Decl., ¶ 8. PissedConsumer claimed that Ascentive's participation in PissedConsumer's "reputation management program" would turn negative reviews on PissedConsumer's website into positive ones. *Id.* at ¶ 9. PissedConsumer represented that in exchange for substantial sums, negative reviews would be removed, hidden or minimized so that its website would highlight positive content over negative content. *Id.*

PissedConsumer threatened Ascentive that absent significant payments and Ascentive's participation in its "reputation management program," the negative content posted at PissedConsumer.com would not be removed and these changes would not be made. *Id.* at ¶10. *See also* PissedConsumer's Answer, ¶ 70. The display of this negative content was threatened to continue into the future (and has continued) absent Ascentive's payment of substantial fees to PissedConsumer. *Id.*

Following its discovery of the PissedConsumer webpages and PissedConsumer's extortion and other conduct in connection with these webpages, Ascentive's counsel exchanged correspondence with PissedConsumer's counsel. When PissedConsumer's counsel ceased responding to Ascentive's correspondence, Ascentive initiated this lawsuit. Ascentive then

engaged in additional discussions with PissedConsumer's counsel regarding the removal of the webpages.  Ascentive filed this motion soon after it became clear these discussions were not going to result in the pages being removed.

**4.      Contrary to its Claim, PissedConsumer Removes Consumer Complaints For Monetary Gain.**

Ascentive has not yet conducted discovery in this matter, which is needed to expose the full extent of PissedConsumer's removal of consumer complaints in exchange for money from the victims of the complaints.  Some evidence that PissedConsumer removes complaints, however, is already apparent from a limited review of the PissedConsumer website.

**(a)      Evidence of Extortion of Davidson Inventegration.**

Ascentive's complaint highlighted one instance of PissedConsumer removing negative posting described at http://davison-inventegration.pissedconsumer.com/pissed-consumer-is-pulling-complaints-from-davison-employees-hmmm-wonder-why-20100729191616.html.  The posting said:

> It [is] pretty strange how all of a sudden most of the complaints against Davison Inventegration posted by 'Ex Employees' seemed to have been pulled from Pissed Consumer's website.  Hmmm.  From what I hear this is the same thing Davison did with Rip Off Report.  Paid them off so they pulled the postings that did the most damages and most likely had the most credibility…I am disappointed at Pissed Consumer.

*See* Arena Decl., Ex. 8; *see also* Ascentive's Complaint, at 14.  Davison appeared to be participating in PissedConsumer's "reputation management program." *Id.*

After Ascentive filed its complaint in this action, the posting was  replaced by the following comment by Davison Inventegration:

> Pissed Consumer asked that you contact us at CCA@davisoninvents.com to see if we could work out any problems you had.  Since you have chosen NOT to contact us we assume either you are a competitor, you are just upset that your product didn't go anywhere or you have reconsidered your opinion.

8

Of course, this posting doesn't even complain about Davison so much as it complains about the Pissed Consumer website. It is very likely that this person is not a client. If he was, he would want to talk to someone at Davison to have his problem resolved, not spend a lot of time griping about it.

Davison cannot speak for this website, but it is likely that postings were removed from the site because they had no basis for being on the site in the first place. There was either no actual complaint or no proof of their identity. Davison is working with Pissed Consumer to solve any valid complaints, and to put an end to ones that are possibly competitors or ex-employees who are just looking to get a little revenge for a perceived slight.

Printout from PissedConsumer.com, attached to Arena Decl., as Ex. 8. The previous posting regarding Davision Integration is now completely hidden from view. *Id.*

If victims of the postings (like Davison Inventegration) pay PissedConsumer in accordance with its exorbitant demands, PissedConsumer will remove, recategorize, hide and filter existing and new complaints submitted by third parties for publication on its website. *Id.* On the other hand, if the victim does not pay PissedConsumer the money it demands, like Ascentive, PissedConsumer will continue to encourage negative complaints as described above, which damage the companies' reputations as much as possible.

     **(b)**     **Consumers' Inability to Post Any Complaints About RipoffReport.com Following a Confidential Agreement Between PissedConsumer and RipoffReport.com.**

Xcentric Ventures, LLC, is the company that operates the website www.ripoffreport.com. The website contains consumer complaints, similar to the complaints and content found at PissedConsumer.com. Xcentric Ventures filed suit against PissedConsumer on October 7, 2008, alleging that PissedConsumer "copies large quantities of copyrighted material from Ripoff Report and republishes the stolen information on www.PissedConsumer.com." *See* Xcentric Ventures, LLC, v. Opinion Corp. Complaint, attached to Arena Decl. as Ex. 9, at 3. It further alleged that PissedConsumer's use of the "Ripoff Report" trademark in connection with the subdomain Rip-off-Report.PissedConsumer.com constituted trademark infringement and had

9

caused actual consumer confusion.  *Id.* at 4.  RipoffReport then moved for a preliminary

injunction.  Subsequent to this lawsuit, PissedConsumer has refused to allow any negative

comments to be posted about RipoffReport.com at http://rip-off-report.pissedconsumer.com.  For

example, a complaint about RipoffReport.com posted on November 2, 2010, was quickly

removed by PissedConsumer.  *See* November 2, 2010 PissedConsumer Complaint re:

RipoffReport.com and printout from Rip-off-Report.PissedConsumer.com, attached to Arena

Decl., Ex. 10.

5.    **Consumers Are Further Misled By PissedConsumer's Improper "Search Engine Optimization" Tactics**

When a consumer searches on Google's search engine for Ascentive's trademark -

"Ascentive" – PissedConsumer's website "Ascentive.PissedConsumer.com" often appears in the

first two websites listed in Google's search results for "Ascentive."  *See* Google Search Results,

Arena Decl., Ex. 6.  This is despite the fact that PissedConsumer's website offers little to no

content about Ascentive and its products.  PissedConsumer.com Printouts, Arena Decl., Ex. 2.

This high Google ranking results from PissedConsumer's practice of "SEO" or "search engine

optimization."  This refers to the process through which a company improves its website's

visibility or ranking in search engines' "natural" or unpaid search results.  PissedConsumer

admits that it utilizes SEO tactics.  PissedConsumer's Answer, ¶ 52.

Online commentators have remarked on evidence that PissedConsumer employs various

deceptive SEO practices to be ranked in the first two search results on Google, and equally

prominently by other search engines such as Bing and Yahoo!, including the following practices:

- Buying hundreds of domain names and using them to create links to PissedConsumer's website, so that PissedConsumer's website appears prominently in search engine search results despite the fact that these inbound links have nothing to do with public interest or relevancy.  *See* Articles describing PissedConsumer's use of "black hat" SEO practices and "linkfarm schemes," attached to Arena Decl. as Exhibit 12.

10

- Creating numerous subdomains that interlink between each other, also affecting search engines' evaluation of PissedConsumer's "relevancy." *Id.*

- Making excessive use of brand name "keywords" in website text, metadata and subdomains, in a manner that causes PissedConsumer's webpages to appear more relevant to searches for those brand names even though it is unrelated. *Id.*

- Reposting the same "consumer complaints" repeatedly on multiple websites so that the complaints appear current and as new content, even when the complaints are outdated and recycled. *Id.* Singer Decl., ¶ 11.

- Creating Twitter accounts that simply post links to complaints at the PissedConsumer website, linking to PissedConsumer.com but offering no other content. For example, the Twitter accounts located at www.twitter.com/pissedconsumer and www.twitter.com/consumer_press repeatedly repost links to alleged PissedConsumer customer complaints regarding Ascentive and its products, even where those alleged complaints are outdated and were posted ***more than a year ago***. This causes consumers and search engines to perceive posted "complaints" about Ascentive as more current and numerous than they actually are. It also increases PissedConsumer's prominence on search engines such as Google. *Id.* Singer Decl., ¶ 11.

PissedConsumer repeatedly reposts the same "complaints" about Ascentive and its products on PissedConsumer's website, through PissedConsumer's Twitter accounts, and through other websites, falsely indicating that the complaints are recent and current, to increase the negative impact of the complaints on Ascentive and to increase the Google ranking of PissedConsumer's website relative to Ascentive's websites. Singer Decl., ¶ 11.

**6.    PissedConsumer's Use of Ascentive's Trademarks in PissedConsumer's Website Text, Subdomains and Metadata.**

PissedConsumer admits that it uses the trademarks "Ascentive" and "FinallyFast" in its subdomains (including the website addresses displayed to consumers) and in the metadata associated with its website.[3] PissedConsumer's Answer, ¶¶ 40-42. Although PissedConsumer initially denied that it used Ascentive's trademarks "in commerce," it now admits that it used

---

[3] Metadata is data associated with a website that is written in HTML code and read by search engines that index the website. PissedConsumer's Answer, ¶ 42.

Ascentive's trademarks in commerce and in connection with the advertisements placed on its website. PissedConsumer's Answer, ¶ 123.

PissedConsumer's website contains descriptions of Ascentive and its products posted by PissedConsumer. For example, PissedConsumer's website states:

> Ascentive LLC is an American company. The company offers such products and services as internet optimizer, internet monitoring software, fix registry errors, clean windows registry, eliminate spyware, memory optimizer, system optimizer, spam protection, business ad government, employee monitoring software, and so much more. Ascentive offers free trials for almost all the products.

PissedConsumer's Answer, ¶ 44. Alongside this description of Ascentive, PissedConsumer admits that it displays numerous advertisements for third parties' products and services, including but not limited to advertisements for internet monitoring software, registry error cleaners, internet optimizers, spyware software and spam protection software. PissedConsumer admits that these advertisements offer the same "free download" and "free scan" offered by Ascentive. *Id.* at ¶ 45. PissedConsumer admits that many of these third-party advertisements promote the products of Ascentive's direct competitors. *Id.* at ¶ 46.

PissedConsumer's advertisements are displayed through Google's "AdWords" advertising program. *Id.* at ¶ 47. The Google AdWords advertising program compensates PissedConsumer based on the number of clicks on the advertisements on its website. *Id.* PissedConsumer admits that: "PissedConsumer profits from click-through fees generated by its display of third-party advertisements and its use of Ascentive's trademarks at Ascentive.PissedConsumer.com and FinallyFast.PissedConsumer.com." *Id.* at ¶ 124.

As Ascentive is a company that generates 99 percent of its revenues from online software sales, PissedConsumer's website, which appears prominently in search results for Ascentive's brand names, has had a drastic impact on Ascentive's reputation and ability to do business. Schran Decl., ¶ 5.

## ARGUMENT

To obtain a preliminary injunction, a movant must demonstrate: (1) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial; (2) irreparable harm absent injunctive relief; (3) that the balance of hardships tips decidedly in the plaintiff's favor, and (4) that the public's interest weighs in favor of granting an injunction. *Metropolitan Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010); *see also Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 38 (2d Cir. 2010) (concluding that a recent opinion from the Supreme Court did not "abrogate the more flexible standard for a preliminary injunction" adopted in the Second Circuit).   As discussed below, Ascentive satisfies all four requirements to obtain a preliminary injunction.

**A.    ASCENTIVE IS LIKELY TO SUCCEED ON THE MERITS AND SERIOUS QUESTIONS GO TO THE MERITS OF ASCENTIVE'S CLAIMS AND MAKE THEM FAIR GROUNDS FOR TRIAL.**

**1.    PissedConsumer is Liable Under the Civil RICO Statute For Conducting and Conspiring to Conduct an Enterprise that Engages in a Pattern of Racketeering Activity.**

In encouraging and publishing negative consumer complaints without regard to their accuracy, manipulating the appearance of such complaints so as to maximize their damaging effect, and then exacting large fees from the subjects of said complaints, PissedConsumer has engaged and is engaging in a pattern of extortion, bribery and other fraudulent behavior that is prohibited by the Racketeer Influenced and Corrupt Organizations Act ("RICO" or the "Act), 18 U.S.C. § 1961, et al.

RICO makes it unlawful to conduct or participate in, or to conspire to conduct or participate in, any enterprise that engages in a pattern of racketeering activity.  18 U.S.C. § 1962(c) and (d).  "Racketeering activity" under the Act includes any act of bribery punishable

13

under state law by imprisonment for more than a year, and extortion under the Hobbs Act, 18

U.S.C. § 1951. *See id. at* § 1961(1). A pattern of racketeering activity consists of two or more

predicate acts of racketeering activity. *Id. at* § 1961(5).

The Act's prohibition of racketeering activity applies to PissedConsumer. The statute

defines an "enterprise" as any individual, partnership, corporation, association, or other legal

entity, and any union or group of individuals associated in fact although not a legal entity. §

1961(4). In other words, a RICO enterprise can be virtually any de facto or de jure association.

*Boyle v. U.S.,* 129 S.Ct. 2237, 2243, 173 L.Ed.2d 1265 (2009) (RICO statute's definition of

"enterprise" is "obviously broad"). As a business venture and a partnership of persons operating

the website and its related services, PissedConsumer's and its agents' activities fall within the

scope of the Act. For the reasons described more fully below, PissedConsumer's dishonest

business practices constitute the predicate acts of commercial bribery and extortion punishable

under the Act.

> **(a)** **PissedConsumer is Liable Under the Civil RICO Statute For Committing and Conspiring to Commit Predicate Acts of Commercial Bribery Under 18 Pa. C.S. § 4108(b).**

PissedConsumer's solicitation and acceptance of payment to alter complaints that it

claims it maintains without bias is prohibited by the Pennsylvania Commercial Bribery Act, 18

Pa. C.S. § 4108, which serves as a predicate act under RICO. *See* 18 U.S.C. § 1961(1); *Westlake*

*Plastic Co. v. O'Donnell*, 182 F.R.D. 165, 170 (E.D.Pa. 1998) (holding that commercial bribery

in Pennsylvania constitutes a racketeering activity within the meaning of RICO). The

Commercial Bribery Act provides:

> A person who holds himself out to the public as being engaged in
> the business of making disinterested selection, appraisal or
> criticism of commodities or services commits a misdemeanor of
> the second degree if he solicits, accepts or agrees to accept any
> benefit to influence his selection, appraisal or criticism.

14

18 Pa. C.S. § 4108(b).

The defendant's actions in *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, serve as an example of the behavior prohibited by Pennsylvania's commercial bribery statute. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, No. 95cv1698, 1996 WL 47167 (E.D.Pa. Feb. 2, 1996). The defendant in *Brokerage Concepts* operated a network of health maintenance organizations. *Id.* at *1. The plaintiffs, who had been selected to provide certain products and services to the plaintiff's member organizations, brought suit against the defendant for conditioning the plaintiff's participation as providers on their purchase of other services from a company affiliated with the defendant. *Id.* The court held that by presenting evidence of statements by the defendant that quality was its only criterion for choosing providers, the plaintiff had provided sufficient proof of the violation of the statute to survive summary judgment. *Id.* at *6.

As in *Brokerage Concepts*, there is ample proof of PissedConsumer's illegal behavior in holding itself out to be objective but manipulating the posting that appear on its website in exchange for substantial monetary payments. PissedConsumer describes itself as a "premier consumer advocacy group" dedicated to giving consumers an "unbiased" view of companies and products. PissedConsumer's Answer, ¶ 28. PissedConsumer admits that it advertises itself to the public as a company that "allows consumers to 'make better choices' between competing products and gives consumers 'empowering' and 'unbiased' view of companies and products." *Id.* at ¶ 29. PissedConsumer states that it "**prides itself** on its ability to deliver **honest opinions about products and services** to the consumers around the world." *See* Podolsky Press Release attached to Arena Decl. as Exhibit 1. (emphasis added). It further claims that it allows anyone to post complaints on its website, does not influence those posting (even if they are false), and **does**

***not remove posted complaints***.  *See* PissedConsumer Terms & Conditions, Ex. 5;

PissedConsumer's Answer, ¶ 34-36.

PissedConsumer fails to disclose that it demands fees from companies such as Ascentive

to change the appearance of or remove negative postings appearing on its website.  Singer Decl.,

¶¶ 8-10.  Not only does PissedConsumer not disclose these bribes, it ***actively hides them*** by

"demanding" that participants in its "reputation management program" keep the payments

confidential and sign a non-disclosure agreement.  *See* PissedConsumer's Answer, ¶ 62

(admitting that it demanded that Ascentive sign a non-dsclosure agreement before

PissedConsumer would provide Ascentive with the details and prices of its program).

PissedConsumer has violated the Commercial Bribery Act by holding itself out as a

company that "prides itself on delivering honest opinions," publishes "unbiased" reviews, and

"empowers" consumers, but then soliciting and accepting bribes in exchange for influencing

those reviews.  Nowhere in its press releases does PissedConsumer reveal that companies can

pay PissedConsumer to have negative reviews removed, hidden, never published and/or

recategorized through its "reputation management program."  PissedConsumer's conduct in: (1)

advertising itself as being engaged in the business of making disinterested selection, appraisal

and criticism of commodities and services; (2) hiding the fact that it solicits and accepts bribes

through demanding non-disclosure agreements; (3) encouraging negative website content and

influencing that content to solicit and accept bribes; and (4) using improper SEO tactics, other

websites and accounts, and registered trademarks for the same purposes, gives rise to liability

under the Commercial Bribery Act and civil RICO statute.

**(b)     PissedConsumer is Liable Under the Civil RICO Statute For Committing and Conspiring to Commit Predicate Acts of Extortion under the Hobbs Act, 18 U.S.C. § 1951.**

PissedConsumer's actions also constitute extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, which states:

> Whoever in anyway or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

"Extortion" under the statute means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* It is well settled that "fear" within the meaning of the act includes fear of economic loss, including lost business opportunity. *DeFalco v. Bernas*, 244 F.3d 286, 313 (2d Cir. 2001); *U.S. v. Brecht*, 540 F.2d 45, 52 (2d Cir. 1976), *cert denied*, 429 U.S. 1123 (1977). Courts within the Second Circuit hold that a wrongful use of fear of economic loss amounts to extortion in "cases in which the evidence was plain that nonpayment would result in preclusion from or diminished opportunity for some existing or potential economic benefit." *DeFalco*, 244 F.3d at 313; *see also Hy Cite Corp. v. badbusinessbureau.com, L.L.C.*, 418 F.Supp.2d 1142, 1149 (D.Ariz. 2005) ("Obtaining property by threatening economic loss can constitute extortion if the person making the threat does not have a right to the property.")

Indeed, a court has held refusing to regulate defamatory internet postings without payment constitutes extortion under the Hobbs Act. *Hy Cite*, 418 F.Supp.2d at 1150 (denying motion to dismiss RICO claim based on predicate act of extortion in similar context). The defendant in *Hy Cite* owned and operated a website that allowed users to post complaints about businesses. *Id.* at 1145. The defendant exercised editorial control over the website and

maintained a "mediation program" by which it sought to help resolve disputes about posted

complaints. *Id.* at 1146. Under the program, the defendant would contact consumers to resolve

complaints for $30,000, update posts for an additional $20,000 and notify the plaintiff of new

complaints and allow it an opportunity to resolve them before the complaints were posted for

$1,500 monthly fee. *Id.* The court found that: "[r]emedying the publication of false and

defamatory complaints, which Defendants allegedly created and solicited, does not give

Defendants the right to collect fees...Plaintiff has properly alleged threatened extortion." *Id.* at

1150.

PissedConsumer's similar conduct constitutes extortion and attempted extortion under the

Hobbs Act in this case. PissedConsumer's website is causing Ascentive to experience ongoing

economic loss and damage to its reputation and PissedConsumer is threatening and has

threatened Ascentive with the fear of continuing economic loss absent payment from Ascentive

to PissedConsumer.

 2.    **PissedConsumer is Liable For Trademark Infringement, Unfair Competition
        and False Designation of Origin.**

PissedConsumer's unauthorized and unlawful use of Ascentive's trademarks constitutes

trademark infringement, unfair competition, and false designation of origin under the Lanham

Act—specifically, 15 U.S.C. § 1125(a) and § 1114.[4] In a trademark infringement case, where a

mark merits protection and there is a showing that a significant number of consumers are likely

to be confused about the source of the goods identified by the allegedly infringing mark, that is

---

[4] Ascentive asserts claims of trademark infringement, unfair competition and false designation of
origin under 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a), as well as common law trademark
infringement, unfair competition and false designation of origin claims. The test for Ascentive's
common law claims is the same as the test for infringement and unfair competition under the
Lanham Act. *See, e.g., Malletier v. Dooney & Bourke, Inc.,* 561 F.Supp.2d 368, 381 (S.D.N.Y.
2008) ("The elements necessary to prevail on common law causes of action for trademark
infringement mirror the Lanham Act claims.")

generally sufficient to demonstrate a likelihood of success on the merits. *Virgin Enterprises Ltd.*

*v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). "Consumer confusion is important because proof of

a likelihood of confusion establishes a likelihood of success on the merits." *Soil Solutions, Inc.*

*v. Soil Solution Industries Inc.*, No. 09-CV-2470, 2009 WL 3753912, 3 (E.D.N.Y. Nov. 6, 2009)

(*citing Hasbro Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988)).

  Likelihood of confusion can be established by a showing of "initial interest confusion."

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir. 1987); *see also*

*Malletier v. Burlington Coat Warehouse Corp.*, 426 F.3d 532, 539 n. 4 (2d Cir. 2005) (It is well-

established that "point-of-sale confusion is not the only confusion which the Lanham Act seeks

to prevent; other forms of confusion, including ... initial interest confusion ... may also be

actionable.") The Lanham Act forbids a competitor from "luring potential customers away from

a producer by initially passing off its goods as those of the producer's even if confusion as to the

source of the goods is dispelled by the time any sales are consummated." *Checkpoint Sys., Inc.,*

*v. Check Point Software Techs., Inc.*, 269 F.3d 270, 294 (3d Cir. 2001). Courts have found that

damages to a trademark holder result even where a consumer eventually becomes aware of the

source's actual identity or where no sale occurs. *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437

F.Supp.2d 273, 290 (D.N.J. 2006).

  In the internet context, evidence of initial interest confusion exists where there is

evidence of "the unauthorized use of trademarks to divert internet traffic, thereby capitalizing on

a trademark holder's goodwill." *GoTo.com, Inc.*, 437 F.Supp.2d at 290 (*quoting Australian*

*Gold, Inc., v. Hatfield*, 436 F.3d 1228, 1239 (10th Cir. 2006)). A diversion of internet traffic

from the trademark holder's website to those of its competitors is a significant factor contributing

to a likelihood of confusion. *Id.* Courts also have held that the use of another's trademark in

one's metadata creates "initial interest" confusion, which is actionable trademark infringement under the Lanham Act. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1062-64 (9th Cir. 1999).

In this case, PissedConsumer intentionally uses Ascentive's distinctive trademarks in its website metadata to cause the website to appear prominently in search results for trademarks such as "Ascentive." *See* PissedConsumer's Answer, ¶¶ 40-42 Google Results, Arena Decl., Ex. 6. It uses Ascentive's trademarks in its subdomains, e.g. http://Ascentive.PissedConsumer.com. *Id.* It uses "Ascentive" prominently in the text of its website. *See* PissedConsumer Printouts, Arena Decl., Ex. 11. It includes a description of Ascentive that suggests an affiliation with Ascentive and displays this description alongside the advertisements of Ascentive's competitors. *Id.* For example, this screenshot is excerpted from PissedConsumer's website:

**Ascentive**

Rating: ★★★★★
93 complaints



Ascentive LLC is an American company. The company offers such products and services as internet optimizer, internet monitoring software, fix registry errors, clean windows registry, eliminate spyware, memory optimizer, system optimizer, spam protection, business ad government, employee monitoring software, and so much more. Ascentive offers free trials for almost all the products. In addition, the company provides software updates and replacement. Ascentive offers customer support as well. The company has been awarded many times as the best company in the industry.

All the software developed by Ascentive LLC is protected by copyright laws and international copyright treaties. Please try to contact Ascentive Customer Service directly prior to posting any complaints on this site.

# Make your PC run like new!

The most comprehensive, patented, award-winning, PC repair tool.

**DOWNLOAD HERE!**

*See* Screenshots from PissedConsumer.com, attached to Arena Decl. as Ex. 11 (image excerpted from screenshot). If a consumer clicks the "Download Here!" button, however, he or she is directed to a competitor's product.

When consumers click on the ad, they are redirected to the competitive products sold at www.reimage.com. A consumer may initially believe that the ad is for a product sold by Ascentive and click the ad to further investigate the product, particularly if the consumer is not reading the "fine print" on PissedConsumer's website. Once the consumer clicks on the ad,

PissedConsumer has already profited from consumer confusion as to whether the advertisement is affiliated with Ascentive.

PissedConsumer's practice of using Ascentive's trademarks prominently on its webpages and in its metadata, in connection with ads for competitive products and services, allows PissedConsumer to profit from consumer confusion as to the source of the products advertised. Ex. 11.  PissedConsumer displays numerous advertisements and links to Ascentive's competitors' products at Ascentive.PissedConsumer.com.  Ex. 11.  PissedConsumer's conduct constitutes trademark infringement, false designation of origin, and unfair competition under the law.

### 3.   PissedConsumer is Liable For Tortious Interference With Existing and Prospective Economic Advantage.

The elements of a cause of action for tortious interference with existing or prospective economic advantage under New York law are that: (1) the plaintiff had a business relationship or a prospective business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort; and (4) the defendant's interference caused injury to the relationship with the third party. *Amaranth, LLC, v. J.P. Morgan Chase & Co.,* 71 A.D.3d 40, 888 N.Y.S.2d 489 (N.Y. App. Div. 2009).  "It is well settled that where a statement impugns the basic integrity or creditworthiness of a business, an action lies and injury is conclusively presumed." *Id.* at 495.

In this case, PissedConsumer was aware of Ascentive's contractual and prospective contractual relationships with its customers and prospective customers but engaged in illegal and improper actions that harmed those relationships.  PissedConsumer intentionally used Ascentive's trademarks in commerce and in connection with the advertisements displayed on its

website.  PissedConsumer's Answer, ¶ 23.  PissedConsumer encouraged negative commentary about Ascentive and its products that obviously impugned Ascentive's reputation and business. For example, PissedConsumer published false statements that Ascentive's software contains a virus that damages consumers' computers.  PissedConsumer.com Printout, Ex. 7. PissedConsumer's conduct in encouraging such statements and using them to extort money from companies including Ascentive constitutes tortious interference with Ascentive's existing customers and prospective customers.

**B.**     **ASCENTIVE IS SUFFERING IRREPARABLE HARM.**

Irreparable harm exists in this case because the false and defamatory comments on PissedConsumer's website, which are published continuously as part of PissedConsumer's extortion and commercial bribery scheme, are causing ongoing harm to Ascentive's reputation, business and good will.  PissedConsumer's scheme includes negative postings on its website that falsely characterize Ascentive's software as harmful to consumers' computers and a "scam." These statements impugn the basic integrity of Ascentive's business and are presumed to cause injury to its good name.  *See Pierce & Stevens Chemical Corp. v. U. S. Consumer Product Safety Commission*, 439 F.Supp. 247, 250 (W.D.N.Y. 1977) (granting preliminary injunction and finding irreparable harm where defamatory statements were damaging company's "good name"). The injury caused to the good will associated with Ascentive's name is not compensable by monetary damages.  *See National Elevator Cab & Door Corp. v. H & B, Inc.*, 2008 WL 207843, at *5 (E.D.N.Y. 2008) ("[H]arm to a company's good will is not compensable."); *Ecolab, Inc. v. Paolo*, 753 F.Supp. 1100, 1110 (E.D.N.Y.1991) ("Loss of good will constitutes irreparable harm which cannot be compensated by money damages.").

In addition, in the context of a motion for a preliminary injunction in a trademark infringement case, it is well established that if a plaintiff establishes a likelihood of success on

the merits of its trademark claims, there is *a presumption* of irreparable harm. *See, e.g. Zino Davidoff SA v. CVS Corp.,* 571 F.3d 238, 246 (2d Cir.2009) (A plaintiff who is able to show a likelihood of confusion is presumed to have established irreparable injury necessary for the granting of a preliminary injunction); *Nawab*, 335 F.3d at 146 ("In an action for trademark infringement, where a mark merits protection, a showing that a significant number of consumers are likely to be confused about the source of the goods identified by the allegedly infringing mark is generally sufficient to demonstrate both irreparable harm and a likelihood of success on the merits.")

## C.   THE PUBLIC INTEREST AND BALANCE OF HARDSHIPS STRONGLY FAVOR AN INJUNCTION.

If the Court concludes that Ascentive has either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, on its claims that PissedConsumer's acts were illegal, it follows that the public interest strongly favors an injunction. *See, e.g. U.S. v. Private Sanitation Industry Association of Nassau/Suffolk, Inc.,* 995 F.2d 375, 377 (2d Cir. 1993) (affirming appropriateness of injunctive relief to prohibit future civil RICO violations by defendants and noting that the RICO statute "grants courts broad discretion and latitude in enjoining violators from activities that might lead to future violations.")

Additionally, as Ascentive has shown that there is a likelihood that PissedConsumer's deceptive advertising scheme will confuse consumers and deceive them into thinking the reviews on PissedConsumer's website are unbiased, when they are not, it follows that the public interest favors an injunction. "Public interest can be defined in a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Opticians Assoc. of America v. Independent Opticians of America*, 920 F.2d 187, 197-98 (3d Cir. 1990). "Having already established that there is a likelihood of consumer confusion created by

24

the concurrent use…it follows that if such use continues, the public interest would be damaged."

*Id. New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F.Supp.2d 305, 344

(S.D.N.Y. 2010) (public interest was served by issuance of preliminary injunction because "the

public has an interest in not being deceived").

Finally, the balance of the harms in this case strongly favors Ascentive.  The lost

advertising revenue PissedConsumer is generating from the two pages

FinallyFast.PissedConsumer.com and Ascentive.PissedConsumer.com – two of its hundreds (or

thousands) of webpages – cannot compare to the impact on Ascentive's reputation and business

of the negative and defamatory comments posted on these webpages.  The harm to Ascentive is

exacerbated because of PissedConsumer's prominent use of Ascentive's brand names.

Ascentive's customers searching for "Ascentive" view PissedConsumer's website in the first few

search results and after reaching PissedConsumer's website, are redirected to the websites of

PissedConsumer's competitors.

## CONCLUSION

For the foregoing reasons, plaintiff Ascentive, LLC, respectfully requests that this Court

grant its motion for preliminary injunction and order that defendant Opinion Corp. d/b/a

PissedConsumer.com, disable the webpages located at Ascentive.PissedConsumer.com and

FinallyFast.PissedConsumer.com.

By:  /s/
Darren H. Goldstein, Esq. (DHG 9804)
Abbe F. Fletman, Esq. (admitted pro hac vice)
Alexis Arena, Esq. (admitted pro hac vice)
FLASTER/GREENBERG P.C.
1600 John F. Kennedy Blvd., Suite 200
Philadelphia, PA  19103
*Attorneys for plaintiff Ascentive, LLC*

Dated:  November 23, 2010

25