**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ASCENTIVE LLC,<br><br><br>         *Plaintiff,*<br><br>  -*vs.*-<br><br>OPINION CORP. d/b/a PISSEDCONSUMER.COM, MICHAEL PODOLSKY, JOANNA SIMPSON and ALEX SYROV,<br><br>      *Defendants.* | Civil Action No.<br>1:10-CV-04433-ILG-SMG |
| OPINION CORP.,<br><br>        *Counterclaim Plaintiff,*<br><br>  -*vs.*-<br><br>ASCENTIVE LLC,<br><br>        *Counterclaim Defendant.* | |

---

**MEMORANDUM OF LAW IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

---

Ronald D. Coleman (RC 3875)
Joel G. MacMull (JM 8239)
GOETZ FITZPATRICK LLP
One Penn Plaza—Suite 4401
New York, NY 10119
(212) 695-8100
rcoleman@goetzfitz.com
jmacmull@goetzfitz.com

*Attorneys for Defendants*
*Opinion Corp., Michael Podolsky &*
*Alex Syrov*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES……………………………………………………………ii

PRELIMINARY STATEMENT…………………………………………………...1

STATEMENT OF FACTS…………………………………………………………...3

       LEGAL ARGUMENT……………...……………………………………...11

I.     PLAINTIFF CANNOT MEET THE HIGH STANDARDS NECESSARY TO JUSTIFY THE GRANTING OF A PRELIMINARY INJUNCTION TO RESTRAIN FREE SPEECH……………………………………………………...11

II.    PLAINTIFF CANNOT DEMONSTRATE IRREPARABLE HARM……………..13

III.   THE BALANCE OF HARDSHIPS TIPS IN DEFENDANTS' FAVOR………….16

IV.   PLAINTIFF CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS ON ITS TRADEMARK INFRINGEMENT CLAIMS………..17

      A.    Plaintiffs cannot demonstrate a likelihood of confusion ………………...18

          (a)    Defendants' use of the marks was obviously critical of Ascentive and not likely to cause a mistake as to origin, sponsorship or affiliation ……………………..18

          (b)    The "initial confusion" doctrine is at best inapplicable here………..20

      B.    The First Amendment Protects Defendants' use of Plaintiff's Marks for Expressive Purposes……………………………………………………...24

V.    PLAINTIFF CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS ON ITS STATE LAW CLAIMS FOR TORTIOUS INTERFERENCE…25

      A.    Plaintiff's Claim for Interference with Contract and Prospective Relations is Insufficient……..………………...27

VI.   PLAINTIFF CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS RICO CLAIMS…………………………………….28

CONCLUSION…………………………………………………………………..32

# TABLE OF AUTHORITIES

**Cases**

*Advanced Global Tech. LLC v. Sirius Satellite Radio, Inc.,*
15 Misc.3d 776, 836 N.Y.S.2d 807 (N.Y.Sup.Ct. 2007) ............................................. 28

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ............................................. 29

*Barrett v. Rosenthal*, 40 Cal.4th 33, 51 Cal.Rptr.3d 55, 146 P.3d 510 (2006) ............................. 26

*Bihari v. Gross,* 199 F.Supp.2d 309 (S.D.N.Y. 2000*)* .................................................. 14, 23

*Brookfield Communications., Inc. v. West Coast Entmt. Corp.,* 174 F.3d 1036 (9th Cir. 1999).. 20

*Checkpoint Sys. v. Check Point Software Tech.*, 269 F.3d 270 (3d Cir. 2001) ............................ 22

*Citizens United v. Fed. Election Comm'n,* 130 S. Ct. 876 (2010) ................................. 16

*Continental Realty Corp. v. J.C. Penney Co.,* 729 F.Supp. 1452 (S.D.N.Y.1990) ....................... 31

*Elrod v. Burns*, 477 U.S. 347 (1976) ................................................................ 16

*Envirosource, Inc. v. Horsehead Res. Dev. Co.*, 1996 WL 363091 (S.D.N.Y. July 1, 1996) ...... 27

*Erie Boulevard Triangle Corp. v. City of Schenectady*, 152 F. Supp.2d 241 (N.D.N.Y. 2001).. 16

*Girls Scouts v. Personality Posters Mfg. Co.*, 304 F. Supp. 1228 (S.D.N.Y. 1969) ..................... 19

*Gucci Am., Inc. v. Hall & Assocs.*, 135 F.Supp.2d 409 (S.D.N.Y.2001) .................................... 25

*H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 238, 109 S.Ct. 2893 (1989) ............. 30, 31

*Hasbro, Inc. v. Clue Computing*, 232 F.3d 1 (1st Cir. 2000) ........................................ 20

*Hearts on Fire Co. v. Blue Nile*, 603 F. Supp. 2d 274 (D. Mass. 2009) ....................................... 22

*Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21 (2d Cir.1990) ........................................ 29

*Henneberry v. Sumitomo Corp. of Am.*, 415 F.Supp.2d 423 (S.D.N.Y. 2006) ........................ 27

*Howard v. Am. Online Inc.*, 208 F.3d 741 (9th Cir. 2000) ........................................... 30

*Konigsberg v. Time, Inc.*, 288 F. Supp. 989 (S.D.N.Y.1968) ......................................... 13

*L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26  (1st Cir. 1987) .................................. 24

*Lamparello v. Falwell*, 420 F.3d 309 (4th Cir. 2005) .............................................. 20

*Latino Officers Ass'n, New York, Inc. v. City of New York*, 196 F.3d 458 (2d Cir.1999) ............ 15

*Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F. Supp. 2d 277 (S.D.N.Y. 1998) .............. 14

*Matletier v. Dooney & Bourke, Inc.,* 340 F. Supp.2d 415 (S.D.N.Y. 2004) ................................ 12

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ........................................................ 12

*McLaughlin v. New York*, 784 F.Supp. 961 (N.D.N.Y.1992) ........................................ 15

*Minnesota Mining & Mfg. Co. v. Graham-Field, Inc.,*
1997 WL 166497 (S.D.N.Y. Apr. 9, 1997) ........................................................... 27

*Moss v. Morgan Stanley Inc.*, 719 F.2d 5 (2d Cir. 1983) ........................................... 30

*Murawski v. Pataki,* 514 F. Supp. 2d 577 (S.D.N.Y. 2007) ......................................... 26

*MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F. 3d 190 (2d Cir. 2004) .......................... 12

*Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368 (2d Cir. 2000) ........................... 27

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) .............................................. 12

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ........................................ 12

*Nissan Motor v. Nissan Computer*, 378 F.3d 1002 (9th Cir, 2004) .................................... 22

*Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971)...................................... 12
*Pier Connection, Inc. v. Lakhani*, 907 F. Supp. 72 (S.D.N.Y. 1995) ............................... 31
*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973) ........... 15
*Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1999) ...................................................... 13
*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989)........................................................... 24
*Sedima S.P.R.L. v. Imrex Corp.*, 473 U.S. 479 (1985)...................................................... 30
*Stop the Olympic Prison v. United States Olympic Comm.*,489 F. Supp. 1112 (S.D.N.Y.1980) . 13
*Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964 (2d Cir. 1995)........................... 14
*Weiss Assoc., Inc. v. HRL Assoc., Inc.*, 902 F.2d 1546 (Fed. Cir. 1990) .................................... 21
*Yankee Pub. Inc. v. News America Pub. Inc.*, 809 F. Supp. 267 (S.D.N.Y. 1992)........... 18, 24, 25
*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir.1997)............................................... 26

**Statutes**

15 U.S.C. §§ 1114(1) & 1125(a)........................................................................ 18
47 U.S.C. § 230................................................................................................ 25, 26
18 U.S.C.  §§ 1961 & 1962................................................................................ 29, 30
18 Pa. Cons. Stat. Ann. § 4108 ......................................................................... 32

## PRELIMINARY STATEMENT

Plaintiff Ascentive, LLC ("Ascentive") sells "malware." i.e., a computer virus – or at least, that is what comments on PissedConsumer.com call its ActiveSpeed program. Defendants are the corporate owner and two of its principals of PissedConsumer.com, an admittedly indelicately named "gripe site" – actually a consumer forum that permits third parties to log on and post criticism of businesses.  For this reason the website is called, however indelicately, "PissedConsumer.com."

Ascentive bills ActiveSpeed as software to make computers operate faster.  But critics – and not merely the ones on PissedConsumer.com – say ActiveSpeed is of no benefit.  Not only is ActiveSpeed of limited effectiveness according to many writers, but, they say, it actually installs unwanted – and almost unremovable – computer code on users' computers.  For this reason ActiveSpeed is described in many publications as "spyware" or "malware."  Some have expressed that opinion on PissedConsumer.com.

Businesses and people do not like to be criticized, of course.  If they could, many would get judges to silence their critics, especially when the criticism is stinging; even more so when it is justified.  In the United States of America, however, judges almost never fulfill this function.

Ascentive believes it is different, however.  Ascentive **really** wants criticism of its products as "badware" to stop – or at least now it wants it to stop.  True, Ascentive has been aware of the criticisms on PissedConsumer.com of its alleged spyware for nearly six months; true, Ascentive sat idly for nearly two months after filing this action.  Now, though, Ascentive wants a judge to make the hurtful words about "spyware" and "malware" on PissedConsumer.com just go away, and has made a motion for a preliminary injunction in this Court seeking such relief from criticism.

1

While Ascentive cannot ignore all that "malware" talk on the Internet, its motion does ask the Court to ignore not only fundamental free speech jurisprudence but the most basic tenets of the law concerning preliminary restraints.  The gravamen of Ascentive's motion is that by operating their Internet consumer forum in a manner Ascentive deems objectionable, defendants have ceded all their constitutional, procedural and substantive legal rights.  The complaint and motion seek to justify court-ordered censorship of comments about ActiveSpeed on PissedConsumer.com by turning a garden-variety defamation suit into a long list of creative, colorful legal theories.  Thus this motion for a preliminary injunction speaks of trademarks infringed, conspiracies hatched and shrouded attempts at "bribery."  All these are alleged to have been done by defendants who are so bad that the constitutional doomsday weapon of prior restraint seems a perfectly reasonable measure to staunch the "irreparable" harm done to the reputation of a product known on the Internet, justifiably or not, as a computer virus that you pay for.

Ascentive's dramatic and distractive submissions, however, are no substitute for the Bill of Rights, nor for core axioms of equity governing the extraordinary grant of preliminary relief – especially when that relief is restraint of speech.  Indeed, as demonstrated below, plaintiff's submissions do not even demonstrate conventional likelihood of success on the merits.  This is hardly surprising for a number of reasons.  One is, again, the fact tht Ascentive's purported grounds for relief are merely elaborately disguised defamation claims.  Secondly, the claim of irreparable harm is belied by plaintiff's leisurely approach to seeking emergency relief.  Third is the fact that most of Ascentive's complaint itself constitutes a breach of a confidentiality agreement it voluntarily entered into with PissedConsumer.com.  And above all, the ambiguous

harm to the reputation of ActiveSpeed is more than a little dubious, considering that the product is widely regarded as a disguised computer virus.

Ultimately, Ascentive is not really different from everyone else:  If it has been damaged by some unlawful conduct, Ascentive is entitled to the opportunity to prove its entitlement to redress for that harm.  But no legal theory or combination of them, no mater how esoteric and complex, entitles Ascentive to silence commentary on an issue of genuine public concern – i.e., whether or not ActiveSpeed ruins computers – while it attempts to do so.  As more fully explained below, plaintiff is highly unlikely to succeed on the merits of any of its respective claims, has failed to show that it faces any irreparable harm absent injunctive relief, and has failed to show that the balance of the hardships tips decisively in its favor.  Indeed, to the contrary, because plaintiff seeks to enjoin protected speech in a public forum on matters of public concern, the balance of hardships – as well as the public interest – tip decidedly in defendants' favor.  The Court should dismiss this application forthwith.


## STATEMENT OF FACTS

Plaintiff's statement of facts is littered with factual mischaracterizations, and even sets forth unwarranted conclusions of law. Both must be addressed.

The website at issue in the case, located at <u>www.pissedconsumer.com</u>, is owned and operated by defendant Opinion Corp.  It is what is known as a "gripe site" to detractors, or a "consumer reviews" or "consumer forum" site to others.  Such sites provide a forum for parties to post, anonymously if they wish, comments about products and services.  The   purpose   of providing such a forum, i.e., of bearing the expense of designing and maintaining such an Internet business, is frequently to generate income, which may be achieved in a number of ways.

3

Most are dependent, however, on Internet traffic volume, and on some degree of credibility and balance.

On the other hand, PissedConsumer.com is called "PissedConsumer.com."  The name hardly suggests either balance or subtlety.  It is true that the site offers users the opportunity to contribute whatever sort of consumer reviews they wish and to tag them with a variety of "tones."  Thus, for example, when users elect to submit a review, they start at PissedConsumer.com's initial comment page at http://www.pissedconsumer.com/post-complaint.html and select one of three "radio button" options, as shown below:

**Review Type:**
- ● I am Pissed
- ○ Neutral
- ○ I am Pleased

Notwithstanding these options, it may still be that, as intuition suggests, more people are motivated to submit complaints and negative reviews of their experiences on any website, much less a site called PissedConsumer.com, than they are to post praise.  Or it may not be.  Plaintiff's papers make no serious attempt empirically to gauge how those Internet users who choose to peruse a website for "pissed consumers" weigh these typically anonymous reviews.  Nor does plaintiff provide the Court with objective guidance based on admissible, qualified evidence of how gripe-site reviews, as opposed to articles in *Consumer Reports* or technology publications, influence buying decisions, and whether there is any distinction between "negative" reviews that merely characterize their subject in subjective terms and those that make specific factual claims which are amenable to investigation and confirmation – and rebuttal.

4

Above all, however, on the topic of "negative reviews," Ascentive is guilty of much the same offense of which it accuses PissedConsumer.com: cherry-picking for its own purposes. This is not to say that Ascentive is ignoring positive comments about its ActiveSpeed product on PissedConsumer.com. Rather, Ascentive fails to lay out before the court the true nature of the reputation this lawsuit is supposedly an attempt to protect.

The Internet abounds with comments, anonymous or otherwise, about people, places and things, but results gleaned by searching for information about ActiveSpeed makes it difficult indeed to understand what harm PissedConsumer.com's reviews could do that the rest of the Web is not already inflicting on the product. Defendants set forth some enlightening samples of these comments below. The intention of doing so is not to suggest that there is a grain of truth to any of these comments. Rather, it is to establish the baseline from which any consideration of harm – irreparable or otherwise – to the reputation of ActiveSpeed by the alleged actions or omissions of defendants here must be measured.

One website of note in this category is called ResellerReviews, found at www.resellerreviews.com. ResellerReviews ratings are syndicated on Google Product Search, Microsoft's Bing.com, TheFind.com and ShopWiki.com.[1] In June of 2009, the New York Attorney General announced a "partnership" with the New York Better Business Bureau and ResellerRatings.com "to quickly detect and prosecute illegal online business practices."[2] As of

---

[1]       TechCrunch, June 25, 2010, "Bing Taps ResellerRatings For Merchant Reviews," found at http://techcrunch.com/2010/06/25/bing-taps-resellerratings-for-merchant-reviews/ (last visited December 3, 2010).(Attached as Exhibit A to the Affirmation of Joel G. MacMull, Esq. in Support of Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction (hereafter "MacMull Aff., Ex. ____.").)

[2]       According to the Attorney General's website:

the date of this filing, ResellerReviews featured 16 reviews of ActiveSpeed,[3] as indicated on the

excerpt below, and reported an "overall customer satisfaction rating" of 2.34 out of 10.



Each review on ResellerRatings.com contains both text commentary and a score of 1 to 5

"checks."  Three of the 13 reviews found on the site gave scores of "five checks," all of which

are without a doubt "rave reviews," unreserved in their praise ("This software is awesome. Not

only did it save my computer - I was about to throw it out the window - but it continues to keep

---

> Attorney General Cuomo . . . announced that his office has created an innovative arrangement with the NY BBB and ResellerRatings.com to quickly and effectively detect, investigate, and prosecute instances of illegal business practices by Internet-based companies. In particular, the NY BBB and ResellerRatings.com will report companies to the Attorney General's Office once there is evidence that suggests a company is engaging in fraud, based on either the volume of complaints received or the tenor of consumer reviews posted online. The Attorney General's office will share in return the results of its investigations and, in the case of ResellerRatings.com, will alert the website whenever the office is able to determine that fake "consumer testimonials" have been posted.

Office of the Attorney General Media Center, "Attorney General Cuomo Secures Agreements . . . ," June 25, 2009, found at http://www.ag.ny.gov/media_center/2009/june/june25b_09.html (last visited December 3, 2010).(MacMull Aff., Ex. B.)

[3]     Reseller     Reviews,     "Ascentive     Cusomer     Reviews,"     found     at http://www.resellerratings.com/ store/Ascentive#reviews (last visited December 3, 2010). (MacMull Aff., Ex. C.)

my computer running fast").  The ten others, however, rated ActiveSpeed with only one check

out of five.  Sample comments are as follows:

**4/15/10 12:43 PM**
After trying to use Ascentive's "ActiveSpeed", which is claimed by them to
"learn" to make internet use more efficient, several times, with no improvement I
could find; and after constant "upselling" of additional programs at inflated prices,
I contacted Ascentive requesting a refund. Since I contacted them 55 days after I
purchased ActiveSpeec, it was beyond the 30 day refund time and they refused
reimbursement, something I understand, but which does not make me feel better
about the failure of the program to accomplish what I had expected. From my
experience with Ascentive, my belief is that their advertising is misleading, the
product I used was ineffective, and that their primary mission is to lead purchasers
to buy additional products, not to provide either good service or effective
products. I will not purchase Ascentive software again.

**7/7/08 4:15 PM**
this product does nothing to speed your pc: in fact, since they ripped me for over
$85, i get ten times the junk mail, and my pc is SLOWER!!!
DON'T BE FOOLED! IT'S A SCAM!!!

**3/15/06 12:06 PM**
I ordered ActiveSpeed and found out it was basically useless. The website ensures
a 30-day satisfaction guarantee period which they did not honour. Cancellation
procedure vey cumbersome and time consuming. I would never order from this
company again.

**8/23/03 1:28 PM**
BEWARE OF THIS COMPANY!!! DO NOT SIGN UP /DO NOT ACCEPT
ANY "FREE" 30-DAY TRIAL OFFER of any of their products. I agree 500%
with comments from "Chuck012" (posted 8/8/03.)They are clearly practicing
deceptive /fraudulent and very unethical business practices. They should be
prosecuted by some U.S. federal agency. I DO intend to file an official police
complaint because these folks should not be able to continue doing business this
way. Check out their website for yourself. It is impossible to exercise cancellation
even before the end of 30 days. . . .

Every one of these comments – positive and negative – could be fabrications,

notwithstanding the level of credibility attached to ResellerRatings.com by some.  But given that

level of credibility, Ascentive's claims of "irreparable harm" to a reputation it seeks to establish

mainly by reference to dollars spent on advertising must be taken with a very large grain of salt.

While ResellerRatings may or may not represent a "gold standard" in terms of consumer online rating forums, it is not unique in demonstrating that, whatever has been done online to Ascentive's reputation, plaintiff cannot demonstrate that it was done by defendants in this action. The following sample excerpts, all set forth as exhibits to the MacMull Affirmation, demonstrate the point.  For example, on BriteHub.com, a technology website, an article by a spyware expert recognized as a "Microsoft MVP" IT professional[4] writes:

> It's been five years since we first heard about the research on Rogue and Suspect Antispyware by Microsoft MVP and Director of Malware Research for Sunbelt, Eric L. Howes. Today, most rogue malware scanners are using false detection to rip-off and exploit the name of legitimate malware scanner programs. No trial version (forcing users to pay for the program) are usually offered and these programs are difficult to remove and will hijack the computer settings by changing the home and search pages. . . .

> Rogue malware scanners can be seen in TV commercials too! Example: FinallyFast.com and FinallyFast.com.au are currently running TV commercials. See the article at MalwareTreks for an explanation as to why FinallyFast is a program to be avoided.

A blogger[5] on technology and computers writes:

> So after being painfully subjected to one too many of these cheesy 'Finally Fast.com' commercials, I decided to do some research about them and their program and I have to say I'm not very surprised at what I found. The company itself is not the most reputable due to the fact that when they mention on their commercial that the program was featured in Forbes and Business Week they neglected to mention what program was featured (it was the one that helps employers spy on employees' computer usage) or that the company that owns Finally Fast (Ascentive) also owns both magazines. No wonder it was only featured in those two. . . .

---

[4]     Donna Buenaventura, May 4, 2010, "Beware of Rogue Programs: Fake Malware Scanners and Registry Cleaners," found at http://www.brighthub.com/computing/smb-security/articles /30856.aspx #ixzz171rPvr4F, (last visited December 3, 2010).(MacMull Aff., Ex. D.)

[5]     TTS Technology Blog, April 3, 2010, "Finally Fast! (.com) Review …& Free Programs That Work Better!," found at http://nwindianacomputerrepair.com/nwittsblog/2010/04/finally-fast-com-review/,  (last visited December 3, 2010).(MacMull Aff. Ex. E.)

They do have a free scan on their site that (surprise, surprise) ALWAYS finds errors…even if you just used the program.  Want to know why?  Because the site installs a root-kit (Win32:Rootkit-gen) on your computer in your temporary internet files to ensure you at least get one (false) positive result for spyware.  . . . After the free scan it recommends you buy their software that is instantly sent to your email address.  Something rather important you should know, if you choose to buy the CD it automatically enrolls you to their subscription for program updates.  Yes, it costs EXTRA to update the program…regardless of which way you have it delivered. . . .

All in all, I wouldn't pay any amount of money for this second-rate product simply due to the fact that they seem blatantly dishonest.  Knowing that there are plenty of free programs to do the same exact thing and the fact that they completely dogged out their competition on their TV commercial only makes me want to keep far, far away from this product and anything they produce in the future.

Numerous reviews of FinallyFast are also featured at the Norton Safeweb site, operated by the anti-malware technology company Symantec.  Sample excerpts are as follows:

This site gives a fake warning of errors, viruses, so forth and so on... but the thing that really makes this a problem is the fact that it downloads viruses to your computer and actually asks you to pay to fix it, which it installs the software which lags your pc even more than before! Bad site! I recommend you stay away from this site and never buy anything from Ascentive for your pc's sake.[6]

I downloaded it and got in to a lot of trouble. 1. it downloaded many other things, not counting the viruses. they even had commercials about it?! why would that tv station sponsor a product like it? 2. it did not have a REAL security program like Norton. and 3. why does norton rate this site good? it IS BAD!!!!![7]

Considering merely the foregoing samples from across the Internet, defendants submit that, in terms of harm to its reputation, plaintiff cannot even demonstrate that Ascentive, and FinallyFast, have "a reputation" capable of being damaged.

---

[6]      Found at http://safeweb.norton.com/reviews/107628, last visited December 3, 2010. (MacMull Aff., Ex. F.)

[7]      Found at http://safeweb.norton.com/reviews/89038, last visited December 3, 2010. (MacMull Aff., Ex. G.)

Notwithstanding this, plaintiff's submissions make much of what it characterizes as an elaborate shakedown scheme in which defendants "threatened Ascentive that absent significant payments [to defendants] and Ascentive's participation in its 'reputation management program,' the negative content posted at PissedConsummer.com would not be removed and these changes would not be made." (Pltf. Memo, at 7.)  Defendants deny this allegation; even by plaintiff's lights, however, by all indications Ascentive quite rationally decided not to make any "investment" – legitimate or otherwise – to affect negative reviews on one of countless websites reporting negative feedback about FinallyFast, and brought this action for its own tactical or other reasons.  These may be related to plaintiff's claim that "PissedConsumer demanded that Ascentive sign a 'non-disclosure agreement" before PissedConsumer would provide Ascentive the details and price of its 'reputation management program' [b]ecause it was the only way to get information about the removal of false internet postings that were impairing its business … ." (Pltf. Memo, at 6.)  In other words, plaintiff claims, or perhaps more accurately admits, that its CEO signed the non-disclosure agreement ("NDA") – whose breach is the premise of its entire complaint here – with the intention at the outset to breach it, and to induce defendants to make disclosures of confidential information that they would not have made but for that fraudulent inducement.   In fact, however, the NDA between plaintiff and defendants was signed by Ascentive on June 10, 2010, before the parties even began to correspond in mid-June in the manner plaintiff complains of. (Pltf. Memo, at 6; Singer Decl.¶¶ 5-8.)

Plaintiff's submissions with respect to its unfair competition and trademark claims are entirely conclusory.  It is no less self-evident – indeed, it is quite a bit more – to look at plaintiff's own exhibits and conclude that no reasonable individual could have possibly confused the website content in question with the communications or advertising by plaintiff.  Despite the

obviousness of these distinctions, plaintiff insists that consumers of Ascentive's products are as feeble-minded as many of the Internet commenters quoted above suggest they are and lack the most basic skills as differentiating one product or service from another. Similarly, the implication that defendant is somehow "trading off" or somehow taking unfair advantage of the "goodwill" and reputation of plaintiff is utterly unsupported even by the allegations. (Pltf. Memo, at 10-12.) Rather, what is eminently clear from the limited record established to date is that defendants are not "taking advantage" of Ascentive as it suggests, but are publishing messages intended for others and, in so doing, are publishing bona fide content on their website – an activity they have every right to "benefit" from, even if it involves the use of trademarks in describing products.

Lastly, plaintiff suggests that defendant's postings are false and outdated concerning their content, namely, regarding consumer satisfaction. (Pltf. Memo, at 5, 11.) But many complaints about Ascentive on PissedConsumer are not outdated at all, but rather are quite recent. As of the date of this submission six separate posts from at least four different user accounts have been posted since September 14, 2010. (MacMull Aff., Ex. H.) Moreover, since each post indicates the date on which it was made, consumers can easily determine whether or not they could be interpreted to apply to current conditions. The proposition that archival material is not only "misleading" but unlawful is completely unsupportable.

## LEGAL ARGUMENT

### I. PLAINTIFF CANNOT MEET THE HIGH STANDARDS NECESSARY TO JUSTIFY THE GRANTING OF A PRELIMINARY INJUNCTION TO RESTRAIN FREE SPEECH

A party seeking a preliminary injunction must demonstrate "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b)

sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F. 3d 190, 192 (2d Cir. 2004) (internal quotations omitted).  It is well established that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), and that a preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies and should not be routinely granted." *Matletier v. Dooney & Bourke, Inc.,* 340 F. Supp.2d 415, 428 (S.D.N.Y. 2004) (internal quotes omitted).  Significantly, however, plaintiff omits to mention that injunctions implicating protected speech, such as the criticisms of Ascentive's dubious software, are granted sparingly. Nearly forty years ago, in *Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971), the Supreme Court struck down as unconstitutional a state court's order enjoining the distribution of leaflets critical of respondent's business practices. The Court emphasized:

> It is elementary, of course, that in a case of this kind the courts do not concern themselves with the truth or validity of the publication. Under *Near v. Minnesota*, the injunction, so far as it imposes prior restraint on speech and publication, constitutes an impermissible restraint on First Amendment rights. . . . No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court.

*Id.* at 418-19 (internal citations omitted).  The ruling in *Keefe* is consistent with innumerable opinions establishing an ironclad rule that prior restraints on speech are presumptively invalid, even when the potential harm at issue was much greater than any injury to reputation. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) (rejecting prior restraint issued to ensure protection of criminal defendant's Sixth Amendment right to a fair trial); *New York Times Co. v. United States*, 403 U.S. 713 (1971) (even during wartime, newspapers not enjoined from publishing papers that government feared could threaten national security); *Stop the Olympic*

12

*Prison v. United States Olympic Comm.,* 489 F. Supp. 1112, 1124-25 (S.D.N.Y.1980) ("A court of equity will not, except in special circumstances, issue an injunctive order restraining libel or slander or otherwise restricting free speech. To enjoin any publication, no matter how libelous, would be repugnant to the First Amendment to the Constitution, and to historic principles of equity") (quoting *Konigsberg v. Time, Inc.,* 288 F. Supp. 989, 989 (S.D.N.Y.1968)).

Ultimately, notwithstanding plaintiff's elaborate pleadings, this present motion is essentially a request for the same kind of prior restraint refused by courts in the foregoing cases, and too many others like them to count. There is at least one big difference, though. While the restraint sought in the Pentagon Papers case required the Court to weigh colorable national security claims against free speech concerns, here the plaintiff is asking the Court to get one website out of an untold number to stop publishing content concerning Ascentive's dubious computer software. This Court should end its inquiry on this basis alone and deny plaintiff's motion.

## II.    PLAINTIFF CANNOT DEMONSTRATE IRREPARABLE HARM

A showing of "irreparable harm" in the absence of injunctive relief is "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (citations omitted). Because Ascentive cannot make any showing of irreparable harm as defined by the law, its preliminary injunction motion must fail.

One reason Ascentive cannot demonstrate irreparable harm is that it has taken so long to seek an injunction. As noted above, and conceded in plaintiff's memorandum (Pltf. Memo at 5-6) and complaint (Compl. ¶¶ 59-64), Ascentive filed its initial complaint three months after the alleged mischievous conduct arose, and waited an additional two months after filing its complaint to bring the present motion. This inexcusable and unexplained delay betrays plaintiff's

13

after-the-fact call for urgency and undermines any claim of irreparable harm as a matter of law, notwithstanding presumptions of harm typically applied, for example, to *bona fide* allegations of trademark infringement. (See Pltf. Memo, at 23-24.)  "Any such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief."  *See Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F. Supp. 2d 277, 281-282 (S.D.N.Y. 1998), *quoting Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 968 (2d Cir. 1995) (unexplained delay of five weeks in bringing suit and of three months in seeking a preliminary injunction was more than sufficient basis for concluding that presumption of irreparable injury had been vitiated.)

But Ascentive's leisurely stroll toward "emergency" relief – sprung on the Court and defendants on the eve of Thanksgiving – is not its only failure. Rather, plaintiff contends that defendant's false and defamatory comments, which sound in defamation, but which are not the basis for plaintiff's underlying preliminary injunction motion[8] are causing harm to Ascentive's reputation, business and good will.  (Pltf. Memo at 23; Schran Decl. ¶¶ 11-13.) Citing to a single, near thirty-five year old case from another District, plaintiff argues that an irreparable harm exists where defamatory statements were damaging to a company's good name. (*See id.*) Plaintiff's argument is erroneousness.

First, as set out extensively above, plaintiff already suffers from an unflattering Internet reputation as a purveyor of malware long before the conduct complained of ever arose. Second, plaintiff relies on legal authority that is outdated, at best. The court's decision in *Bihari v. Gross,* 199 F.Supp.2d 309 (S.D.N.Y. 2000)* is insightful, which held:

---

[8]      Despite filing a massive complaint alleging facts that sound in defamation, there is actually no defamation claim in this case. Presumably that is because truth is a complete defense to defamation.

The rule against preliminarily enjoining libel rests on two grounds. First, a preliminary injunction would be unconstitutional as a prior restraint on freedom of expression. "The special vice of a prior restraint is that communication will be suppressed ... before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973). Prior restraints of future speech are particularly dangerous because of the difficulty courts face in designing an order that does not chill protected speech. *See Latino Officers Ass'n, New York, Inc. v. City of New York*, 196 F.3d 458, 465 (2d Cir.1999) ("The danger of a prior restraint, as opposed to ex post disciplinary action, is precisely that making predictions ex ante as to what restrictions on speech will ultimately be found permissible is hazardous and may chill protected speech."); *McLaughlin v. New York*, 784 F.Supp. 961, 977 (N.D.N.Y.1992) (refusing to enjoin defendant's "blacklisting" of former employee because the "court could not possibly design an order that would be concise enough to avoid chilling defendants' protected speech relating to the plaintiff."). Second, injunctive relief is unnecessary because plaintiffs have an adequate remedy at law. *See American Malting Co.*, 209 F. at 356 ("The fact that the false statements may injure the plaintiff in his business or as to his property does not alone constitute a sufficient ground for the issuance of an injunction[ ] [because] [t]he party wronged has an adequate remedy at law."); *McLaughlin*, 784 F.Supp. at 977 (N.D.N.Y.1992) ("The fact that a sufficient after-the-fact remedy, in the form of a defamation suit, would be available to redress future 'blacklisting' prevents this court from awarding plaintiff's request for an enjoinder of defendants' future speech."); *Ramos*, 684 N.Y.S.2d at 213 (refusing to grant declaratory relief in defamation suit because plaintiff can seek post-publication damages).

*Bihari*, 119 F.Supp.2d at 326. This excerpt alone should resolve this entire motion.

While plaintiff suggests that a preliminary injunction is more readily available where the defamation is in furtherance of another tort, in this case plaintiff's incongruous RICO claims (Pltf. Memo at 23), much as in *Bihari*, smack of overreaching. Moreover, here there is no allegation of an invasion of plaintiff's privacy or of defamatory speech directed at a captive audience – elements that typically serve as a precondition to the granting of injunctive relief restraining speech. *See id.* at 326-27 (collecting cases).

The affidavit by Ascentive's marketing director, Ian Singer, elucidates nothing here, especially in terms of a threat to ongoing harm to plaintiff as might conceivably justify consideration of preliminary restraints. At best, all plaintiff can argue is that they may have

made a *prima facie* case of an intent to cause commercial harm.  Such a claim, however, is a

basis for a damages lawsuit – not an injunction prohibiting prior restraint of constitutionally

protected speech. *See id.*

### III.    THE BALANCE OF HARDSHIPS TIPS IN DEFENDANTS' FAVOR

Ignoring the First Amendment aspect of this motion, Ascentive argues that the balance of

harms "strongly favors Ascentive." (Pltf. Memo, at 25.)   But the law is that the deprivation of

defendant's First Amendment rights, which it is beyond cavil is the relief sought here, is itself a

serious hardship weighing heavily against preliminary injunctive relief. *See id.* at 325-26.  "It is a

well-recognized principle of law that the 'loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury.'" *Erie Boulevard Triangle Corp.*

*v. City of Schenectady*, 152 F. Supp.2d 241, 246 (N.D.N.Y. 2001) (quoting *Elrod v. Burns*, 477

U.S. 347, 373 (1976)). As this Court is well aware, the activity at issue here – providing a forum

for online commentaries viewed by those who consciously elect to read them – ranks among the

purest possible forms of First Amendment protection afforded. *See Citizens United v. Fed.*

*Election Comm'n*, 130 S. Ct. 876, 883 (2010) (First Amendment applies to corporations).  Any

loss of this freedom would accordingly constitute irreparable harm to defendants.

Plaintiff's premise on this motion is that the First Amendment is not implicated here,

because defendant's alleged activities constitute a "corporate campaign" to extort, bribe and

otherwise injure plaintiff.  However amenable to competent proof those allegations prove to be  –

which they are not – there is scant evidence before the Court to make that determination of fact

now.  Even if there were, plaintiff has made no connection between that imagined scheme and

the maintenance of the commentary about its widely discredited commercial practices on

PissedConsumer.com.  Defendants' bad acts do not vitiate their free speech rights, or those of the

commenters on their website.  Furthermore, besides being seriously undercut by the delay in

16

seeking this relief discussed above, defendants balance of hardships calculation does not explain what relevance the alleged bribery and racketeering scheme is to this preliminary injunction motion, for Ascentive is no longer being "victimized" by it – except by the existence of the online comments which, at most, the "scheme" supposedly offered to remove. There is no credible evidence that, absent the alleged "racket," those comments would not be online anyway.

Meanwhile, on defendants' side, the irreparable harm threatened by the curtailment of their rights to free speech is obvious. There can be little question that the precedent established by issuance of the injunction Ascentive seeks would effectively destroy defendant's business – and many other related sites – in a matter of weeks or days.

Accordingly, Plaintiff fails to meet its burden on the "balance of hardships" inquiry. For this reason as well, Plaintiff's motion for a preliminary injunction must be denied.

## IV.      PLAINTIFF CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS ON ITS TRADEMARK INFRINGEMENT CLAIMS

Plaintiff's third cause of action, and one basis for its requested injunctive relief, is trademark infringement under the Lanham Act, 15 U.S.C. § 1114, and 15 U.S.C. § 1125(a).  This claim cannot succeed on the merits because even under the facts as pled plaintiff cannot, as a matter of law, show that the defendants' use of their trademarks in connection with the web pages criticizing the products with which they are associated is likely to cause confusion, mistake, or deception.  This use, in fact, is not only not infringing, it is expressive activity and a *bona fide* nominative or descriptive use of these marks protected by the First Amendment. Because plaintiffs cannot succeed on the merits of this claim, it could not provide a basis for a preliminary injunction even if Ascentive met any of the other requirements for such relief.

A.   **Plaintiffs Cannot Demonstrate a Likelihood of Confusion**

(a)   **Defendants' use of the marks was obviously
critical of Ascentive and not likely to cause a
mistake as to origin, sponsorship or affiliation**

Plaintiff's argument in support of injunctive relief begins from the premise that every unauthorized use of a trademark is actionable. It is not. A trademark owner's rights are violated only where the unauthorized use "has a substantial capacity to mislead consumers (or other concerned actors in the marketplace) into a confusion as to the entity furnishing the goods or services." *Yankee Pub. Inc. v. News America Pub. Inc.,* 809 F. Supp. 267, 272-73 (S.D.N.Y. 1992) (citing 15 U.S.C. §§ 1114(1) & 1125(a)) (emphasis added). Even under §43(a) of the Lanham Act, which protects against trademark likelihood of confusion not only as to source, but also as to affiliation, connection, sponsorship, association, or approval, it is preposterous to say that the trademark uses on PissedConsumer.com could possibly lead even the dimmest Internet user to believe that the commentary on the website – so offensive to plaintiff that it brought this lawsuit – was actually approved by Ascentive in any way.

Plaintiff nonetheless argues that would-be Ascentive consumers are "confused" by the descriptions of Ascentive products and services which appear on PissedConsumer.com. (Pltf. Memo, at 20-21.) This "confusion", plaintiff contends, is exacerbated by the presence of a download tool on the website which, plaintiff contends, offers competing products and appears adjacent to text discussing Ascentive. (*See id.*)   But the law does not support plaintiff's far-fetched arguments.

As the Southern District noted in *Bihari*, where, as here, the inherent and obvious purpose of a "junior user's" adoption of a trademark is to injure the "senior user," the likelihood of confusion is **minimal**, because the public is trusted to have common sense.  "Because the purpose of the [defendant's] websites is to injure [plaintiff] commercially, no reasonable viewer

18

would believe that the disparaging comments regarding [plaintiff's] business ethics – comments which appear on the first page of the websites – are endorsed by [plaintiff].") *Bihari*, 119 F.Supp.2d at 319. This is fundamental trademark law, and does not depend on some elevated definition of consumer sophistication.  In fact, the courts routinely define "sophistication" in much less "sophisticated" terms than plaintiffs would suggest, for here a simple grasp of the obvious is all that is required to negate confusion. Thus, in *Girls Scouts v. Personality Posters Mfg. Co.*, 304 F. Supp. 1228, 1231 (S.D.N.Y. 1969), the court ruled that "rational analysis" precluded confusion about whether the Girl Scouts were the source of a poster depicting a pregnant girl in the well-known uniform of the Girl Scouts appearing with the caveat "BE PREPARED." Similarly, in *Stop the Olympic Prison v. United States Olympic Committee*, *supra*, 489 F. Supp. at 1123, a poster reading "Stop the Olympic Prison" was held not to violate the trademark of the United States Olympic Committee. The court reasoned as follows:

> On the basis of its own examination of the poster, the Court finds it extremely unlikely that anyone would presume it to have been produced, sponsored or in any way authorized by the U.S.O.C. While at a fleeting glance, someone might conceivably mistake it for a poster advertising the Olympics, nobody could conceivably retain such a misconception long enough to do any harm: for example, there is no danger that anyone would purchase or display it as such.

*Id.* As in *Girl Scouts* and *Olympic Prison*, no rational person could believe that anything about PissedConsumer.com is in any way affiliated with Ascentive.

Here, as plaintiff's own exhibits demonstrate, among the comments posted on PissedConsumer.com are those stating, in large and bold type: "Ascentive software is junk and then they want to charge a year later for the same junk"; other comments also note that Ascentive product is "Garbage Software" and that users "want this [Ascentive] program taken off [their] computer immediately." (Decl. of Alexis Arena, at pp. 55-56.)  Given the blatantly critical tone and content of users' comments, as well as the prominent display of PISSED CONSUMER in

the upper-left-hand corner of the webpage, no reasonable audience could possibly be confused as to the source of these comments, and nothing in the Lanham Act suggests otherwise.

### (b) The "initial interest confusion" doctrine is at best inapplicable here

The "initial interest confusion" doctrine is a dubious concept, never endorsed by the Second Circuit, that the Lanham Act "forbids a competitor from luring potential customers away from a producer by initially passing off its goods as those of the producer's, even if confusion as to the source of the goods is dispelled by the time any sales are consummated." *Lamparello v. Falwell*, 420 F.3d 309, 315-16 (4th Cir. 2005) (internal quotations omitted).  Essentially it replaces traditional tort concepts of harm, or even likelihood of harm, with a highly subjective, almost *per se* test for use on the Internet.  The doctrine was famously rationalized in the Ninth Circuit's opinion in *Brookfield Communics., Inc. v. West Coast Entmt. Corp.,* 174 F.3d 1036, 1064 (9th Cir. 1999) utilizing the analogy of a misleading highway sign:

> Suppose West Coast's competitor (let's call it "Blockbuster") puts up a billboard on a highway reading - "West Coast Video: 2 miles ahead at Exit 7" - where West Coast is really located at Exit 8 but Blockbuster is located at Exit 7. Customers looking for West Coast's store will pull off at Exit 7 and drive around looking for it. Unable to locate West Coast, but seeing the Blockbuster store right by the highway entrance, they may simply rent there. Even consumers who prefer West Coast may find it not worth the trouble to continue searching for West Coast since there is a Blockbuster right there. Customers are not confused in the narrow sense: they are fully aware that they are purchasing from Blockbuster and they have no reason to believe that Blockbuster is related to, or in any way sponsored by, West Coast. Nevertheless, the fact that there is only initial consumer confusion does not alter the fact that Blockbuster would be misappropriating West Coast's acquired goodwill.

*Id.*  But the doctrine of "initial interest" has been the subject of considerable criticism in general.  Both the First and Fourth Circuits have expressed considerable skepticism about whether the doctrine of initial interest confusion is valid at all. *Lamparello v. Falwell*, 420 F.3d 309, 317 (4th Cir. 2005); *Hasbro, Inc. v. Clue Computing*, 232 F.3d 1, 2 (1st Cir. 2000).

20

Developed in a sales context, it was meant to be applied only where "a potential purchaser is initially confused [such that] the [senior seller] may be **precluded from further consideration.**" *Weiss Assoc., Inc. v. HRL Assoc., Inc.*, 902 F.2d 1546 (Fed. Cir. 1990) (emphasis added). In other words, it only matters once the user is "off the highway." For this reason, the application of this analogy to the virtual as opposed to a real world was questioned in *Bihari*, where the court wrote:

> The harm caused by a misleading billboard on the highway is difficult to correct. In contrast, on the information superhighway, resuming one's search for the correct website is relatively simple. With one click of the mouse and few seconds delay, a viewer can return to the search engine's results and resume searching for the original website.

*Bihari*, 199 F. Supp.2d at 320, n. 15. This is consistent with longstanding principles of trademark law. In *Girl Scouts*, for example, the Southern District of New York rejected transient confusion as proof of trademark harm in a social-commentary context:

> Even if we hypothesize that some viewers might at first believe that the subject of the poster is actually a pregnant Girl Scout, it is highly doubtful that any such impression would be more than momentary or that any viewer would conclude that the Girl Scouts had printed or distributed the poster.

304 F. Supp. at 1231. As the Southern District recognized in *Girl Scouts*, ephemeral moments of confusion that do not threaten to divert sales are not evidence of actionable harm under the Lanham Act. Real harm must be shown to recover for any tortious conduct, but all the more so when such harm is posited as a basis for overcoming the constitutional protection of free speech:

> No evidence is found anywhere in the record before the court that the poster has to date damaged the plaintiff in any way. No facts are presented to show that contributions to the organization have fallen off, that members have resigned, that recruits have failed to join, that sales . . . have decreased, or that voluntary workers have dissociated themselves or declined to support the honorable work of the organization.

*Id.* at 1235. Similarly, there is no evidence before the Court of anything actually happening to Ascentive that could be objectively described as damage – and this after nearly six months during which it did nothing to seek injunctive relief and at least monitor the financial or other effects of PissedConsumer.com's criticisms.

Whatever force initial interest confusion has is far less where, as here, customers are likely to exercise care in making their final purchasing decisions. *See Nissan Motor v. Nissan Computer*, 378 F.3d 1002, 1019 (9th Cir, 2004); *Checkpoint Sys. v. Check Point Software Tech.*, 269 F.3d 270, 296-297 (3d Cir. 2001). *See also Hearts on Fire Co. v. Blue Nile*, 603 F. Supp. 2d 274, 287 (D. Mass. 2009) ("initial interest confusion can support a claim under the Lanham Act – but only where the plaintiff has plausibly alleged that consumers were confused, and not simply diverted."). Because, as *Bihari* taught, trademarks embedded in criticism are axiomatically unlikely to be confused as competitive, there can be no application of initial interest here and no basis for a finding of likelihood of success on the merits.

Moreover, Ascentive's desire to utilize the Lanham Act, via "initial interest," as a tool of censorship is incompatible with the First Amendment.  As the *Lamparello* court wrote with respect to another grip site:

> Applying the initial interest confusion theory to gripe sites like [defendant's] would enable the markholder to insulate himself from criticism — or at least to minimize access to it. We have already condemned such uses of the Lanham Act, stating that a markholder cannot shield itself from criticism by forbidding the use of its name in commentaries critical of its conduct. Just because speech is critical of a corporation and its business practices is not a sufficient reason to enjoin the speech.

*Lamparello*, 420 F.3d at 317-18 (internal quotations and cites omitted).

Here defendants are not using Ascentive's trademarks even to "divert" or "redirect" potential customers from plaintiff's goods or services to defendants' own goods or services, the

hallmark of the "initial interest confusion" doctrine. Notably absent in plaintiff's submissions is evidence that defendant's website in anyway directs customers away from Ascentive in favor of PissedConsumer's services, which, again, do not even compete with plaintiff's products and services.

Plaintiff's argument that confusion arises due to the proximity of a download tool appearing adjacent to text discussing Ascentive on PissedConsumer is neither legally nor factually sustainable. First, plaintiff fails to inform the court that PissedConsumer.com does not constantly display the tool. (MacMull Aff. Ex. I.) Nor is the advertising feature controlled or operated by defendants. (*See id.*; *see also* MacMull Aff. Exs. J, L.) Rather, as plaintiff concedes the appearance of certain website advertisements within the defined space directly adjacent to the text discussing Ascentive – and which regularly rotates from "click-to-click" on defendant's website – are under the exclusive control and regulation of Google's "AdWords" advertising program, not defendants. (Pltf. Memo, at 12; Compl. ¶ 47.) Indeed, many of the advertisements which plaintiff mistakenly believes are "fixed" offerings from the website www.reimage.com (Pltf. Memo. at 21) have several different online sources, and advertise products and services that have absolutely no relationship, competitive or otherwise, to plaintiff, such as free credit counseling services. (MacMull Aff., Ex. J.)

Second, any user clicking on this third-party link immediately realizes that it is not an authorized Ascentive website of any kind. (MacMull Aff., Ex. M.) Again, per *Bihari*, a user will not be "confused," merely, perhaps, chagrined – and needs merely to "back up" with one click of the mouse and resume searching online for his or her desired website. *See Bihari*, 119 F.Supp.2d at 320 at n.15.

Because there can be neither "initial interest confusion" nor any subsequent confusion between plaintiff's marks and defendant's services which are limited to commentaries, plaintiff is unlikely to succeed on the merits on their trademark infringement claims.

**B.      The First Amendment Protects Defendants'
         use of Plaintiff's Marks for Expressive Purposes**

"Because the trademark law regulates the use of words, pictures, and other symbols, it can conflict with values protected by the First Amendment." *Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F. Supp. 267, 275 (S.D.N.Y. 1992). "Trademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F,2d 26, 29 (1st Cir, 1987). Thus, when unauthorized use of another's mark is part of a "communicative message" and not a "source identifier," First Amendment rights trump competing trademark rights, and the Lanham Act is narrowly construed. *See Yankee Publ'g*, 809 F, Supp. at 276.

First Amendment-protected "communicative messages" or "expressive purposes" clearly include "comedy, parody, allusion, **criticism**, news reporting, and commentary." *Yankee Publ'g*, 809 F. Supp. at 276. (emphasis added). The Fourth Circuit has warned that a trademark holder should not exploit the Lanham Act to "shield itself from criticism by forbidding the use of its name in commentaries critical of its conduct." *Lamparello*, 420 F.3d at 318. Where trademark rights collide with the First Amendment, trademark infringement will be found only where "the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989).

In the present case, it cannot seriously be disputed that defendants used plaintiff's trademarks for anything other than for an "expressive purpose" and as part of a "communicative message" of criticism or commentary about Ascentive. The comments on PissedConsumer.com

24

draw the public's attention to a software provider with an already-tarnished reputation for providing customers with an inferior product, or worse.  This is undoubtedly an issue of public concern and a legitimate target for critical expression.   Given the negligible likelihood of consumer confusion as to the source of these messages, the free-expression versus consumer-confusion balancing test overwhelmingly tips in defendants' favor.  Thus in *Yankee Publ'g*, the court ruled that where the danger of the public's confusing the source of an imitation magazine cover containing "socio-economic commentary" was "slight at worst," the public's interest in avoiding confusion was "clearly outweighed" by its interest in free expression.  *Yankee Publ'g*, 809, F. Supp. at 278, 280.  Plaintiff is not entitled to hide its desire to silence defendants' free speech by calling its censorious aims a trademark infringement.

## V.   PLAINTIFF CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS ON ITS STATE LAW CLAIMS FOR TORTIOUS INTERFERENCE

Section 230 of the Communications Decency Act (47 U.S.C. § 230, hereinafter "Section 230") prohibits the imposition of liability under state law on any user or provider of "interactive computer service" for publishing content provided by another.  Section 230 provides, in pertinent part, that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," *id.*§ 230(c)(1), and that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section," *id.* § 230(e)(3).

It is well-established law that sites such as PissedConsumer.com fall squarely within the protection of the statute, which applies to all state law claims, however styled, so long as the act complained of is the publication of third party content. *See Gucci Am., Inc. v. Hall & Assocs.*, 135 F.Supp.2d 409, 417 (S.D.N.Y.2001) (citing legislative history of Section 230); *see also*

*Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir.1997) (holding that "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions such as deciding whether to publish, withdraw, postpone or alter content are barred" by Section 230); *Barrett v. Rosenthal*, 40 Cal.4th 33, 51 Cal.Rptr.3d 55, 146 P.3d 510, 518 n. 9 (2006) (collecting cases). This is the case here.

Section 230 defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet." 47 U.S.C. § 230(f)(2). PissedConsumer.com is an "interactive computer service" and qualifies for immunity under Section 230 because, (1) it is an internet search engine within the meaning of the statute that allows members of the public to search its directory of webpages and is therefore an "information service ... that provides or enables computer access by multiple users to a computer server"; and (2) the claims against it assert that it is liable for publishing "content" originated by another. (Pltf. Memo., at 3-4.) *See, e.g.*, *Murawski v. Pataki*, 514 F. Supp. 2d 577, 591 (S.D.N.Y. 2007).

Plaintiff attempts to overcome this tidal wave of precedent by claiming a right for injunctive relief based on the mere **possibility** that defendants themselves, rather than actual consumers of Ascentive's products or even dishonest third parties, **may be** providing the derogatory posts at issue. (Pltf. Memo, at 4; Compl. ¶ 38.)  Crediting such speculation, of course, would utterly eviscerate Section 230, since such a possibility always exists.  Indeed, even a direct allegation of such chicanery, which is not before the Court here, would – without compelling corroboration – similarly provide an automatic "out" of Section 230's bar of state-law claims against such websites.  The Court should pay this "hail Mary" tactic no heed and apply Section

26

230 as grounds for finding that there is no likelihood of success on the merits on Ascentive's tortious interference claims.

### A.    Plaintiff's Claim for Interference with <u>Contract and Prospective Relations is Insufficient</u>

As it happens, even if Section 230 were not an issue in the case, plaintiff claims for tortious interference are equally vapid. This is not surprising. Claims such as these, patently meritless under established precedent interpreting a crystal-clear statute the protects the constitutional right to free speech, cannot have been drafted with an eye toward anything but intimidation. As pled, plaintiff's claim lack the requisite specificity as required under New York law. (Compl. ¶¶ 149-158.) Nowhere within plaintiff's complaint does it set forth the identities of any entities who have allegedly been interfered with.

In New York, the elements of a claim for tortious interference with prospective business relations are: (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship. *See Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000); *Henneberry v. Sumitomo Corp. of Am.*, 415 F.Supp.2d 423, 467-68 (S.D.N.Y. 2006).

To satisfy the first element of this claim, plaintiff must have had "some particular, existing business relationship through which [it] would have done business but for the allegedly tortious behavior." *Minnesota Mining & Mfg. Co. v. Graham-Field, Inc.*, 96 Civ. 3839(MBM), 1997 WL 166497, at *7 (S.D.N.Y. Apr. 9, 1997); *accord Henneberry*, 415 F.Supp.2d at 468; *see also Envirosource, Inc. v. Horsehead Res. Dev. Co.*, 95 Civ. 5106(AGS), 1996 WL 363091, at *14 (S.D.N.Y. July 1, 1996) ("A general allegation of interference with customers without any

27

sufficiently particular allegation of interference with a specific contract or business relationship will not withstand a motion to dismiss.").

Here, plaintiff simply parrots the elements of a claim for tortious interference with contract and prospective business relations in the abstract, without alleging facts to support their claim. Again, as noted above, plaintiffs make a single generalized reference to "relationships with internet users" and "customers" without expanding on the nature of those relationships, such as for example, alleging the frequency of sales to these customers, the volume of sales attributable to those customers, or whether they exclusively purchased goods from plaintiffs. (Compl. ¶¶ 149-158.) Further, plaintiffs fail to allege that but for defendant's conduct, any third party would have continued to conduct business with plaintiff. In other words, to the extent that plaintiffs have even alleged a cognizable injury, their damages would be entirely speculative. Such conclusory allegations are insufficient to state a claim. *See Advanced Global Tech. LLC v. Sirius Satellite Radio, Inc.*, 15 Misc.3d 776, 782-83 836 N.Y.S.2d 807, 812 (N.Y.Sup.Ct. 2007) (holding that plaintiff's allegations that defendant engaged in coercive business practices "without justification, entirely out of malice" and without "normal economic self-interest" were conclusory and thus insufficient to state a claim).

Accordingly, because plaintiff's complaint fails to even state a claim for tortious interference with contractual and prospective business relations as a matter of law, plaintiff's request for injunctive relief should also fail for the foregoing reasons.

**VI.    PLAINTIFF CANNOT DEMONSTRATE
A LIKELIHOOD OF SUCCESS
ON THE MERITS OF ITS RICO CLAIMS**

Plaintiff has topped off its elaborate repackaging of its defamation claim and request for prior restraint with the *pièce de résistance* of modern litigation – two claims under civil RICO

28

and a claim for commercial bribery as the underlying predicate tort.  It fails here, too, to demonstrate a likelihood of success on the merits which would, if not for the other fatal deficiencies of its application, doom its application for a preliminary injunction.

The allegations fail on many grounds.  For one, there must be some damage to the plaintiff, and that damage must be proximately caused by the alleged racketeering itself.  *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457-58 (2006).  As the Supreme Court explained in *Anza*:

> The cause of Ideal's asserted harms, however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State). The attenuation between the plaintiff's harms and the claimed RICO violation arises from a different source in this case than in *Holmes,* where the alleged violations were linked to the asserted harms only through the broker-dealers' inability to meet their financial obligations. Nevertheless, the absence of proximate causation is equally clear in both cases.

*Id. See Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990) ("in order to have standing, a plaintiff must show: (1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation."); *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 24 (2d Cir. 1990) (injury in the form of lost future business commissions "too speculative to confer standing" under section 1962(c); injury from overt racketeering act lacking under 1962(d)).

As demonstrated above, however, no evidence, or even a coherent theory, of damage is before this Court.  The allegations (Compl. ¶110) and "proof" speaking of "reputational damage" concern a product already widely derided on the Internet.  Nor is there any connection between that notional damage and any alleged "racketeering activity."  The harm alleged, if it can be called that, arises from the postings on PissedConsumer.com – not the alleged offer to delete them for money.  The claims of the loss of "employee time" spent "negotiating" and in other

29

business activities connected with Ascentive's displeasure with PissedConsumer.com (Compl. ¶ 111) cannot be taken seriously as a basis for RICO damages.

Secondly, the Complaint alleges only one predicate act of racketeering:  The supposed scheme to "extort" (or "bribe") Ascentive as a condition to removing unflattering comments about its products.  "A violation under section 1962(c) requires proof of: "1) conduct 2) of an enterprise 3) through a pattern 4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Corp.,* 473 U.S. 479, 496 (1985) (footnote omitted).

> A pattern is defined as "at least two acts of racketeering activity" within ten years of each other. 18 U.S.C. § 1961(5). Two acts are necessary, but not sufficient, for finding a violation. *See H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 238, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). "[T]he term 'pattern' itself requires the showing of a relationship between the predicates and of the threat of continuing activity." *Id.* at 239, 109 S.Ct. 2893 (internal citation and quotation marks omitted).

*Howard v. Am. Online Inc.,* 208 F.3d 741, 746 (9th Cir. 2000).  To show a pattern under RICO, a plaintiff must prove that there are a sufficient number of predicate acts "indictable" as mail or wire fraud. *See* 18 U.S.C. §§ 1961(1)(B), 1962(c).  *Id.*; *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17 (2d Cir. 1983). The predicate acts and the threat of continuing activity are linked by a requirement of proof of "**criminal acts** that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Moss,* 719 F.2d at 17.

This Complaint and the evidence before the Court fail to do.  Citing miscellaneous lawful activities as a part of a RICO pattern, without proving, much less alleging, that they are indictable, is not sufficient.  *See Howard,* 208 F.3d at 748 (online misrepresentations did not qualify as predicate acts).  Thus the website content on PissedConsumer.com, using Twitter, sending out press releases, or any other acts alleged in paragraph 100 or elsewhere in the

30

Complaint that offend Ascentive, but which are not indictable cannot qualify as RICO predicate acts.

Similarly, the allegations of the Complaint fail to establish the "continuity" aspect of a RICO pleading:

> Plaintiffs' claim of open-ended continuity fails because Pier Connection has alleged no facts that would allow the Court to infer that Defendants committed anything other than a single fraudulent scheme. To infer a threat of repeated fraud from a single alleged scheme would in effect render the pattern requirement meaningless." *Continental Realty Corp. v. J.C. Penney Co.,* 729 F.Supp. 1452, 1455 (S.D.N.Y.1990). In *Continental Realty,* the plaintiff's allegations with respect to a failed real estate transaction supported an open-ended scheme on their face. However, the court refused to find open-ended continuity. The court noted that "nothing in the Defendants' actions suggest[ed] 'a distinct threat of long-term racketeering activity.' " *Id.* at 1455, citing *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902. As in *Continental Realty,* the plaintiffs in the instant case have "fail[ed] to provide any factual support for [their] contention that [Defendants'] fraudulent activity will continue in the future." *Continental Realty,* 729 F.Supp. at 1455. *See also Deem v. Lockheed Corp.,* 1991 WL 196171, at *9 (S.D.N.Y. Sept. 25, 1991) (finding no threat of continuity "since there is no indication that defendants committed these same or similar acts before[,] or that they committed them after" completing the scheme against the plaintiffs).

*Pier Connection, Inc. v. Lakhani,* 907 F. Supp. 72, 77 (S.D.N.Y. 1995). Similarly, the only proof before the Court regarding the alleged scheme here involves the largely speculative and conclusory submissions concerning the one prospective engagement of Opinion Corp. by Ascentive. No other parties are identified in the Complaint as "victims" of this "scheme."

The underlying predicates alleged by plaintiff as well – violations of the Pennsylvania bribery statute and the Hobbs Act – fail as well. The Complaint claims (Compl. ¶¶ 105, 107) that Ascentive was "threatened with the fear of continuing economic loss," yet such "fear" was obviously not enough to motivate plaintiff to seek relief for months after filing this complaint or even months between learning of the complained-of actions and beginning the litigation. In fact, the plain inference is that there was no fear of "continuing economic loss" because there was never any economic loss at all attributable to PissedConsumer.com. Indeed all the allegations in

31

that paragraph regarding the alleged acts of extortion by Opinion Corp. and defendant Alex Syrov involve "economic loss" that has not been and cannot be proved here – save one, i.e., the allegation that it was "extortion" to sign a non-disclosure agreement which plaintiff admits it had no intention of complying with anyway. This is not extortion; it is sour grapes. Furthermore, even if were extortion, there is nothing in the record that suggests that a preliminary injunction would be of any aid to plaintiff except with respect to the unconstitutional censorship they seek this Court to impose.

Similarly, the claims under Pennsylvania's bribery statute – conceding, without admitting, that the law of that state applies here – also fail. The Pennsylvania commercial bribery statute states that a "person who holds himself out to the public as being in the business of making disinterested selection, appraisal, or criticism of commodities or services" violates the law "if he solicits, accepts or agrees to accept any benefit to influence his selection, appraisal or criticism." 18 Pa. Cons. Stat. Ann. § 4108(b). But PissedConsumer.com does not hold itself out as anything of the sort. It provides a forum. It does not make selections, appraisals or criticisms, and plaintiff has no proof that it does. Plaintiff cannot show a likelihood of success under this statute, and in turn Ascentive's RICO claims cannot, on this record, be said to be likely to succeed in this litigation.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court deny plaintiff's motion for preliminary injunctive relief.

Dated:  December 3, 2010

GOETZ FITZPATRICK LLP


By:_____
             Ronald D. Coleman (RC 3875)
Joel G. Macmull (JM 8239)
One Penn Plaza—Suite 4401
New York, NY 10119
(212) 695-8100
rcoleman@goetzfitz.com
jmacmull@goetzfitz.com

*Attorneys for Defendants*
*Opinion Corp., Michael Podolsky & Alex Syrov*