**FLASTER**
**GREENBERG**
ATTORNEYS AT LAW • A PROFESSIONAL CORPORATION

Four Penn Center
1600 John F. Kennedy Boulevard
2nd Floor
Philadelphia, PA 19103
(215) 279-9393
Fax: (215) 279-9394
www.flastergreenberg.com

ABBE F. FLETMAN, ESQUIRE
Direct Dial: (215) 279-9388
E-Mail: abbe.fletman@flastergreenberg.com

December 14, 2010

**VIA ELECTRONIC FILING**
Senior Judge I. Leo Glasser
United States District Court
 for the Eastern District of New York
225 Cadman Plaza East
Room 921 South
Brooklyn, NY 11201

      Re:  *Ascentive, LLC v. Opinion Corp. d/b/a PissedConsumer.com, et al.*
            Civil Action No. 1:10-cv-00443 (E.D.N.Y.)

Dear Judge Glasser:

      The letter brief of plaintiff Ascentive, LLC ("Ascentive"), responds to the arguments of defendants Opinion Corp. d/b/a PissedConsumer.com, Michael Podolsky and Alex Syrov[1] (collectively "PissedConsumer") made during oral argument on Tuesday, December 7 and further addresses the four questions the Court posed on Monday, December 6. After consideration of all the evidence and arguments, the Court should grant the preliminary relief Ascentive seeks, including requiring PissedConsumer to remove the Ascentive-related webpages it maintains in violation of the Lanham Act, 15 U.S.C. § 1125(a) and § 1114, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et al.*

**A.**    **Ascentive Has Carried Its Burden on Likelihood of Success on the Merits.**

      **1.**    *Consumers Who Search for "Ascentive" on the Internet are Likely to Suffer Confusion.*

      In this preliminary injunction proceeding, the plaintiff Ascentive of course bears the burden of showing it is likely to succeed on the merits of its claims or that a serious question goes to the merits to make them fair grounds for trial. *Metropolitan Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). Ascentive has sustained this burden on its Lanham Act claims because: (1) intentional copying of a registered trademark by a defendant,

---

[1] Also named as a defendant in the complaint is Joanna Simpson. Defense counsel has declined to accept service on Ms. Simpson's behalf and, despite diligent efforts, plaintiff has to date been unable to locate Ms. Simpson and serve her.

which is not disputed, gives rise to a presumption of a likelihood of confusion;[2] (2) it is also undisputed that PissedConsumer uses Ascentive's trademarks in connection with advertisements for Ascentive's direct competitors, and profits from those advertisements; (3) Ascentive has at least established a serious question as to likelihood of confusion under the *Polaroid* factors; and (4) Ascentive has at least established a serious question as to initial interest confusion, which alone suffices to establish a likelihood of confusion actionable under the Lanham Act.

    a.    *Ascentive Has Established that PissedConsumer Intentionally Copied its Trademarks.*

The United States Court of Appeals for the Second Circuit has held that intentional copying of a trademark by a defendant gives rise to a presumption of a likelihood of confusion. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 258 (2d Cir. 1987). It is undisputed in this case that PissedConsumer intentionally used the trademarks "Ascentive" and "FinallyFast" in its subdomain names and in the title and text of its Ascentive-related web pages. *See* P-7, P-8, P-19-21.[3] *See also* Ascentive's Complaint and PissedConsumer's Answer, at ¶ 40 (admitting that "PissedConsumer created two subdomains associated with Ascentive – Ascentive.PissedConsumer.com and FinallyFast.PissedConsumer.com"); at ¶ 41 (admitting that "PissedConsumer uses the trademarks 'Ascentive' and 'FinallyFast' in connection with these subdomains. Ascentive's trademarks are displayed to consumers visiting PissedConsumer's website in the text displayed at finallyfast.pissedconsumer.com and ascentive.pissedconsumer.com and in the subdomain addresses themselves."); at ¶ 42 (admitting that "PissedConsumer also uses Ascentive's trademarks in the metadata associated with its website").

PissedConsumer has introduced no evidence to rebut this presumption. It has merely asserted a fair use defense which, as discussed below, is inapplicable under this set of facts. For this reason alone, Ascentive has satisfied its burden of showing a likelihood of success on the merits or, at a minimum, that a serious question goes to the merits of its Lanham Act claims to make them fair grounds for trial.

    b.    *PissedConsumer Admits That It Uses Ascentive's Trademarks in Connection With Advertisements for Ascentive's Direct Competitors and Profits From Those Advertisements.*

PissedConsumer's use of Ascentive's trademarks in advertisements for Ascentive's direct competitors alone subjects it to liability under the Lanham Act. The Lanham Act imposes

---

[2] To prevail in a trademark infringement claim, the plaintiff must show that it has a valid mark entitled to protection and that the defendants' use of that mark is likely to cause confusion. *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 477 (2d Cir. 1996). In this case, PissedConsumer does not dispute that Ascentive owns valid registered trademarks for Ascentive and FinallyFast. PissedConsumer's Answer, at ¶ 18. Ascentive accordingly addresses only the likelihood of confusion element.

[3] Exhibit numbers in this letter brief refer to exhibits that were introduced into evidence at the preliminary injunction hearing on December 6.

liability for infringement of a registered mark upon any person who uses an infringing mark in interstate commerce "in connection with the sale, offering for sale, distribution, or advertising of any goods or services." *See* 15 U.S.C. § 1114(1); McCarthy on Trademarks, § 25:26 (2009). "This broad definition includes any manufacturer, supplier, dealer, printer, publisher or broadcaster who in fact has used the infringing mark in connection with 'the sale, offering for sale, distribution or *advertising* of any goods or services' when such use is likely to cause confusion." McCarthy, § 25:26 (emphasis added). "This means that merely advertising an infringing mark itself is an act of infringement, apart from any manufacturing or sale." *Id.* (citing *Miller Brewing Co. v. Carling O'Keefe Breweries, Ltd.*, 452 F.Supp. 429 (W.D.N.Y. 1978) (television advertising alone triggers the Act); (*Vuitton et Fils S.A. v. Crown Handbags*, 492 F.Supp. 1071 (S.D.N.Y. 1979), *aff'd*, 622 F.2d 577 (2d Cir. 1980) (offer to sell infringing items is infringement)).

Although PissedConsumer itself is not a "direct competitor" of Ascentive, PissedConsumer is profiting from the advertisement of directly competitive products and services on its website. PissedConsumer admits that every time a consumer clicks on one of the ads displayed on its website -- ads for the products and services of Ascentive's direct competitors – PissedConsumer reaps profits. *See* Ascentive's Complaint and PissedConsumer's Answer, ¶ 45 (admitting that: "[a]longside this description of Ascentive, PissedConsumer displays numerous advertisements for third parties' products and services, including but not limited to advertisements for internet monitoring software, registry error cleaners, internet optimizers, spyware software and spam protection software. These advertisements offer the same 'free download' and 'free scan' offered by Ascentive."); at ¶ 47 (admitting that "[t]he advertisements are displayed through Google's 'AdWords' advertising program, in which Google allows PissedConsumer to profit from this display of third-party advertisements on its website every time a consumer clicks on one of the advertisements.").

PissedConsumer is essentially acting as a retailer using consumer confusion caused by its use of Ascentive's trademarks to sell the products of Ascentive's direct competitors. As such, PissedConsumer falls squarely within the language of the Lanham Act and Ascentive has established likelihood of success on the merits on its trademark, unfair competition and false advertising claims.

    c. *Ascentive Has Established a Likelihood of Confusion Under the Polaroid Standard.*

Under the law of this Circuit, courts deciding whether a plaintiff has established a likelihood of confusion must consider the eight factors enunciated by Judge Friendly in *Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820 (1961). No survey evidence is required to make this showing; the Second Circuit has not set forth "any requirement that survey evidence of secondary meaning or customer confusion be introduced before a plaintiff may obtain a preliminary injunction." *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 78 (2d Cir.1985*), abrogated on other grounds as stated in Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir.1992).

The *Polaroid* factors are: "(1) the strength of the plaintiff's mark; (2) the similarity of plaintiff's and defendant's marks; (3) the competitive proximity of their products; (4) the likelihood that plaintiff will 'bridge the gap' and offer a product like defendant's; (5) actual confusion between products; (6) defendant's good faith; (7) the quality of defendant's products as compared to plaintiff's; and (8) the sophistication of the purchasers." *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F.Supp.2d 176, 187 (W.D.N.Y. 2000) (*citing Polaroid*, 287 F.2d at 495).

No single *Polaroid* factor is dispositive. *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 139 (2d Cir. 1999). Instead, the court must consider each factor in the context of the others and balance the factors to determine whether a likelihood of confusion exists. *Mobil Oil*, 818 F.2d at 256-57. Moreover, application of the *Polaroid* factors "is not a mechanical process where the party with the greatest number of factors weighing in its favor wins." *OBH*, 86 F.Supp.2d at 187 (internal quotations and citations omitted). "Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Id* (citation omitted).

Applying these factors to this case, Ascentive has established, for purposes of the pending injunction motion, that consumers are likely to be confused.

(i)   *Strength of Ascentive's Marks*

"The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods or services sold under the mark as emanating from a particular source." *OBH*, 86 F.Supp.2d at 188 (citation omitted). Ascentive owns a registration for its "ASCENTIVE" trademark, Reg. No. 3,091,824 (issued May 16, 2006, first used in 1999). Schran Decl., ¶ 9. Ascentive also owns registrations in the United States Patent and Trademark Office for its FINALLYFAST.COM trademark (Reg. No. 3,533,775, issued Nov. 18, 2008), FINALLY FAST trademark (Reg. No. 3,727,610, issued Dec. 22, 2009), and FINALLYFAST trademark (Reg. No. 3,727,611, issued Dec. 22, 2009). *Id*. Ascentive's Chief Executive Officer Adam Schran testified on December 9, 2010, that the Ascentive and Finally Fast trademarks are used in national television advertising, radio advertising and on the internet. Moreover, PissedConsumer introduced no evidence disputing the strength of Ascentive's trademarks. This factor, therefore, weighs in Ascentive's favor.

(ii)   *Degree of Similarity Between the Marks*

PissedConsumer admits that it selected and uses Ascentive marks, "Ascentive" and "FinallyFast," as part of its subdomain names, "www.ascentive.pissedconsumer.com" and "www.finallyfast.pissedconsumer.com." It displays Ascentive's marks in large font on these pages; larger font than it uses for any other term on the webpages. *See, e.g.,* P-8. Finally, it admits that it uses the trademarks in purported neutral descriptions of Ascentive on the www.ascentive.pissedconsumer.com website and in the metadata associated with its website. *Id*. There is no distinction between the "Ascentive" mark and the mark used in PissedConsumer's subdomains, on its website text, in the purported neutral descriptions on its website, and in its metadata. Because the marks are identical, this factor weighs in Ascentive's favor.

      (iii)  *Competitive Proximity of the Products*

  Competitive proximity refers to the extent to which products compete for the same audience. Here, there is competitive proximity between Ascentive's website and PissedConsumer's website because "[b]oth sites compete for the same audience-namely, Internet users who are searching for a web site that uses plaintiffs' mark as its address. This high degree of competitive proximity increases the likelihood of confusion among Internet users." *OBH*, 86 F.Supp.2d at 188 (*citing Planned Parenthood Federation of America, Inc. v. Bucci*, 1997 WL 133313, at *8 (S.D.N.Y. Mar. 24,1999)). Indeed, PissedConsumer is actively targeting Ascentive's consumers with its intentional use of Ascentive's trademarks.

  In addition, PissedConsumer admits that its website contains "numerous advertisements for third parties' products and services, including but not limited to advertisements for internet monitoring software, registry error cleaners, internet optimizers, spyware software and spam protection software," and that "[t]hese advertisements offer the same 'free download' and 'free scan' offered by Ascentive." Answer, at ¶ 45. PissedConsumer also admits that it profits every time a consumer clicks on one of these advertisements for Ascentive's competitors. It is undisputed that the products and services advertised on PissedConsumer's website directly compete with Ascentive's products and services. *See, e.g.,* Ex. P-8; P-19; P-20; P-21. Accordingly, there is undisputed competitive proximity between the products offered by Ascentive and the products offered at PissedConsumer.com and this factor therefore weighs in Ascentive's favor.

      (iv)  *Likelihood that PissedConsumer.com Will 'Bridge the Gap'*

  "Where the market for competing goods or services is the same, there is no need to consider whether the plaintiff will bridge the gap between the markets." *OBH*, 86 F.Supp.2d at 188 (*citing Planned Parenthood*, 1997 WL 133313, at *8). As explained above, Ascentive's websites and PissedConsumer's websites at Ascentive.PissedConsumer.com and FinallyFast.PissedConsumer.com are vying for the same users in the same market. Accordingly, the Court need not consider this factor in determining likelihood of confusion.

      (v)  *Actual Confusion Between Products*

  Ascentive has no evidence of actual confusion at this time. The absence of actual confusion, however, is not dispositive of the question of likelihood of confusion. *Hasboro, Inc. v. Landard Toys, Ltd.*, 858 F.2d 70, 79 (2d Cir.1988) (holding that evidence of actual confusion "is not necessary to show a likelihood of confusion").

      (vi)  *PissedConsumer's Lack of Good Faith*

  PissedConsumer's actual knowledge of Ascentive's trademarks, before adopting those trademarks and using them to profit from competing advertisements, demonstrates bad faith and, as discussed above, gives rise to a presumption of a likelihood of confusion. *See Mobil Oil*, 818 F.2d at 259 ("In this circuit and others, numerous decisions have recognized that the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer.") Around May or June 2010, Ascentive

discovered that PissedConsumer had made a decision to create the subdomains at Ascentive.PissedConsumer.com and FinallyFast.PissedConsumer.com and had adopted the Ascentive and FinallyFast trademarks with the clear intention of profiting from confusion among internet users.

PissedConsumer admits that it engages in search engine optimization practices to cause its website to appear prominently in search results on Google and other search engines for "Ascentive" and "FinallyFast" and uses those trademarks in its metadata and subdomains. Consumers typically research Ascentive by typing the trademark into the Google search engine. Schran Decl., at ¶ 5-6. A consumer who did so would find the following description among the top web results:

> **Ascentive @ Pissed Consumer**
> **Ascentive** reviews and complaints. The company offers such products and services as internet optimizer, internet monitoring software, fix registry errors, ...
> ascentive.pissedconsumer.com/ - Cached - Similar

Ex. P-7. Given the neutral description contained in this result, an appreciable number of ordinary searchers are likely to believe Ascentive is the source. Indeed, even if they notice the words, "Pissed Consumer," they might well think this was a customer service site of Ascentive.

Once an internet user clicks on this link, he or she will be taken to a web page where the most prominent element is the word, "Ascentive," with a neutral description of the company, i.e.:

# Ascentive

Rating:
88 comp



Ascentive LLC is an American company. The company offers such products and services as internet optimizer, internet monitoring software, fix registry errors, clean windows registry, eliminate spyware, memory optimizer, system optimizer, spam protection, business ad government, employee monitoring software, and so much more. Ascentive offers free trials for almost all the products. In addition, the company provides software updates and replacement. Ascentive offers customer support as well. The company has been awarded many times as the best company in the industry.

All the software developed by Ascentive LLC is protected by copyright laws and international copyright treaties. Please try to contact Ascentive Customer Service directly prior to posting any complaints on this site.

Ex. P-8. Contained *within this description*, PissedConsumer displays ads for the products of Ascentive's competitors. Ex. P-20. For example, one ad appears when a computer user floats his or her mouse over the description of Ascentive's products, and states: "Spyware Find info and Deals on Spyware Online. Keep Your Computer and Files Safe. Click here." Ex. P-20. In small type at the bottom, the ad identifies the website address "Adacycle.com," however, a computer user is not likely to know whether this website is affiliated with Ascentive based on

this ad text. Ascentive sells products to combat spyware. Schran Decl., ¶ 2, 7. Ascentive also sells software products under various brand names, including "Spyware Striker," "Greenlight Guardian," "PC Speedscan," "WinRocket," "ActiveSpeed," "FinallyFast," "RAMRocket," and "BeAware," among others. See www.ascentive.com. A consumer will not know whether this ad is affiliated with Ascentive until he or she clicks on the advertisement, at which point, PissedConsumer has already made a profit. Each time a searcher clicks through to one of those hyperlinks or ads, PissedConsumer.com receives a payment from Google.[4]

Accordingly, PissedConsumer.com is not simply a bulletin board for gripes, as it claims. See P-17 ("PissedConsumer.com is a premier consumer reviews and complaints social network. PissedConsumer prides itself on its ability to deliver honest opinions about products and services to the consumers around the world.") To the contrary, it is the antithesis of good faith to rely on confusion to intercept the potential viewers of Ascentive's websites and expose them to advertising from Ascentive's competitors through which PissedConsumer.com profits. There is ample evidence to find that PissedConsumer.com acted in bad faith and this factor weighs in Ascentive's favor.

    (vii) *Quality of the Products Advertised By PissedConsumer as compared to Ascentive's*

Courts cannot compare multiple websites and determine whether one is of higher quality than another. *OBH*, 86 F.Supp.2d at 189. Accordingly, this factor is neutral.

    (viii) *Sophistication of the Purchasers*

A number of district courts in the Second Circuit have held that the sophistication of users is irrelevant when consumers have suffered initial interest confusion, which "afflicts sophisticated Internet users no less than it does unsophisticated users." *OBH* at 189-90 (*citing New York State Soc'y of Certified Pub. Accountants v. Eric Louis Assocs., Inc.*, 79 F.Supp.2d 331, 341 (S.D.N.Y. 1999); *Planned Parenthood*, 1997 WL 133313, at *9); see also Jews For Jesus v. Brodsky*, 993 F. Supp. 282, 303 (D.N.J. 1998), *aff'd*, 159 F.3d 1351 (3d Cir. 1998) ("[C]onsidering the vastness of the Internet and its relatively recent availability to the general public, many Internet users are not sophisticated enough to distinguish between the subtle difference in the domain names of the parties.").

Additionally, purchasers are likely to be misled, and unlikely to exercise great care, because all they must do for PissedConsumer to profit is simply to click on an ad with their mouse. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir. 2000) ("[T]he question in this analysis is not how sophisticated web surfers are but, rather, how high the cost is of choosing one service – that is, one web site – over another on the Web. We agree with our previous conclusion that this cost is negligible: it is simply a single click of a mouse."); *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 293 (3d Cir. 1991) ("Navigating amongst web sites involves practically no effort whatsoever, and arguments that Web users exercise a

---

[4] Google also receives payment for each such click. *See* Information re: Google's AdSense Advertising Program, at https://www.google.com/adsense/static/en_US/AfcOverview.html

great deal of care before clicking on hyperlinks are unconvincing."); *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1057 (9th Cir.1999) ("In the Internet context, in particular, entering a web site takes little effort-usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership.").

In sum, the majority of the *Polaroid* factors, and the most important factor, the similarity of the marks at issue, all favor Ascentive, and the Court should find that Ascentive has carried its burden of showing likelihood of confusion on its Lanham Act claims.

        d.    *Ascentive Has Established Initial Interest Confusion.*

As discussed in Ascentive's preliminary injunction brief, likelihood of confusion also can be established by a showing of "initial interest confusion." *Mobil Oil*, 818 F.2d at 260; *see also Malletier v. Burlington Coat Warehouse Corp.*, 426 F.3d 532, 539 n. 4 (2d Cir. 2005) (It is well established that "point-of-sale confusion is not the only confusion which the Lanham Act seeks to prevent; other forms of confusion, including ... initial interest confusion ... may also be actionable."). The Lanham Act forbids a competitor from "luring potential customers away from a producer by initially passing off its goods as those of the producer's even if confusion as to the source of the goods is dispelled by the time any sales are consummated." *Checkpoint Sys., Inc., v. Check Point Software Techs., Inc.*, 269 F.3d 270, 294 (3d Cir. 2001). Courts have found that damages to a trademark holder result even where a consumer eventually becomes aware of the source's actual identity or where no sale occurs. *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F.Supp.2d 273, 290 (D.N.J. 2006).

As described above, PissedConsumer is profiting from initial interest confusion because consumers visit PissedConsumer.com not knowing whether the website is affiliated with Ascentive, due to the description PissedConsumer causes to be displayed on search engines including Google and PissedConsumer's use of Ascentive's trademarks in connection with the website. *800-JR Cigar*, 437 F.Supp.2d at 290 (*quoting Australian Gold, Inc., v. Hatfield*, 436 F.3d 1228, 1239 (10th Cir. 2006)). Once they arrive at the website, consumers are further confused as to whether the advertisements displayed within and alongside the description of Ascentive and its products are actually affiliated with Ascentive. Ascentive's establishment of initial interest confusion constitutes another separate basis upon which the Court may base a finding that Ascentive has demonstrated a likelihood of success on the merits.

        2.    *Ascentive's trademark claims are not subject to a fair use defense.*

Websites that rely on confusion created by a domain name to convey their message negate any free speech defense. *See* McCarthy on Trademarks, § 25:76 (2009) ("In the author's opinion, gripe sites that use the target's trademark in the domain name either identically or in a confusingly similar format violate mainstream trademark policies. Such sites should not be immunized by free speech principles. Such Web sites rely on confusion to intercept the potential viewers of plaintiff's Web site and expose them to the message disseminated at the site identified by the accused domain name. Such Web sites rely on confusion caused by the domain name to

convey their message, thereby negating any free speech defense."); *see also Planned Parenthood*, 1997 WL 133313, at *6, *aff'd*, 152 F.3d 920 (2d Cir. 1998) (use of trademark in domain was to intercept potential viewers of plaintiff's message); *OBH*, 86 F.Supp.2d at 197 (same). "[T]he critic has no free speech 'right' to confuse web users into thinking that they are entering a Web site of the target in order to expose them to the defendant's messages of criticism of the target." McCarthy on Trademarks, § 25:76. PissedConsumer has no right to lure Ascentive's consumers to its website through confusion as to whether the website is affiliated with Ascentive.

Additionally, there is no fair use defense that permits PissedConsumer to profit from customers' confusion upon reaching PissedConsumer's website. The overriding impression is the Ascentive name, a neutral description and a large button misleadingly advertising a competitor's product:



Ex. P-20. If a consumer goes no farther than this initial screen, and quickly clicks on the "DOWNLOAD HERE!" advertisement, not knowing whether this is an advertisement for an Ascentive product, both PissedConsumer and Ascentive's competitor (located at

www.reimage.com) have profited from customer confusion as to the source of the products advertised. This confusion results directly from PissedConsumer's use of Ascentive's trademarks and is not protected by a "fair use" defense.

> 3. *Ascentive Has Established a Likelihood of Success on the Merits Based on PissedConsumer's Extortion In Violation of the Hobbs Act.*

This case is similar to *United States v. Castillo*, 965 F.2d 238, 239 (7th Cir. 1992), where a newspaper publisher repeatedly published articles critical of a woman leading a local service organization in Chicago. Whenever the leader met the publisher, she would plead him to stop publishing the articles. *Id.* Finally, the publisher called the leader and promised her that he would refrain from publishing articles critical of her if she paid him $26,000. *Id.* The publisher was convicted of extortion under the Hobbs Act. *Id.* at 241. The Seventh Circuit remarked: "It was blackmail, a standard form of extortion. [He] told [her] that for a price he would stop publishing discreditable things about her. He thus was selling silence. Whether the discreditable things were true or false is irrelevant." *Id.* (citation omitted).

PissedConsumer's conduct in this case, however, goes beyond even the conduct of the publisher in *Castillo*. PissedConsumer did not only offer to cease publishing future negative complaints about Ascentive in its written "Service Offering." As described below, PissedConsumer also offered to: (1) remove existing defamation on its website; (2) remove specific instances of trademark infringement, unfair competition and false advertising from its website; and (3) deceive consumers into believing its website comments about Ascentive are "unbiased," or uninfluenced by payments from companies like Ascentive, when they are not. *See* Service Offering, Ex. P-2. PissedConsumer offered to cease engaging in unlawful conduct, which is irreparably damaging Ascentive's business and reputation, only in exchange for monetary payments from Ascentive totaling $120,000. *Id.*

Such conduct constitutes extortion or "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened…fear…" 18 U.S.C. § 1951(b)(2). The Second Circuit has held that "[e]xtortion, as defined in the Hobbs Act, consists of the use of wrongful means to achieve a wrongful objective." *See U.S. v. Clemente*, 640 F.2d 1069, 1076 (2d Cir. 1981). This "wrongfulness" requirement is met where a defendant "had no lawful right to the property obtained, and that the property was obtained because of the victim's fear of economic loss." *Id.* at 1077.

PissedConsumer's use of economic fear is "wrongful" in this case because it was employed for the purpose of obtaining money from Ascentive ($120,000) to which PissedConsumer was not entitled. As in *Clemente*, the $120,000 PissedConsumer demanded from Ascentive did not represent the value of goods or services PissedConsumer would provide to Ascentive, but the cost of PissedConsumer's extortion. *Id.* at 1078 (Hobbs Act applies to "persons such as Clemente who exact tribute from their victims in exchange for agreements either to exercise or refrain from exercising the corrupt influence they have acquired."); *see also Center Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y.*, 808 F. Supp. 213 (S.D.N.Y. 1992) (defendant committed extortion when he "used his influence over Plaintiffs' loan accounts to force Center Cadillac to sell him a car for $2,000 below cost, and without payment for taxes and

fees."). PissedConsumer has not explained, and cannot explain, any lawful justification for charging Ascentive $120,000 to cease its unlawful conduct and make quick alterations to its own website.

Moreover, PissedConsumer attempted to exact this payment through Ascentive's fear of continuing economic loss and PissedConsumer's own unlawful conduct. PissedConsumer's Service Offering acknowledges the harm that it was inflicting on Ascentive's reputation and business when it offered to turn its "negative reviews into positive testimonials" and give Ascentive an "[i]mproved brand image / better first impression." Ex. P-2, at 8, 10. PissedConsumer utilized wrongful means, including (a) defamation; (b) intellectual property violations; and (c) consumer deception, for a wrongful objective. Ascentive has a right to pursue instances of online defamation, violations of its intellectual property rights, and misrepresentations to its customers and prospective customers, without being required to pay $120,000 to PissedConsumer.

    a.    *PissedConsumer's Offer to Remove Unlawful Defamation From Its Website Only in Exchange for Money Constitutes Extortion.*

Ascentive discovered multiple instances of defamation on PissedConsumer's website, including the published statement that Ascentive's software contains a virus, and contacted PissedConsumer about these comments in June 2010. Singer Decl.; Schran Decl. PissedConsumer's response was to offer to remove negative statements in exchange for $120,000. Ex. P-1, P-2. When Ascentive refused to make the requested payments and contacted PissedConsumer through legal counsel, PissedConsumer responded: "While we understand that such comments may be harmful to Ascentive or even defamatory, we have no doubt that PissedConsumer will prevail on its defense of immunity." Ex. P-3, P-4. Instead of offering to remove the defamation, PissedConsumer suggested that Ascentive litigate against the anonymous posters on PissedConsumer's website and claimed that it would identify the anonymous posters only in response to a third-party subpoena. Ex. P-4, at 2.

PissedConsumer's Service Offering, however, tells a different story. PissedConsumer offered to identify anonymous posters on its website and provide Ascentive with their contact information, not in response to a third-party subpoena, but in exchange for money. Ex. P-2, at 8 ("If consumer/poster agrees to be contacted by Ascentive, Opinion Corp will collect – Name; Email; Address; Phone Number; Other Related Information. Collected information will be forwarded to Ascentive for resolution. If a consumer is not willing to be contacted by the company, their review(s) will be deemed inappropriate and will not be posted on the site.") Ascentive would then be given an opportunity to resolve defamatory comments **before the comments were posted online**. *Id.* Moreover, existing defamatory comments would be removed from view by PissedConsumer. Ex. P-2, at 9-10. The comments would be removed not in response to a court order or a third-party subpoena, but in exchange for confidential monetary payments to PissedConsumer. *Id.* Per its Service Offering, PissedConsumer allows companies to bypass the legal process, to avoid the necessity of the submission of any evidence of defamation or confronting the anonymous posters, and instead to pay PissedConsumer to have the comments removed. Thus, PissedConsumer's claim to function as an unbiased consumer advocate is particularly incongruous with its offer to silence consumers if the price is right.

PissedConsumer's offer to remove existing defamation and prevent future defamation from occurring in exchange for money (not evidence that the statements are defamatory) is extortion. *See U.S. v. Kattar*, 840 F.2d 118, 122-24 (1st Cir. 1988) (threat to spread false, injurious statements absent payment was extortion); *HyCite Corp. v. badbusinessbureau.com, L.L.C.*, 418 F.Supp.2d 1142, 1150 (D. Ariz. 2005) ("Plaintiff alleges that Defendants create and solicit false and defamatory complaints against businesses, but will cease this conduct for a $50,000 fee and $1,500 monthly retainer. Remedying the publication of false and defamatory complaints, which Defendants allegedly created and solicited, does not give Defendants the right to collect fees.").

        b.    *PissedConsumer's Offer to Curb Its Own Lanham Act Violations Only in Exchange for Money Constitutes Extortion.*

As described above, PissedConsumer's conduct also constitutes trademark infringement, unfair competition and false advertising under the Lanham Act and common law. Consumers are likely to be confused as to the source of the products advertised at Ascentive.PissedConsumer.com and FinallyFast.PissedConsumer.com. This confusion is exacerbated by PissedConsumer's description of Ascentive and Ascentive's products, which suggests an affiliation with Ascentive but contains links to Ascentive's competitors. It is also exacerbated by content such as PissedConsumer's page title – "Ascentive @ PissedConsumer."

In its Service Offering, PissedConsumer offered to:

(1) change the page title from "Ascentive @ PissedConsumer" to "Ascentive Reviews" (Ex. P-2, at 10);
(2) permit Ascentive to control its own company description, which was written by PissedConsumer, suggests an affiliation with Ascentive, and contains the advertisements of Ascentive's competitors (*Id.*);
(3) permit Ascentive to control the "Best Consumer Reports", which also currently contain competitive advertisements (*Id.*);
(4) disable the commenting functionality on Ascentive's complaints, which would result in fewer competitive advertisements and make the site drop in Google rankings for "Ascentive," leading to less consumer confusion as to the source of the products advertised (*Id.* at 11); and
(5) entertain further suggestions as to how PissedConsumer could achieve the "improved brand image" it offered to Ascentive (*Id.* at 10).

These offers are far from accepted public relations activities. PissedConsumer's offer to make changes including creating a page title that says "Ascentive Reviews" instead of "Ascentive @ PissedConsumer" represents a proposal to reduce consumer confusion over the source of the products advertised on its website. PissedConsumer's offers to curb its own trademark infringement, unfair competition and false advertising in exchange for $120,000 constitute extortion.

    c. *PissedConsumer's Offer to Give Ascentive an Unlawful Advantage Over PissedConsumer's Other "Victims," While Maintaining the Facade of Impartiality to Consumers, is Extortion.*

  Finally, PissedConsumer's attempt to use of economic fear to extract $120,000 from Ascentive is also wrongful because the means and objective of Ascentive's economic fear is the continuing deception of consumers. Unfortunately, PissedConsumer apparently has been successful in using non-disclosure agreements to scare companies that participate in its extortion into silence. Consumers remain largely unaware of PissedConsumer's true tactics. This façade of impartiality presented to Ascentive's prospective consumers is one means through which PissedConsumer's website threatens Ascentive's business. If Ascentive's customers mistakenly believe that PissedConsumer is an impartial consumer advocate, the reviews on its website are all the more damaging. However, continuing consumer deception is also PissedConsumer's objective. If companies give in to PissedConsumer's tactics and make the requested payments to PissedConsumer, both PissedConsumer and those companies will benefit from consumers' inaccurate perception of impartiality.

    *4.* *Ascentive Has Established a Likelihood of Success on the Merits Based on PissedConsumer's Violations of Pennsylvania's Commercial Bribery Statute.*

  Pennsylvania's Commercial Bribery Act provides that "[a] person who holds himself out to the public as being engaged in the business of making disinterested selection, appraisal or criticism of commodities or services commits a misdemeanor of the second degree if he solicits, accepts or agrees to accept any benefit to influence his selection, appraisal or criticism." 18 Pa. C.S. § 4108(b). Because Ascentive is a Pennsylvania company and PissedConsumer's commercial bribery was directed to Ascentive in Pennsylvania (PissedConsumer's Service Offering was emailed to Ascentive in Pennsylvania; PissedConsumer's CEO called Ascentive's employee, who was located in Pennsylvania; the damage Ascentive is suffering is occurring in Pennsylvania), Pennsylvania's commercial bribery statute was violated in this case.[5] Because

---

[5] PissedConsumer also apparently concedes the statute, 18 Pa. Cons. Stat. Ann. § 4108(b), applies in this case. *See* Opposition, at 32. PissedConsumer's Opposition contests, however, that there are two predicate acts in this case. This is incorrect for several reasons. First, violations of the Hobbs Act and Commercial Bribery Act serve as two separate predicate acts under the RICO statute. *United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981) ("[A]lthough there was but one set of transactions, we have violations of two distinct statutes, each with different elements."); *United States v. Hobson*, 893 F.2d 1267 (11th Cir.), *cert denied.*, 498 U.S. 957 (1990) (rejecting defendant's contention that possession and importation of controlled substance was one predicate act and not multiple acts under RICO statute). Second, each statute was violated by multiple acts by PissedConsumer, including but not limited to: (1) drafting and sending the Service Offering to Ascentive; (2) making additional solicitations and representations to Ascentive by phone; and (3) criminal conduct in connection with PissedConsumer.com and other websites. Third, PissedConsumer's actions as to multiple plaintiffs (including both Classic Brands, Inc. and Ascentive, LLC) constitute multiple predicate acts under the statute. *See Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1347 (2d Cir. 1994) (stating that allowing acts directed against third parties to serve as predicate acts if at least

the statute is punishable by more than a year imprisonment, it is also a predicate act under RICO. *See* 18 U.S.C. § 1961(1); *Westlake Plastic Co. v. O'Donnell*, 182 F.R.D. 165, 170 (E.D.Pa. 1998).

PissedConsumer has not cited a single case to suggest it is not liable under Pennsylvania's commercial bribery statute but instead argues that PissedConsumer does not "hold [it]self out to the public as being in the business of making disinterested selection, appraisal, or criticism of commodities or services." Opposition, at 32. In PissedConsumer's Answer to Ascentive's complaint, however, it admitted that "PissedConsumer has published numerous press releases claiming that it is an unbiased 'premier consumer advocacy group.'" *See* Complaint, at ¶ 28; Answer, at ¶ 28. PissedConsumer also states that it "prides itself on its ability to deliver honest opinions about products and services to the consumers around the world." *See* PissedConsumer's Press Releases, attached to Arena Decl. in support of Motion for Preliminary Injunction as Ex. 1. PissedConsumer cannot claim to function as an "unbiased consumer advocacy group" and to "deliver honest opinions about products and services" without holding itself out to the public as being in the business of making disinterested selection, appraisal, or criticism of commodities or services. *See also Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 1996 WL 47167 (E.D.Pa. Feb. 2, 1996) (declining to limit the commercial bribery statute to 'professional critics, commercial rating agencies and the like' and broadening definition to include companies holding themselves out as disinterested, but accepting money to influence selections). PissedConsumer's conduct falls squarely within the commercial bribery statute.

### 5. *PissedConsumer Does Not Enjoy Immunity Under the Communications Decency Act.*

PissedConsumer conceded at oral argument on December 7 that the Communications Decency Act provides no immunity as to Ascentive's intellectual property claims. *See also* 47 U.S.C. § 230(e)(2) (courts must construe the CDA in a manner that would neither "limit or expand any law pertaining to intellectual property"); *Perfect10, Inc. v. CCBill Inc.*, 488 F.3d 1102, 1118 (9th Cir. 2007) (CDA provides no immunity against intellectual property claims); *Gucci America, Inc. v. Hall & Associates*, 135 F.Supp.2d 409, 417 (S.D.N.Y. 2001) (the CDA was enacted to address defamation claims and does not apply to Lanham Act claims).

The CDA likewise provides no immunity as to PissedConsumer's criminal conduct. *See* 47 U.S.C. § 230(e)(1) ("No effect on criminal law. Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this Act, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, United States Code, or any other Federal criminal statute.") *See also Doe v. City of New York*, 583 F.Supp.2d 444, 449 (S.D.N.Y. 2008) (*citing Zeran v. America Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997) ("Congress intended the statute to confer immunity on service providers that act as publishers and host third-

---

one act caused injury to the plaintiff seems to be a correct reading of the RICO statute); *see also Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F.2d 1263, 1268 (3d Cir. 1987) (holding that a pattern of racketeering activity may be based upon predicate acts directed against nonparties); *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809-10 (7th Cir. 1987) (same).

party content, while maintaining the ability 'to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.'")); *Kruska v. Perverted Justice Foundation Inc.*, 2008 WL 2705377 (D.Ariz. July 9, 2008) (finding immunity for state claims under CDA, but noting that there is no immunity for criminal or intellectual property violations and proceeding to analyze RICO and Lanham Act claims).

Additionally, and in any event, the CDA provides PissedConsumer no immunity for its own conduct in this matter. It is undisputed that CDA immunity does not cover PissedConsumer's own actions and any website content **created by PissedConsumer**. *See* 47 U.S.C. § 230(c)(1) (stating that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any **information provided by another information content provider**." (emphasis added)); *see also Anthony v. Yahoo! Inc.*, 421 F.Supp.2d 1257, 1262-63 (N.D.Cal.2006) (Yahoo! was not immune under CDA for content it creates or develops); *Fair Housing of San Francisco v. Roomates.com*, 521 F.3d 1157, 1162-63 (9th Cir. 2008) (Roommates.com was not entitled to CDA immunity "as to content that it creates itself, or is 'responsible, in whole or in part' for creating or developing"); *MCW, Inc. d/b/a Bernard Haldane Associates, v. BADBUSINESSBUREAU.COM, L.L.C, et al.*, 2004 WL 833595, at *8 (N.D.Tex. Aug. 19, 2004) ("Section 230(c) immunity is not so broad as to extend to an interactive computer service that goes beyond the traditional publisher's role and takes an active role in creating or developing the content at issue.").

Ascentive's claims do not depend upon PissedConsumer's status as the publisher or speaker of information provided by third parties in this matter. PissedConsumer's own conduct and admittedly self-created website content forms the basis of Ascentive's claims in this case. For example, PissedConsumer's Service Offering details website content that PissedConsumer, not any third party, creates and controls. Ascentive seeks to hold PissedConsumer liable for: the Service Offering PissedConsumer drafted; the description of Ascentive and its products PissedConsumer drafted; PissedConsumer's use of Ascentive's trademarks in its own website metadata; PissedConsumer's creation and selection of the advertisements for competitive products and services displayed at PissedConsumer.com; PissedConsumer's conduct in holding itself out as an unbiased consumer advocacy group but soliciting payments to influence the goods and services evaluated on its website; PissedConsumer's creation of subdomains containing Ascentive's trademarks; PissedConsumer's creation of the headings, display preferences and page titles on its website; PissedConsumer's use of black hat SEO practices and Ascentive's trademarks to promote its website and deceive consumers; PissedConsumer's own postings on its Twitter accounts, and various other online content created by PissedConsumer. PissedConsumer cannot have any CDA immunity as to content it created, encouraged, developed and/or materially contributed to on its website to reap profits.[6] *MCW*, 2004 WL 833595, at *8.

---

[6] Ascentive also notes that PissedConsumer has a history of authoring the "consumer reviews" on its website. *See Xcentric Ventures v. Opinion Corp.* Complaint, attached to Arena Decl., as Exhibit 9. As Ascentive obtains discovery from PissedConsumer in this matter, Ascentive reserves its right to amend its complaint to assert a defamation claim against PissedConsumer if Ascentive discovers additional evidence that PissedConsumer authored or otherwise materially contributed to the defamatory comments related to Ascentive on its website.

Moreover, PissedConsumer has done nothing to establish it is a "provider or user of an interactive computer service" entitled to immunity under the CDA, 47 U.S.C. § 230(c)(1). Specifically, the individual defendants in this matter have not shown that they qualify as providers of "an interactive computer service," similar to the individual defendants in *MCW*.

**B.     Ascentive Has Carried Its Burden on Irreparable Harm.**

A delay in seeking a preliminary injunction does not negate irreparable harm where the delay is justified. *Weight Watchers Internat'l Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144-45 (2d Cir. 2005) ("[S]hort delay does not rebut the presumption where there is a good reason for it..."); *King v. Innovation Books*, 976 F.2d 824, 832 (2d Cir. 1992) (affirming issuance of preliminary injunction despite eight-month delay); *Hasboro, Inc. v. Landard Toys, Ltd.*, 858 F.2d 70, 79 (2d Cir.1988) (finding that seven-month delay in seeking preliminary injunction did not constitute "undue delay"). The Second Circuit Court of Appeals has consistently held that a delay caused by a plaintiff's good faith efforts to investigate alleged infringement and/or possible legal recourse does not weigh against a finding of irreparable harm. *Kuklachev v. Gelfman*, 361 Fed.Appx. 161, 163 (2d Cir. 2009) (affirming finding that 18-month delay "was excusable based, in part, on the need to investigate the nature of the infringement and to explore what legal recourse was possible"); *Tom Doherty Assoc. Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) (affirming issuance of preliminary injunction despite four-month delay), *citing King*, 976 F.2d at 831. The Second Circuit has similarly held that diligent pursuit of settlement negotiations serves as adequate justification for delay. *CBS Inc. v. Liederman*, 866 F.Supp. 763, 766 (S.D.N.Y. 1994) *aff'd* 44 f.3d 174 (2d Cir. 1995) (per curiam) (finding that 11-month delay was not unreasonable where due to settlement negotiations); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 129 F.Supp.2d 351, 368 (D.N.J. 2000), *aff'd* 290 F.3d 578 (3d Cir. 2002) ("[Plaintiff's] good faith efforts to investigate the facts and pursue remedies outside of litigation do not undermine [its] claim of irreparable harm."). Courts also have found delay excusable where attributable to a defendant's dilatory or evasive behavior. *See, e.g. Tom Doherty*, (delay held not to be undue where caused in part by defendant's refusal to accept or return plaintiff's calls); *CBS*, 866 F.Supp. at 766 (delay found not to be undue where plaintiff experienced difficulty locating defendant in order to notify of trademark infringement); *Esbin & Alter, LLP v. Sappier*, 2010 WL 391830, at *3 (S.D.N.Y. Feb. 4, 2010) (delay not found to be undue where caused by plaintiff's failure to produce several key witnesses for deposition and unwillingness to engage in settlement discussions).

By contrast, courts have found that delay negates an assertion of irreparable injury where the delay in unexplainable, as in *Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F.Supp.2d 277, 281 (S.D.N.Y. 1998) – the sole case cited by PissedConsumer on this issue – or under the following circumstances, as described by the Second Circuit:

> The cases in which we have found that a delay rebutted the presumption of irreparable harm are trademark and copyright cases in which the fair inference was drawn that the owner of the mark or right had concluded that there was no infringement but later brought an action because of the strength of the commercial competition. In these cases, it appeared

> indisputable that the trademark or copyright owners were well aware of their rights and had concluded that they were not violated.

*Tom Doherty*, 60 F.3d at 39.

In this case, the time that elapsed between Ascentive's discovery of PissedConsumer's actionable behavior, filing suit and seeking preliminary injunction is neither unexplained nor indicative of an earlier conclusion that none of Ascentive's rights have been violated; to the contrary, it is wholly justified by Ascentive's good faith efforts to investigate its claims and to informally resolve its dispute with PissedConsumer. Ascentive originally contacted PissedConsumer regarding the false information it posted online and its infringing use of Ascentive's trademark on or about June 9, 2010. Ascentive did not become fully aware of PissedConsumer's intent to refuse to cure the defects identified absent payment of extortionate sums of money until it received the Service Offering on or about June 21, 2010. Upon receipt of the Service Offering, Ascentive immediately sought the advice of counsel, who after conducting factual and legal investigation notified PissedConsumer of its infringing use of its mark and publication of defamatory content by cease and desist letter dated July 27, 2010. PissedConsumer did not respond to Ascentive's letter until August 17, 2010. Ascentive filed suit on September 27, 2010, once it became apparent that PissedConsumer would not respond to its August 24, 2010, request for additional information and that settlement was unlikely. Ascentive re-initiated settlement negotiations on October 13, 2010, after locating and serving certain defendants (with some difficulty). Ascentive subsequently filed its motion for preliminary injunction on November 23, 2010, two weeks after PissedConsumer's filing of an answer makes clear that the prospects of settlement had ended. Indeed, courts have issued preliminary injunctions in the face of longer delays in seeking injunctive relief where explained by good reason. *See, e.g., Kuklachev*, 361 Fed.Appx. at 163 (18 months); *Fisher-Price Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119 (2d Cir. 1994), *abrogated on other grounds by Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) (six months); *King*, 976 F.2d at 831 (eight months); *Hasboro*, 858 F.2d at 79 (seven months). The Court, therefore, should find that the five months that elapsed while Ascentive was investigating its claims and attempting to settle the matter does not preclude a finding of irreparable harm.

In conclusion, Ascentive has carried its burden on likelihood of success on the merits and irreparable harm. In addition, as explained in its opening papers, the balance of harms weighs in Ascentive's favor and the public interest is best served by stopping consumer deception and confusion. For all the reasons stated in its opening papers and this submission, Ascentive respectfully requests that the Court promptly enter Ascentive's proposed preliminary injunction order.

Respectfully,

*Abbe F. FTC* (signature)
Abbe F. Fletman

cc: Ronald Coleman, Esquire (via electronic filing)
    Matthew Wagner, Esquire (via electronic mail)