UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
ASCENTIVE, LLC
and CLASSIC BRANDS, LLC,                                    OPINION AND ORDER

　　　　　Plaintiffs,                                        10 Civ. 4433 (ILG) (SMG)

　　- against -

OPINION CORP., <u>et</u> <u>al.</u>

　　　　　Defendants.
------------------------------------------------------x
GLASSER, Senior United States District Judge:

　　　　This case, arising under the Lanham Act and the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), exemplifies a new species of litigation spawned by the age of the

Internet.  The plaintiffs in this case are Ascentive, LLC ("Ascentive"), an Internet software

company, and Classic Brands, LLC ("Classic") a mattress manufacturer.  Ascentive and Classic

("plaintiffs") bring suit against Opinion Corp. and three of its officers:  (1) Michael Podolsky

("Podolsky"), Chief Executive Officer ("CEO"); (2) Alex Syrov, President; and (3) Joanna Clark

Simpson, Marketing Director (collectively "defendants" or "PissedConsumer"), operators and

owners of a consumer review website called www.PissedConsumer.com.

　　　　Plaintiffs move for a preliminary injunction pursuant to Rule 65 of the Federal Rules of

Civil Procedure to disable PissedConsumer webpages containing negative reviews of their

products at the following web addresses:  Ascentive.PissedConsumer.com, FinallyFast.

PissedConsumer.com; Dormia-mattresss.PissedConsumer.com; and Dormia.PissedConsumer.

.com.  Plaintiffs contend that PissedConsumer's use of their registered trademarks in the web

addresses of these pages, in the pages' metatags—the computer code associated with the pages—

in the text pages themselves, and in connection with advertising for their competitors' products

on these pages constitutes trademark infringement, unfair competition, and false designation of origin under 15 U.S.C. §§ 1114(1), 1125(a).  They also contend that PissedConsumer's "Reputation Management Services," which, for a fee, allows companies receiving negative consumer reviews to respond to the reviews and, under certain circumstances, alter the format in which the reviews appear, effectively amounts to extortion, bribery and other fraudulent behavior prohibited by RICO.

For the following reasons, plaintiffs' motions for a preliminary injunction are hereby DENIED.

## I.  BACKGROUND

Ascentive is a Pennsylvania-based corporation that develops and sells computer software products that enhance and protect personal computers by, among other things, improving system performance, increasing computer speed, and ensuring privacy.  Complaint dated Sept. 24, 2010 ("Ascentive Compl.") ¶ 15 (Dkt. No. 1).  Ascentive owns a number of websites, including www.ascentive.com and www.finallyfast.com, where its computer software products are advertised, sold, and made available for download.  Id. ¶ 21.  Ascentive also has registered trademarks in the names (1) Ascentive; (2) FinallyFast.com; (3) Finally Fast; and (4) FinallyFast. Id. ¶¶ 17-18.  Approximately ninety-nine percent of Ascentive's revenue comes from its online sales, id. at ¶ 23, the majority of which occur after consumers search for its product using a search engine like Google, Declaration of Adam Schran dated November 19, 2010 ("Schran Decl.") ¶ 6 (Dkt. No. 10-4).

Classic is a Maryland-based limited liability company that manufactures specialty sleep products, among which are Dormia brand mattresses.  Classic Complaint dated Nov. 30, 2010 ¶¶ 4, 15 ("Classic Compl.") (Dkt. No. 1).  Classic owns a registered trademark in the name Dormia

and operates a number of websites, including www.dormia.com and www.dormiamattress.com, on which it uses the mark to promote its sleep products and inform consumers of retail locations where they can purchase them. Id. ¶¶ 17, 19. Classic relies heavily on internet marketing for sales of its products both online and through conventional retail outlets. Declaration of Michael Zippelli dated Dec. 3, 2010 ¶ 10 ("Zippelli Decl.") (Dkt. No. 5-8).

PissedConsumer maintains a website, www.PissedConsumer.com, that invites consumers—both anonymous and identified—to post reviews of businesses. Ascentive Compl. ¶¶ 25-26, 35. PissedConsumer advertises itself as a consumer review website that allows consumers to "make better choices" between competing products and gives consumers an "empowering" and "unbiased" view of companies and products. Id. ¶ 29. It makes no attempt to discern which complaints are legitimate and which complaints are false. Id. ¶ 34.

PissedConsumer creates webpages for each of the companies for which there are reviews in the form of "subdomains," or domain names that are part of the larger PissedConsumer domain name at PissedConsumer.com. Id. ¶ 39.[1] And PissedConsumer created such pages regarding plaintiffs at the following web addresses: (1) finallyfast.pissedconsumer.com; (2) ascentive.pissedconsumer.com; (3) dormia-mattress.pissedconsumer.com; and (4) dormia.pissedconsumer.com. Ascentive Compl. ¶ 40; Classic Compl. ¶ 35.[2] On these pages, PissedConsumer provides a description of each of the companies and their products, and—in

---

[1] "Also known colloquially as a 'Web address,' a domain name is a combination of characters that a person types into a computer software program called a browser, in order to gain access to a Web site, a set of computer files through which another person provides information over the Internet." Porsche Cars N. Am., Inc. v. Porsche.net, 302 F.3d 248, 252 (4th Cir. 2002) (citing Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc., 202 F.3d 489, 492-93 (2d Cir. 2000)).

[2] All references to ascentive.pissedconsumer.com also refer to finallyfast.pissedconsumer .com, and all references to dormia.pissedconsumer.com also refer to dormia-mattress.pissed consumer.com. Additionally, all references to Ascentive are also to FinallyFast.

conjunction with a Google advertising program—displays advertisements for third parties'

products and services, including those of plaintiffs' competitors. Ascentive Compl. ¶¶ 45-47;

Classic Compl. ¶ 41.[3] The content of the advertisements change on a click-by-click basis—i.e.,

the advertisements are different for every separate user that visits the website. Transcript of

Hearing Before the Court on Dec. 6, 2010 ("Ascentive Tr.") at 20.

Third-party users' reviews of a company and its products appear at the bottom of each

company's PissedConsumer webpage. In the case of plaintiffs, their PissedConsumer pages

contained a number of comments—some of which are "false . . . really unhelpful and

discouraging to [their] prospective customers . . . [and] the public." Ascentive Tr. at 22-23.

While Ascentive alleges that PissedConsumer actually creates the purported third-party reviews

on the Ascentive.PissedConsumer.com page, Ascentive Compl. ¶ 32, Classic merely states that

"PissedConsumer encourages consumers to create negative postings on the PissedConsumer

website . . . ." Classic Compl. ¶ 27. PissedConsumer denies these allegations. While the fact

that these comments exist at all is troubling enough to plaintiffs, more troubling to them is the

fact that PissedConsumer's webpages containing these comments appear very high on the results

lists that search engines such as Google provide after a search engine user types in plaintiffs'

---

[3] Google offers two advertising products: AdWords and AdSense. AdWords allows
advertisers to display advertisements on Google's search results pages and on the sites of
Google's third-party partners. Woods v. Google Inc., No. 11 Civ.1263 (JF), 2011 WL 3501403,
at *1 (C.D. Cal. Aug. 10, 2011). AdSense "allows third parties, known as publishers or partners,
to provide advertising space on their websites for AdWords advertisers. These publishers
receive a share of the revenue Google receives for each click on an AdWords advertisement that
appears on their websites." Id. Thus, PissedConsumer, the publisher, and Google receive
revenue every time an internet user clicks on one of the advertisements posted on the site.

names or those of their products.  Ascentive Tr. at 18; Transcript of Hearing before the Court on

Jan. 1, 2011 at 30 ("Classic Tr.").[4]

Plaintiffs contend that PissedConsumer's high ranking in search engine results lists is a

product of PissedConsumer's improper "search engine optimization" ("SEO") practices—

practices that make PissedConsumer's content appear to be more relevant to a search engine's

algorithm than the site's content actually is.[5]  These practices include (1) creating web sites with

---

[4] A person searching for a website of a business or a product can enter the name of the entity or the product's trademark in a search engine such as Google or Yahoo!.  After the person prompts the search engine to begin its search, the search engine will provide a list of links to websites in order of their relevance to the search terms.  These lists or rankings, as they are sometimes called, are the result of each search engine's algorithm—a complex mathematical formula—the exact mechanics of which are often considered a trade secret by search engine companies such as Google, the leader among search engines.  For example, "Google's algorithm takes into account dozens of criteria, many of which the company will not discuss.  But it has described one crucial factor in detail:  links from one site to another."  David Segal, The Dirty Little Secrets of Search, N.Y. Times, Feb. 12, 2011 at BU1.

> If you own a Web site, for instance, about Chinese cooking, your site's Google ranking will improve as other sites link to it. The more links to your site, especially those from other Chinese cooking-related sites, the higher your ranking. In a way, what Google is measuring is your site's popularity by polling the best-informed online fans of Chinese cooking and counting their links to your site as votes of approval.

Id.  However, "even links that have nothing to do with Chinese cooking can bolster your profile if your site is barnacled with enough of them," and this can be achieved, among other ways, by a website owner paying to have links to its site placed on sites around the Internet.  Id.

[5] SEO "basically means taking steps to ensure that your website is shown first, or as close to first as possible, when the topic of your website is searched for on an internet search engine such as Google or Yahoo!."  Silver v. Brown, 382 F. App'x 723, 726 n.2 (10th Cir. 2010).  "The 'higher' a website appears within a list of search results, the more likely it is that visitors will land at that website via a particular search engine."  3M Co. v. Mohan, No. 09 Civ. 1413 (ADM) (FLN), 2010 WL 5095676, at *9 (D. Minn. Nov. 24, 2010).

"White hat" SEO techniques, such as redesigning content on a website to attract search engines, are permissible under search engines' terms of service and are considered a legitimate way to increase a website's ranking in search engine results.  James Grimmelman, The Structure of Search Engine Law, 93 Iowa L. Rev. 1, 13 (2007).  "Other, 'black hat' techniques involve mimicking the superficial features that search engines use as proxies for quality content."  Id.

no content and using them solely to create links to PissedConsumer's site; (2) making excessive use of brand names (and trademarks) in website text, web addresses, and webpage code; (3) reposting the same consumer complaints on multiple websites so that the complaints appear new when in fact they are outdated; and (4) creating Twitter accounts that simply post links to outdated reviews at PissedConsumer.[6]  Ascentive Compl. ¶ 53; Classic Compl. ¶ 48. PissedConsumer denies these allegations.

In order to allow companies to deal with negative postings on the PissedConsumer website, PissedConsumer provides what it calls "premium reputation management services" to "assist companies with their online reputation[s]."  Ascentive Compl. ¶ 57.  The reputation management services ("RMS") allow companies "to tell [their] side of the story and address complaints received from consumers."  Id.[7]  Naturally, Ascentive and Classic wished to do just that.

---

For example, some site owner's create "'link farms':  sets of thousands of sites and pages pointing to each other, mimicking a community of real users and hoping to trick search engines into treating them as authoritative, popular sources of information."  Id.  "Black hat" techniques are impermissible under search engines' terms of service, and search engines will impose penalties on companies that engage in such tactics, sometimes even removing the website from its search results altogether.  Segal, supra, at BU1.

[6] Twitter is a social networking service that allows its users to post messages using short communications called "tweets," and to read the tweets of other users.  Users can, among other things,  monitor, or "follow," other users' tweets.  Twitter, About Twitter, http://twitter.com/about (last visited Dec. 13, 2011).

[7] This business model does not appear to be particularly unique.  RipoffReports.com, another consumer review site, offers what it calls its "Corporate Advocacy Program" ("CAP") to businesses receiving negative reviews on its site.  Asia Econ. Inst. v. Xcentric Ventures LLC, No. 10 Civ. 01360 (SVW) (PJW), 2011 WL 2469822, at *3 (C.D. Cal. May 4, 2011).  Members of the Ripoff Report's CAP receive preferential treatment.  "For example, negative reports about CAP members are less prominent in internet searches.  In order to join the CAP, a company must pay a fee to [Ripoff Report's owner]; however, non-members may respond to a report if they create a free account with the Ripoff Report website."  Id. at *3.  Although anyone, including the business being reviewed, may post a comment on a PissedConsumer page, a business can only

In or around June 2010, after learning of negative comments on the PissedConsumer webpages dedicated to their companies, employees of plaintiffs each contacted PissedConsumer to learn more about its RMS and how they could respond to or otherwise engage unhappy consumers. Declaration of Ian Singer dated Nov. 19, 2010 ¶¶ 2, 4 ("Singer Decl.") (Dkt. No. 10-4); Zippelli Decl. ¶¶ 9, 11. Adam Schran ("Schran"), Ascentive's CEO and Michael Zippelli, Classic's CEO, testified that upon contacting PissedConsumer, they were informed that in order to learn more about PissedConsumer's RMS, they would be required to sign a Non-Disclosure Agreement ("NDA"). Ascentive Tr. at 23; Classic Tr. at 77.

Ascentive agreed to the terms of the NDA and, after doing so, received a copy of PissedConsumer's Service Offering that outlined the details of the services that PissedConsumer would perform as part of its RMS. Ascentive Tr. at 28. In exchange for $2,500 per month over three years, plus an upfront fee of $30,000—a total of $120,000—Ascentive would receive the following services:

(1) Notification of every review made on the Ascentive.PissedConsumer webpage and a "grace period" giving Ascentive the ability to address negative complaints before they are publicly posted on the site;

(2) Removal of all complaints made by commenters who refuse to allow Ascentive to contact them to address their complaints;

(3) PissedConsumer's posting of complaints addressed by Ascentive in a way that highlights resolution of the problem, rather than the problem itself. If this feature is in place, visitors to the webpage will only be able to see the original complaint by clicking through to it; and

---

post a direct rebuttal to a particular comment if it has paid for PissedConsumer's RMS. Ascentive Tr. at 96.

(4) Change of the title of the main landing page where consumer reviews are posted from Ascentive@PissedConsumer.com to "Ascentive Reviews" and the ability to change text on the page describing the company and its products and services.

Ascentive Tr. Ex. 2 at 7-12. Ascentive also alleges that Ian Singer, Ascentive's Director of Marketing, on or about June 15th or 17th, 2010, spoke to Podolsky, PissedConsumer's CEO, regarding the RMS, and Podolsky represented that "PissedConsumer would remove negative complaints in exchange for payment and Ascentive's participation in its [RMS]." Ascentive Compl. ¶ 61. PissedConsumer denies this allegation.

No one from Classic, on the other hand, signed the NDA. Zippelli Decl. ¶ 13. Instead, Zippelli opened an account on PissedConsumer's site and posted a complaint about the site itself, even paying a five dollar fee to ensure that his post received "preferred positioning" and that PissedConsumer thus would prominently display the complaint. Id. ¶ 14; Classic Tr. at 81-82. Shortly after Zippelli posted the comment, however, PissedConsumer refunded the fee Zippelli paid and deleted both Zippelli's PissedConsumer account and the negative review he had posted. Classic Tr. at 82.

Ascentive filed suit on September 27, 2010, and its complaint included substantive RICO, RICO conspiracy, and Lanham Act claims and Pennsylvania state law claims for trademark infringement, unfair competition, false designation of origin, violations of unfair trade practices and consumer protection law, interference with contractual and prospective contractual relations and unjust enrichment. On November 23, 2010, Ascentive filed a motion for a preliminary injunction seeking to disable the pages operated by PissedConsumer at Ascentive .PissedConsumer.com and FinallyFast.PissedConsumer.com. Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction dated Nov. 23, 2010 ("Ascentive Mem.") (Dkt.

No. 10-3). PissedConsumer filed its opposition on December 23, 2010, Memorandum of Law in Opposition to Plaintiff's Motion dated Dec. 3, 2010 ("Def. Opp'n.") (Dkt. No. 23), and Ascentive filed its reply on December 14, 2010, Reply dated Dec. 14, 2010 ("Ascentive Reply") (Dkt. No. 27). The Court held a hearing regarding Ascentive's motion on December 6 and 7, 2010.

On December 1, 2010, Classic filed a complaint against PissedConsumer asserting substantive RICO, RICO conspiracy, and Lanham Act claims, as well as state law claims for trademark infringement, unfair competition, false designation of origin, interference with contractual and prospective contractual relations, and unjust enrichment. Classic's complaint contains many allegations identical or nearly identical to those of Ascentive. Shortly after filing its complaint, on December 7, 2010, Classic filed a motion for a preliminary injunction, seeking to disable the pages operated by PissedConsumer at dormia-mattress.pissedconsumer.com and dormia.pissedconsumer.com. Memorandum of Law in Support of Motion for Preliminary Injunction dated Dec. 3, 2010 ("Classic Mem.") (Dkt. No. 5-2). PissedConsumer filed its opposition on January 5, 2010. Memorandum of Law in Opposition to Plaintiff's Motion dated January 5, 2010 (Dkt. No 17). The Court held a hearing regarding Classic's motion for a preliminary injunction on January 11, 2011.

On March 8, 2011, Magistrate Judge Gold consolidated Classic's actions against PissedConsumer with that of Ascentive pursuant to Fed. R. Civ. P. 42(a).

On April 7, 2011 and April 15, 2011, Ascentive and Classic sought to supplement the record underlying their preliminary injunction motions with evidence that Chitika.net ("Chitika"), an Internet advertising company, places advertising for plaintiffs' competitors on PissedConsumer's site and that these advertisements themselves contain plaintiffs' trademarks.

Ascentive's Memorandum in Support of its Motion for Leave to Supplement the Record dated Apr. 7, 2011 at 4 ("Ascentive Supp. Mem.") (Dkt. No. 39-2); Classic's Memorandum in Support of its Motion for Leave to Supplement the Record dated Apr. 15, 2011 ("Classic Supp. Mem.") (Dkt. No. 41).

PissedConsumer filed its opposition papers in response to these submissions on April 18, 2011 and June 24, 2011, respectively, and plaintiffs on April 25, 2011 and July 7, 2011 filed their replies. Def.'s Memorandum of Law in Opposition to Motion to Supplement the Record dated Apr. 18, 2011 ("Def. Supp. Opp'n") (Dkt. No. 44); Def.'s Memorandum of Law in Opposition to Motion to Supplement the Record dated June 24, 2011 (Dkt. No. 57); Ascentive Reply Memorandum of Law dated Apr. 22, 2011 ("Ascentive Supp. Reply") (Dkt. No. 48); Classic Reply Memorandum of Law dated July 7, 2011 (Dkt. No. 58).

## II.  DISCUSSION

### A.  Preliminary Injunction Standard

A court may issue a preliminary injunction "only if the plaintiff has demonstrated either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor." Salinger v. Colting, 607 F.3d 68, 79 (2d Cir. 2010) (internal quotations omitted) (alteration in original). The plaintiff must also demonstrate that he is likely to suffer "'irreparable injury in the absence of an injunction.'" Id. at 80 (quoting Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008)). Finally, "the court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." Salinger, 607 F.3d at 80 (quoting eBay v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)).

Irreparable injury has been defined as harm where "remedies available at law, such as monetary damages, are inadequate to compensate" the plaintiff for his or her injury.  Salinger, 607 F.3d at 80 (quoting eBay, 547 U.S. at 391).  Although prior to Salinger, courts in this circuit presumed irreparable injury in trademark cases where a likelihood of confusion was shown, post-Salinger, this presumption is no longer applicable.  See Salinger, 607 F.3d at 80 (citing eBay, 547 U.S. at 391) ("[T]he court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits . . . ."); see id. at 78 n.7 (limiting holding to copyright cases but noting that there is "no reason that eBay would not apply with equal force to an injunction in any type of case"); Tecnimed SRL v. Kidz–Med, Inc., 763 F. Supp. 2d 395, 402 (S.D.N.Y. 2011) (applying Salinger to a trademark claim); Marks Org., Inc. v. Joles, 784 F. Supp. 2d 322, 334-35 (S.D.N.Y. 2011) (same).

The Court first turns to the threshold question of whether plaintiffs have demonstrated a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and will address plaintiffs' claims in turn below.

**B.  Lanham Act Claims**

Plaintiffs assert two causes of action under the Lanham Act, one for trademark infringement under 15 U.S.C. § 1114(1)[8] and the other for unfair competition and false designation of origin under 15 U.S.C. § 1125(a).[9]  In order to prevail on either claim, a plaintiff

---

[8] Section 1114(1) creates a cause of action against any person who shall, without the consent of the trademark registrant:

> use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . . .

[9] Section 1125(a)(1) creates a cause of action against

is required to show that its marks are valid and that a defendant's use of those marks is likely to cause consumer confusion. See, e.g., Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 114 (2d Cir. 2009) (citing Savin Corp. v. Savin Grp., 391 F.3d 439, 456 (2d Cir. 2004) and Star Indus. v. Bacardi & Co., Ltd., 412 F.3d 373, 384 (2d Cir. 2005)); Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003); Time, Inc. v. Petersen Publ'g Co., 173 F.3d 113, 117 (2d Cir. 1999).[10]

As for confusion in the trademark infringement context, "[t]he crucial issue . . . is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." Starbucks, 588 F.3d at 114 (citation an internal quotation marks omitted). "[T]he Lanham Act seeks to prevent consumer confusion that enables a seller to pass off his goods as the goods of another . . . . [It] protects only against mistaken purchasing decisions and not against confusion generally." Lang v. Ret. Living Publ'g Co., Inc., 949 F.2d 576, 582-83 (2d Cir. 1991) (internal quotation marks and citation omitted). Moreover, particularly in the false designation of origin context and unfair competition context, "'[t]he public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.'" Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 109 (2d Cir. 2010) (quoting Dallas Cowboys

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . .

[10] There is no dispute regarding the validity of plaintiffs' marks or that PissedConsumer used the marks in commerce and in connection with goods and services.

Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 205 (2d Cir. 1979)) (emphasis in original).

Plaintiffs claim that PissedConsumer's use of their trademarks in PissedConsumer's subdomains (e.g., http://ascentive.pissedconsumer.com), metadata (also referred to as metatags),[11] and in the text of its website, in connection with advertising for plaintiffs' competitors' products and services allows PissedConsumer to profit from consumer confusion in violation of the Lanham Act. Ascentive Mem. at 18-20; Classic Mem. at 17-20. Plaintiffs contend, moreover, that the doctrine of "initial interest confusion" applies here. Ascentive Mem. at 19-20; Classic Mem. at 18-19. PissedConsumer responds, among other things, that no likelihood of confusion exists because its use of the marks was in the context of criticism of plaintiffs and not likely to cause a mistake as to origin, sponsorship, or affiliation and, in any event, that the First Amendment protects PissedConsumer's use of the mark. Def. Opp'n at 18-25; Def.'s Letter to the Court dated Dec. 6, 2010 (Dkt. No. 25).

## 1. There is no Likelihood of Confusion

In assessing the likelihood of confusion, a court should generally consider the following factors established by Judge Friendly in Polaroid Corp. v. Polarad Elec. Corp., 287 F.2d 492, 495 (2d Cir. 1961): (1) strength of the senior user's mark; (2) degree of similarity between the marks; (3) competitive proximity of the product and likelihood that the senior user will bridge the gap; (4) evidence of actual confusion; (5) defendant's bad faith; (6) the quality of defendant's product; and (7) sophistication of the relevant group. The application of the Polaroid test is "not

---

[11] A metatag is "a component of a webpage's programming that contains descriptive information about the webpage which is typically not observed when the webpage is displayed in a web browser." Venture Tape Corp. v. McGills Glass Warehouse, 540 F.3d 56, 59 (1st Cir. 2008). A web user can view the metatags associated with any given webpage by selecting "View" and "Source" in his web browser's menu bar.

mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." Starbucks, 588 F.3d at 115 (citation and quotation marks omitted); see also Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 45-46 (2d Cir. 2000) ("[T]he evaluation of the Polaroid factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins."); Orient Express Trading Co. v. Federated Dep't Stores, Inc., 842 F.2d 650, 654 (2d Cir. 1988) (a district court need not "slavishly recite the litany of all eight Polaroid factors in each and every case").

While the factors of the strength of plaintiffs' marks and the degree of similarity between the marks weigh in favor of plaintiffs, a number of the other Polaroid factors weigh heavily against them.[12]  As an initial matter, there is no "competitive proximity" between the parties' goods and services.  This factor "concerns whether and to what extent the two products [or services] compete with each other." Cadbury Beverages Inc. v. Cott Corp., 73 F.3d 474, 480 (2d Cir. 1996).  There is no such competition here.  Ascentive and Dormia are in the business of selling software and sleep products, respectively; PissedConsumer is in the business of selling its RMS program to businesses and collecting revenue from its advertisers.  "When the two users of a mark are operating in completely different areas of commerce, consumers are less likely to assume that their similarly branded products come from the same source." Virgin Enters., 335 F.3d at 150; see also TCPIP Holding Co. v. Haar Commc'ns Inc., 244 F.3d 88, 95 (2d Cir. 2001) ("[O]rdinarily, little confusion will result when the junior use [of a similar mark] is in an area of commerce that is outside the senior owner's area.").  Nor is there a likelihood of "bridging the

---

[12] The strength of a trademark is assessed with reference to its distinctiveness, and, due to their registration, plaintiffs' marks are presumed to be distinctive.  See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986) ("[R]egistered trademarks are presumed to be distinctive and should be afforded the utmost protection.").  Moreover, there is no dispute that PissedConsumer has used plaintiffs' marks and thus the marks being compared are identical.

gap," a factor closely related to competitive proximity. This factor refers to the interest of the senior users—here, plaintiffs—in preserving avenues of expansion and entering into related fields. <u>See</u> <u>Hormel Foods Corp. v. Jim Henson Prods., Inc.</u>, 73 F.3d 497, 504 (2d Cir. 1996) (citation omitted). Plaintiffs do not contend that they seek to enter PissedConsumer's field.

Next, plaintiffs have provided the Court with no evidence of actual confusion in the form of, for example, consumer surveys or an expert report even though they have had ample time to do so.[13] While "actual confusion need not be shown to prevail," <u>see</u> <u>Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.</u>, 830 F.2d 1217, 1227 (2d Cir. 1987), evidence of actual confusion is "highly probative" of the likelihood of confusion, <u>Levi Strauss & Co.</u>, 799 F.2d at 875.

The factor of bad faith also weighs against plaintiffs. In the trademark context, "[b]ad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." <u>Star Indus.</u>, 412 F.3d at 388 (rum maker's logo design not likely to be confused with the trademarked logo of vodka maker where, among other reasons, there was lack of evidence tending to show rum maker's desire to exploit vodka maker's reputation or confuse it with the reputation of rum maker). "[I]n the absence of evidence, apart from proof of copying, that the defendant sought to confuse consumers, bad faith should not be inferred simply from the fact of copying." <u>Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.</u>, 111 F.3d 993, 1005 (2d Cir. 1997). This factor is not "of high relevance to the likelihood of confusion." <u>Virgin Enters.</u>, 335 F.3d at 141. It can "affect the court's choice of remedy or can tip the balance where questions are close. It does not bear directly on whether consumers are likely to be confused."

---

[13] Schran, Ascentive's CEO, acknowledged, moreover, that Ascentive received no complaints from consumers who visited Ascentive.PissedConsumer.com and clicked on an advertisement for one of Ascentive's competitors thinking that it would allow them to download Ascentive software. Tr. at 85.

Id. (citing TCPIP Holding Co., 244 F.3d at 102).  While it may be true that PissedConsumer has

engaged in sharp-elbowed and perhaps unethical SEO tactics meant to make its webpages appear

more relevant to search engines such as Google or Yahoo! than they actually are, that fact has no

bearing on the inquiry here—whether PissedConsumer has attempted to sow confusion as to the

source, origin, or affiliation of its products and services with those of plaintiffs.[14]

Indeed, it is clear that PissedConsumer is not using plaintiffs' marks as source identifiers

at all.  The Court will discuss this point and why PissedConsumer's use of plaintiffs' marks in

(1) domain names; (2) webpage content; (3) metatags; and (4) in connection with the advertising

of their competitors does not result in a likelihood of confusion in further detail below.

## 2.  Use of Marks in Domain Names & Webpage Content

Where, as here, the domain name of a website itself—Ascentive.PissedConsumer.com or

Domia.PissedConsumer.com—makes clear that it is not affiliated with trademarks the domain

name incorporates and indeed is critical of the companies that own the marks, the use of the

marks does not present a likelihood of confusion.  See, e.g., Taubman Co. v. Webfeats, 319 F.3d

770, 777-78 (6th Cir. 2003) (no Lanham Act violation where gripe site with domain name

taubmansucks.com that provided editorial on conflict between website creator and plaintiff

corporation did not create any possibility of confusion); Taylor Building Corp. of Am. v.

Benfield, 507 F. Supp. 2d 832, 847 (S.D. Ohio 2007) (gripe site with domain name

taylorhomesripoff.com that served as forum for criticizing home builder did not create any

likelihood of confusion "because [n]o one seeking Taylor's website would think—even

---

[14] The same is true of the fact that Janet Simpson, PissedConsumer's purported Marketing Director who issues press releases on behalf of PissedConsumer, does not actually exist.  Classic Tr. at 72.  While issuing press releases in the name of a fictitious person may be regarded as unethical, as the Court is inclined to believe it is, it can only accurately be described as misleading but not confusing in that it would lead a consumer to mistake one person for another or affect source identification or purchasing decisions.

momentarily—that Taylor in fact sponsored a website that included the word "ripoff" in its website address"); Bally Total Fitness Holding Corp. v. Faber, 29 F. Supp. 2d 1161, 1163-64 (C.D. Cal. 1998) (gripe site with domain name www.compupix.com/ballysucks dedicated to complaints about Bally's health club did not create likelihood of confusion because no reasonable visitor to gripe site would assume it to come from same source or think it to be affiliated with, connected with, or sponsored by Bally's). Like the word "sucks," the word "pissed" has entered the vernacular as a word instinct with criticism and negativity.[15] Thus, no reasonable visitor to Ascentive.PissedConsumer.com or Dormia.PissedConsumer.com would assume the sites to be affiliated with Ascentive or Classic respectively, and PissedConsumer's use of plaintiffs' marks in the various domain names at issue is not likely to cause confusion as to source.

This same conclusion holds true for PissedConsumer's use of the plaintiffs' marks in the content of the PissedConsumer site itself. See MCW, Inc. v. Badbusinessbureau.com, L.L.C., No. 02 Civ. 2727, 2004 WL 833595, at *16 (N.D. Tex. Apr. 14, 2004) (Lanham Act unfair competition claims against consumer review websites called "ripoffreport.com" and "badbusinessbureau.com" that used plaintiff's trademarks in connection with allegedly defamatory posts dismissed because no visitor to websites would believe that plaintiff markholder endorsed the comments on sites); Whitney Inf. Network, Inc. v. Xcentric Ventures, No. 2:04-cv-47-FtM-34SPC, (M.D. Fla. July 14, 2005) (unpublished memorandum and order) (dismissing trademark infringement and false designation of origin claims against "ripoffreport.com" because plaintiff mark holder, a seller of education courses, was involved in different field than defendant, who sold advertising space on site and helped aggrieved

---

[15] Merriam-Webster defines the word "pissed" as "angry, irritated." Merriam-Webster (2011), http://www.merriam-webster.com (last visited Dec. 13, 2011).

consumers reclaim lost money, and because no consumer would "be confused by a consumer watch-dog type website that is not selling any real estate investment course"); cf. Lamparello v. Falwell, 420 F.3d 309, 315 (4th Cir. 2005) (no likelihood of confusion between Reverend Jerry Falwell's trademark, his name, and a website critical of his views at fallwell.com because criticism website and Falwell's website did not look alike, owner of the criticism site "clearly created his website intending only to provide a forum to criticize ideas, not to steal customers," and "[n]o one would believe that Reverend Falwell sponsored a site criticizing himself, his positions, and his interpretations of the Bible"); Bihari v. Gross, 119 F. Supp. 2d 309, 319 (S.D.N.Y. 2000) (no likelihood of confusion because no reasonable viewer would believe that the disparaging comments regarding designer's business ethics on defendant's websites were endorsed by designer).

The decision in Cintas Corporation v. Unite Here, 601 F. Supp. 2d 571 (S.D.N.Y. 2009), aff'd 355 F. App'x 508 (2d Cir. 2009) (per curiam) is particularly instructive. There, plaintiff Cintas, the largest uniform supplier in the United States, brought, among other things, claims for trademark infringement and unfair competition under the Lanham Act against two labor unions operating a website at www.cintasexposed.com that contained negative information about Cintas and its alleged anti-union practices and that contained a link to an online store selling union apparel and other items that, in turn, contained links to Cintas's competitors' websites. Id. at 575. Taking issue with the unions' use of its mark in the domain name and on the site itself, Cintas alleged that the website generated profits for defendants by disparaging Cintas, confusing its customers, and "portraying Cintas in a bad light to the general consuming public." Id.

The court dismissed Cintas's trademark claims, reasoning that while the materials available on the union's site "may disparage Cintas, the likelihood that Cintas's actual or

potential customers would be confused about who provides CINTAS goods and services is remote." Id. at 579. The court stressed, moreover, that there is no justification for relief under Section 1114 and 1125(a), when "'the defendants use plaintiff's mark not in a manner that would create confusion as to the source, but rather as part of a message whose meaning depends on reference to plaintiff's product.'" Id. at 579 (quoting United We Stand Am., Inc. v. United We Stand Am. N.Y., Inc., 128 F.3d 86, 92-93 (2d Cir. 1997).[16]

The same is true here. There is little likelihood that a potential consumer visiting PissedConsumer would be confused about whether it was the source of plaintiffs' goods or whether Ascentive or Classic sponsored or otherwise approved of PissedConsumer's use of their marks. Indeed, the domain names here, like cintasexposed.com or taubmansucks.com, bespeak negativity concerning plaintiffs' products. So too does PissedConsumer's logo—a frowning red cartoon face with a furrowed brow and a speech bubble containing characters in place of an expletive—and PissedConsumer's tagline: "TELL THE WORLD. BE HEARD." The comments posted on the site are also decidedly negative. See Ascentive Mem. (Arena Decl.) Ex. 11, at 3 ("Ascentive software is junk . . . . I would say that this company has been ripping people off since they began."); Classic Mem. (Panjwani Decl.) Ex. 4, at 2 ("Dormia Mattress—Countrywide Sales Fraud, Inferior product. We purchased our Dormia latex/foam mattress

---

[16] Classic attempts to distinguish Cintas on the grounds that the (1) relevant group in that case was "a sophisticated corporate audience;" and (2) website in that case contained a disclaimer stating that it contained "criticism and information" about Cintas. Classic Reply Memorandum of Law in Support of Motion to Supplement the Record dated July 7, 2011 at 13-14 (Dkt. No. 58). These distinctions are inapposite. "Sophistication of the relevant group" is merely one of the Polaroid factors that courts consider in determining whether the likelihood of consumer confusion exists, see Polaroid, 287 F.2d at 495, and plaintiffs have offered no specific information regarding the sophistication of the relevant group here. Additionally, here, there was no need for PissedConsumer's pages to contain a disclaimer stating that it contains criticism and information regarding plaintiffs' products as this is evident from the domain name and content of the site itself.

7/2008. It has a worn path and sags causing back and hip pain in the morning."). It strains

credulity that an Internet user would believe that plaintiffs would sponsor or otherwise approve

of a site that contains such criticisms.[17] Instead, after a brief inspection of the content of

PissedConsumer's website, the user would realize that they were visiting a third-party gripe site

for "pissed" consumers. The Court thus concludes that PissedConsumer's use of plaintiffs'

marks in domain names and in the text of the site itself is not likely to cause confusion as to

whether PissedConsumer was the source of plaintiffs' products or whether plaintiffs approved of

or otherwise endorsed the use of their marks.

### 3. Use of Marks in Metatags

As for PissedConsumer's use of plaintiffs' marks in its metatags, plaintiffs contend that

the use causes PissedConsumer's website to appear prominently in search results for their marks

and ultimately results in "initial interest confusion." Ascentive Mem. at 19-20; Classic Mem. at

18-19. Plaintiffs rely on Brookfield Communications v. West Coast Entertainment Corp., 174

F.3d 1036 (9th Cir. 1999), a decision in which the Ninth Circuit concluded that initial interest

confusion could be created by the misleading use of metatags, in support of their position.

Ascentive Mem. at 20; Classic Mem. at 18-19. The Court finds plaintiffs' contentions

unpersuasive.

Initial interest confusion in the Internet context "arises when a consumer who searches

for the plaintiff's website with the aid of a search engine is directed instead to the defendant's

site because of a similarity in the parties' website addresses." Savin, 391 F.3d at 462 n.13. In

the context of the Internet, "the concern is that potential customers of one website will be

---

[17] It also strains credulity that a consumer would believe PissedConsumer's pages to be
associated with the customer relations department of plaintiffs, one of Ascentive's contentions.
See Ascentive Tr. at 21.

diverted and distracted to a competing website.  The harm is that the potential customer believes that the competing website is associated with the website the customer was originally searching for and will not resume searching for the original website."  Bihari, 119 F. Supp. 2d at 319. However, "[b]ecause consumers diverted on the Internet can more readily get back on track than those in actual space, thus minimizing the harm to the owner of the searched-for site from consumers becoming trapped in a competing site, Internet initial interest confusion requires a showing of intentional deception."  Savin, 391 F.3d at 462 n.13.

Initial interest confusion is unlikely here.  As an initial matter, PissedConsumer cannot divert Internet users away from plaintiffs' sites because PissedConsumer's site is not in competition with those of plaintiffs.  See Bihari, 119 F. Supp. 2d at 320 (no initial interest confusion where gripe site using plaintiff's metadata was not in competition with that of plaintiff); BigStar Entm't, Inc. v. Next Big Star, Inc., 105 F. Supp. 2d at 209-10 (S.D.N.Y. 2000) (initial interest confusion "presumably would not arise, or would be minimized, in circumstances where the products in question are used for substantially different purposes and therefore the merchants are not in close competitive proximity, even if there may be some similarity between their marks").[18]  There is no competitive proximity between the parties' goods and services; Ascentive and Classic are in completely different fields than PissedConsumer.[19]

---

[18] Competitive proximity "concerns whether and to what extent the two products [or services] compete with each other." Cadbury Beverages, 73 F.3d at 480.

[19] While it is true, as plaintiffs contend, that PissedConsumer's pages containing plaintiffs' domain names sometimes contain pop-up ads and banner ads for plaintiffs' competitors, the key inquiry in the initial interest confusion analysis is whether PissedConsumer—the alleged infringer—competes with plaintiffs.  See Falwell, 420 F.3d at 317 ("When an alleged infringer does not compete with the markholder for sales, 'some initial confusion will not likely facilitate free riding on the goodwill of another mark, or otherwise harm the user claiming infringement. Where confusion has little or no meaningful effect in the marketplace, it is of little or no consequence in our analysis.'" (quoting Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 296-97 (3d Cir. 2001))).

Additionally, for the reasons already discussed above, no reasonable consumer searching for either of plaintiffs' sites would be diverted to PissedConsumer's webpages in light of their domain names; the PissedConsumer pages and all their content were clearly critical of plaintiffs. See Falwell, 420 F.3d at 320 (no initial interest confusion because "[t]he critical element—use of another firm's mark to capture the markholder's customers and profits—simply does not exist when the alleged infringer establishes a gripe site that criticizes the markholder"); Cintas, 601 F. Supp. at 579-80 (no initial interest confusion because no consumer looking for a uniform company's website would mistakenly visit a site called cintasexposed.org and because site's content was transparent in its disdain for Cintas); Bihari, 119 F. Supp. 2d at 320 (no initial interest confusion because internet user visiting site containing disparaging comments about mark owner would believe that sites belong to him or his business).

Finally, the circumstances here are unlike those in Brookfield. In that case, the Ninth Circuit addressed whether the defendant's use of "MovieBuff" in the metatag code on its website infringed the "MovieBuff" mark of the plaintiff, one of its competitors. 174 F.3d at 1062. Plaintiff Brookfield had created a website offering an Internet-based searchable entertainment database under the "Moviebuff" mark. Id. at 1042. Defendant West Coast, a video rental chain, registered a site at "Moviebuff.com" that also contained a searchable entertainment database. Id. at 1042-43. The Ninth Circuit concluded that the defendant's use of the marks caused "initial interest confusion" and thus infringement, explaining that even though "there is no source confusion in the sense that consumers know [who] they are patronizing, . . . there is nevertheless initial interest confusion in the sense that, by using 'moviebuff.com' or 'MovieBuff' to divert people looking for 'MovieBuff' to its website, [the defendant] improperly benefits from the

goodwill that [the plaintiff] developed in its mark." Id. at 1062. The Ninth Circuit explained the

harm of initial interest confusion in cyberspace as follows:

> Using another's trademark in one's metatags is much like posting a sign with
> another's trademark in front of one's store. Suppose [defendant] West Coast's,
> competitor (let's call it "Blockbuster") puts up a billboard on a highway
> reading—"West Coast Video: 2 miles ahead at Exit 7"—where West Coast is
> really located at Exit 8 but Blockbuster is located at Exit 7. Customers looking
> for West Coast's store will pull off at Exit 7 and drive around looking for it.
> Unable to locate West Coast, but seeing the Blockbuster store right by the
> highway entrance, they may simply rent there. Even consumers who prefer West
> Coast may find it not worth the trouble to continue searching for West Coast since
> there is a Blockbuster right there.

Id. at 1064.

This analogy and Brookfield itself have been roundly criticized by courts and

commentators. See, e.g., Michael Grynberg, Trademark Litig. as Consumer Conflict, 86 N.Y.U.

L. Rev. 60, 86 (2008) (citations omitted) (noting that "Brookfield and its progeny have been

heavily criticized for expanding initial interest confusion doctrine into Internet cases in which the

case for any consumer harm is doubtful"); Playboy Enters. v. Netscape Commc'ns Corp., 354

F.3d 1020, 1034-35 (9th Cir. 2004) (Berzon, J., concurring) (noting that Brookfield was

"wrongly decided," and that the billboard analogy "has been widely criticized as inapplicable to

the internet situation, given both the fact that customers were not misdirected and the minimal

inconvenience in directing one's web browser back to the original list of search results"). The

Court agrees with the criticism that the harm caused by initial interest confusion in the internet

context is minimal as "with one click of the mouse and a few seconds delay, a viewer can return

to the search engine's results and resume searching for the original website." Bihari, 119 F.

Supp. 2d at 320 n.15.

In any event, unlike in Brookfield, plaintiffs and PissedConsumer are not competitors. In

such circumstances, as the Ninth Circuit acknowledged, "the likelihood of confusion would

probably be remote. A Web surfer who accessed "moviebuff.com" and reached a website advertising the services of Schlumberger Ltd. (a large oil drilling company) would be unlikely to think that Brookfield had entered the oil drilling business or was sponsoring the oil driller." Brookfield, 174 F.3d at 1056. Additionally, unlike in Brookfield, PissedConsumer is using the marks to describe the contents of its pages concerning Ascentive and Classic, not to suggest affiliation or source. See Bihari, 119 F. Supp. 2d at 320 (use of plaintiff's marks in metatags by websites critical of plaintiff permissible means of describing contents of sites); cf. Playboy Enters., 279 F.3d at 801 (use of metatags containing plaintiff Playboy's mark permissible where defendant, a former playmate, could not identify the content of her site selling photos of herself without referring to plaintiff's marks, "Playboy" and "Playmate," and where "[p]recluding their use would have the unwanted effect of hindering the free flow of information on the internet").

Finally, the technological landscape today is vastly different than it was in 1999 when the Ninth Circuit decided Brookfield. The Ninth Circuit characterized the interaction between search engines and metatags as follows: "The more often a term appears in the metatags and in the text of the web page, the more likely it is that the web page will be 'hit' in a search for that keyword and the higher on the list of 'hits' the web page will appear." Plaintiffs make this point in their submissions. Ascentive Mem. at 20 ("PissedConsumer intentionally uses Ascentive's distinctive trademarks in its website metadata to cause the website to appear prominently in search results for trademarks such as "Ascentive."); Classic Mem. at 19 ("PissedConsumer uses Classic's distinctive DORMIA trademark in its website metadata to cause the website to appear prominently in search results for trademarks such as "DORMIA" in order to redirect traffic towards its site.").

These contentions reflect a flawed understanding of the operation of search engines. Although early search engines—such as those in <u>Brookfield</u>—used to rely heavily on metatags to find and rank websites based on relevancy to the search terms provided by the user, "modern search engines make little if any use of metatags." J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 25:69 (4th ed. 2003); <u>see also</u> Anne Gilson Lalonde & Jerome Gilson, <u>Gilson on Trademarks</u> § 7A.08 (2009 ed.) ("Since at least 2002 . . . search engines such as Google generally do not index web sites based on their meta keywords tags."). Instead, search engines today primarily use algorithms that rank a website by the number of other sites that link or point to that website. <u>See, e.g.</u>, <u>Network Automation, Inc. v. Advanced Sys.</u>, 638 F.3d 1137, 1146 n.3 (9th Cir. 2011) (citation omitted); <u>Standard Process, Inc. v. Banks</u>, 554 F. Supp. 2d 866, 871 (E.D. Wis. 2008). Indeed, the algorithm of Google, the leading search engine, does not use metatags to determine its results list at all. <u>See</u> Google Webmaster Central Blog, http://www.googlewebmastercentral.blogspot.com/2009/ 09/google-does-not-use-keywords-meta-tag.html (last visited Dec. 13, 2011).

Closely connected with plaintiffs' arguments concerning PissedConsumer's use of metatags to affect search engine results is their contention that PissedConsumer engaged in improper SEO tactics to increase PissedConsumer's position in search engine results lists.[20] For example, PissedConsumer has repeatedly posted old consumer complaints concerning plaintiffs through Twitter, an action that indicates to a search engine that the entire complaint and the webpage upon which it is found is new and relevant and thus may increase its position in a

---

[20] Other allegedly improper SEO tactics include (1) creating web addresses and using them solely to create links to PissedConsumer's site; (2) reposting the same consumer complaints on multiple websites so that the complaints appear new when in fact they are outdated; and (3) creating Twitter accounts that simply post links to outdated complaints at PissedConsumer. Ascentive Compl. ¶ 53; Classic Compl. ¶ 48.

search engine results list.  Ascentive Tr. at 98-100.  Ascentive's CEO, Schran, testified as follows:

Witness:      My testimony about the misleading date is that your client, using unethical Black Hat techniques, posted on Twitter, complaints that are dated as being 2010, then when you click on them, they go to complaints from 2008.  They're dredging up old complaints to make it seem to Google that they're new and relevant.

Counsel:      Is it your testimony that it's an unethical Black Hat technique to use Twitter to link to information that was posted on the internet on a date other than the date of the Twitter publication?

Witness:      It can be.

The Court:    Either it is or it isn't.  When you say it can –

Witness:      Under some circumstances yes, and under some circumstance [sic] no. If the date was off by a few days, that would be ethical. If the date is off by a few years, that's unethical.

Counsel:      What's unethical about it?

Witness:      Posting an old complaint as a new one?  It breaches the trust of Twitter.  Twitter is supposed to be timely, relevant content about stuff that's happening now.  It is not supposed to be a way for people to make money by reposting old complaints, so they can make money from the ads on that site.

Counsel:      Is it your understanding that it's against the law to link to an old complaint on Twitter?

| Witness: | I didn't speak to the law. |
|---|---|
| Counsel: | You realize why we're here, though, today, right? |

Tr. at 99-100. While it may be—and likely is—the case that PissedConsumer's SEO practices are intended to make its webpages seem more relevant to search engines than they actually are and these methods may indeed violate the search engines' terms of services, the remedy for this conduct is not trademark law but instead with the search engines themselves. The Court stated as much at Ascentive's preliminary injunction hearing:

> I'd like to know why, if at all, this so-called trick being played on Google isn't something that Google has legitimate complaint [sic] about and not the object of the complaints.
>
> What I'm hearing is it's Google that's being, in a way, misled or tricked— and I don't know how precisely how Google is being tricked, except that they're putting something higher than they might otherwise have. . . . I don't know what the trick is being played [sic] on the consumer. I don't know what it is that constitutes some trick or misleading or confusion as far as the consumer is concerned.

Ascentive Tr. at 111-12. If the search engines conclude that PissedConsumer's SEO practices are indeed in violation of their terms of service or guidelines, they can take certain steps to punish PissedConsumer including lowering the site's place in their search result lists or removing the site from their lists completely—the so called "death penalty." See, e.g., Segal, supra n.6, at BU1 (describing Google's temporary removal of BMW from its search result list after discovering that BMW had used an improper black hat SEO strategy to bolster BMW's position in the list); Greg Lastowka, Google's Law, 73 Brook. L. Rev. 1327, 1355 & n.126 (2008) (noting that employees at Google have confirmed that Google sometimes penalizes websites by removing them from Google's search results list in response to certain SEO techniques).

In any event, PissedConsumer's placement on a search engine's results list—whether on its first page or last—is ultimately irrelevant because there is no likelihood that a consumer who visits PissedConsumer pages would believe that Ascentive or Classic sponsored or otherwise approved of the use of their marks on pages with such decidedly negative names and content. In sum, PissedConsumer's use of plaintiffs' marks in its metatags is unlikely to cause initial interest confusion.

### 4. Use of Marks in Connection with Advertising

Plaintiffs also contend that PissedConsumer has infringed their marks by displaying banner and pop-up advertisements through the Chitika advertising network that contain plaintiffs' marks in the text of the advertisements themselves.[21] Ascentive Supp. Mem. at 2-4; Classic Supp. Mem. at 2.[22] PissedConsumer responds that plaintiffs' claims "are based on advertisements by third parties that in turn link to services that compete with Ascentive's" and

---

[21] A banner advertisement is a graphic image, sometimes containing text, used on a website to advertise a product or service. If users click on a banner advertisement, the user's web browser will link them immediately to the advertiser's website. See, e.g., Playboy Enters., 354 F.3d at 1028. A prominent commentator describes "pop up" advertising as follows:

> Internet users may suddenly see a small advertisement pop up in front of the page they are viewing, or when they close a web page, there may be an advertisement hiding underneath it. These are "pop-up" and "pop-under" ads. A computer user may download certain computer software onto his or her computer as part of a bundle of free software, and may or may not be aware that such software will create pop-up ads. Once the user enters a URL or search term, that can trigger the software to place an advertisement onto the screen. The product advertised may depend on the content of the web site or the search term the user has entered; if the web site is an air travel site, the advertisement could be for a discount airline ticket service, for example.

Gilson, supra, § 7A.14.

[22] Plaintiffs' motions for leave to supplement the record are granted. The motions contain new information relevant to the precise nature of the advertisements appearing on PissedConsumer's site.

that at best any claim against PissedConsumer can only sound in contributory infringement, a legal theory not sufficiently alleged in plaintiffs' complaints. Def. Supp. Opp'n at 3-4. The Court agrees.

The parties dispute precisely how Chitika functions but do not dispute that it is Chitika—not PissedConsumer—that ultimately places the advertising containing plaintiffs' marks on PissedConsumer's site and thus would be responsible for any direct infringement of plaintiffs' marks. <u>Compare</u> Declaration of Kyle Reiff (of Ascentive) dated Apr. 6, 2011 at 2 ("When a user types in a search for 'Ascentive' [in a site's internal search engine] that search data is sent to Chitika.net and their network software returns an ad relevant to searches on 'Ascentive.'), <u>with</u> Affirmation of Michael Podolsky (of PissedConsumer) dated April 17, 2011 ¶¶ 11, 28 (Dkt. No. 44-2) ("PissedConsumer exercises no control over the [advertisements] offered by Chitika.net . . . . [A]d networks, and not PissedConsumer, are exclusively responsible for determining which advertisement appears in the location on PissedConsumer's website and its overall relevancy to each user."). The implication of these statements is that any direct infringement of plaintiffs' trademarks would be the result of Chitika's actions, not those of PissedConsumer, and that PissedConsumer could only be held liable, if at all, for its actions based on a theory of contributory trademark infringement.[23]

---

[23] Plaintiffs have provided the Court with no authority for the proposition that a website owner can be held liable for direct infringement based on actions by a third-party advertising network such as Chitika on the owner's site, and the cases they do cite are distinguishable. <u>American Auto Association, Inc. v. Advance Quotes, LLC</u>, No. 10 Civ. 06020, 2010 WL 2985505 (W.D. Ark. June 29, 2010), involved a motion for a default judgment in which all of the allegations in the complaint, including those related to likelihood of confusion, were required to be accepted as true. <u>See id.</u> at *2. Further, in <u>Rescuecom</u>, the Second Circuit explicitly did not address the likelihood of confusion that would result by Google's use of the plaintiff's marks as part of its advertising program. <u>Rescuecom Corp. v. Google, Inc.</u>, 562 F.3d 123, 130 (2d Cir. 2009) ("We have no idea whether Rescuecom can prove that Google's use of Rescuecom's trademark in its AdWords program causes likelihood of confusion or mistake."). Classic's

The Supreme Court in <u>Inwood</u> described contributory trademark infringement as follows: "[A] manufacturer or distributor [who] intentionally induces another to infringe a trademark, or . . . continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement . . . is contributorily responsible for any harm done as a result of the deceit." <u>Inwood Labs., Inc. v. Ives Labs., Inc.</u>, 456 U.S. 844, 854, 102 S. Ct. 2182, 72 L. Ed. 2d 606 (1982); <u>accord</u> <u>Tiffany (NJ) Inc. v. eBay Inc.</u>, 600 F.3d 93, 105-06 (2010).[24] District courts applying <u>Inwood</u> in the context of service providers have concluded that the key inquiry is "'the extent of control exercised by the defendant [service provider] over the third party's means of infringement'" <u>Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd.</u>, No. 07 Civ. 6959 (DAB), 2010 WL 4968072, at *3 (S.D.N.Y. Dec. 6, 2010) (citations omitted); <u>accord</u> <u>Tiffany (NJ) Inc. v. eBay, Inc.</u>, 576 F. Supp. 2d 463, 505 (S.D.N.Y. 2008), <u>rev'd on other grounds</u>, 600 F.3d 114; <u>Gucci Am., Inc. v. Frontline Processing Corp.</u>, 721 F. Supp. 2d 228, 247-48 (S.D.N.Y. 2010).

Put simply, plaintiffs are unlikely to succeed on any contributory infringement claim against PissedConsumer because they do not sufficiently allege, let alone make, such a claim in their complaints. Where a plaintiff's claims cannot survive a motion to dismiss, they fail <u>a fortiori</u> to establish a likelihood of success on the merits. <u>Klein v. City of New York</u>, No. 10 Civ. 9568 (PAE) (JLC), 2011 WL 5248169, at *11 (S.D.N.Y. Oct. 28, 2011) (citing <u>Arbitron Co.</u>

_____

selective quotation from <u>Rescuecom</u> in its papers merely reflects the Second Circuit's summary of the plaintiff's allegations in the complaint.

[24] Where, as here, a party such as PissedConsumer supplies a service—<u>i.e.</u>, hosting a webpage—rather than a product to one engaging in trademark infringement, the Second Circuit has not decided definitively that <u>Inwood</u> applies; instead it assumed without deciding that <u>Inwood</u> applied because the service provider in that case did not contest <u>Inwood</u>'s application. <u>See</u> <u>eBay</u>, 600 F.3d 105-06. Because PissedConsumer does not contest <u>Inwood</u>'s application, the Court will assume without deciding that <u>Inwood</u>'s test for contributory infringement governs here.

v. Phoenix Broad. Corp., No. 97 Civ. 4355 (MBM ) (HBP), 1997 WL 452020, at *6 (S.D.N.Y. Aug. 6, 1997)).

Plaintiffs' complaints contain allegations regarding third-party advertisements on PissedConsumer's website. Ascentive Compl. ¶ 126 ("PissedConsumer's unauthorized and willful use of Ascentive's trademarks in connection with the display of third-party advertisements, including advertisements for the products of Ascentive's competitors, constitutes a use in commerce that infringes Ascentive's exclusive rights in its federally registered marks and is likely to cause confusion, mistake or deception as to the source of the goods and services offered."); Classic Compl. ¶ 112 ("PissedConsumer's unauthorized and willful use of Classic's trademarks in connection with the display of third-party advertisements, including advertisements for the products of Classic's competitors, constitutes a use in commerce that infringes Classic's exclusive rights in its federally registered marks and is likely to cause confusion, mistake or deception as to the source of the goods and services offered.").

But the complaints contain no allegations, as they must, that pertain to "the extent of control exercised by [PissedConsumer] over the third party's means of infringement" or that PissedConsumer was aware of "specific instances of actual infringement" and continued to supply its service after it knew or should have known that it was being used to infringe plaintiffs' marks. H.E.R. Accessories Ltd., 2010 WL 4968072, at *5-6 (motion to dismiss contributory trademark infringement claim granted where plaintiffs failed to sufficiently allege defendant service provider had knowledge of third-party infringement). Nor do the complaints contain any allegations regarding PissedConsumer's inducement of advertisers such as Chitika to infringe plaintiffs' marks. Indeed, plaintiffs' complaints contain no allegations regarding Chitika or its

operation at all.[25]  Because plaintiffs have not alleged a claim of contributory trademark infringement sufficient to withstand a motion to dismiss, plaintiffs are unlikely to succeed on this claim.

In sum, for all of these reasons, plaintiffs are unlikely to succeed on the merits of their Lanham Act claims.[26]  Nor have they demonstrated sufficiently serious questions going to the merits to make them a fair ground for litigation.  Additionally, because, as plaintiffs correctly note, the test for the likelihood of success of their "common law claims is the same as the test for infringement and unfair competition under the Lanham Act," Ascentive Mem. at 18; Classic Mem. at 17; see also U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., — F. Supp. 2d —, No. 09 Civ. 9476, 2011 WL 1842980, at *18 (S.D.N.Y. May 13, 2011), their state law claims for trademark infringement, unfair competition, and false designation of origin are also unlikely to succeed or be a fair ground for litigation.

### C.    State Law Claims & the Communications Decency Act

Plaintiffs assert a number of other state law claims in addition to their claims for trademark infringement, unfair competition, and false designation of origin.  Ascentive asserts claims for violations Pennsylvania's unfair trade practices and consumer protection law; interference with contractual and prospective contractual relations; and unjust enrichment. Ascentive Compl. ¶¶ 142-63.  Meanwhile, Classic asserts claims for interference with contractual and prospective contractual relations and unjust enrichment.  Classic Compl. ¶¶ 128-

---

[25] Instead, plaintiffs discuss the operation of Chitika only in their most recent submissions to the Court.  See, e.g., Ascentive Supp. Reply at 11 ("It is true that Chitika plays a role in delivering ads that display 'Ascentive' in the ad text to PissedConsumer's website, but it is PissedConsumer that decided to display the ads, controls the ads, and triggers the delivery of the ads with its web server.").

[26] In light of this conclusion, the Court will not address PissedConsumer's other arguments.

42. PissedConsumer contends that plaintiffs are unlikely to succeed on the merits on any of these claims because they are barred by Section 230 of the Communications Decency Act, 47 U.S.C. § 230 (the "CDA"). Def. Opp'n at 25-26. The Court agrees.

Section 230 of the CDA immunizes providers of interactive computer services against liability arising from content created by third parties; it provides that "[n]o provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c). It further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." Id. § 230(e)(3). This grant of immunity applies only if the interactive computer service provider is not also an "information content provider," which is defined as someone who is "responsible, in whole or in part, for the creation or development of" the offending content. Id. § 230(f)(3).

Plaintiffs argue that PissedConsumer is an "information content provider" because it "created, encouraged, developed and/or materially contributed" to content on its site. Ascentive Reply at 15. They also maintain that PissedConsumer has failed to establish that it is an "interactive computer service." Id. at 16. Before addressing these contentions, the Court will first provide a brief overview of Section 230 of the CDA.

### 1. Overview of the CDA

Section 230 of the CDA was enacted, in part, to "preserve the vibrant and competitive free market that presently exists for the Internet." 47 U.S.C. § 230(b)(2). Congress enacted Section 230, in part, as a response to a New York state court decision, Stratton Oakmont, Inc. v. Prodigy Servs. Co., 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), where an interactive computer service was held liable for defamatory comments made by one of its two million users.

H.R. Conf. Rep. 458, 104th Cong. 2d Sess. 194 (Jan. 31, 1996) ("One of the specific purposes of [§ 230] is to overrule [Stratton] and any other similar decisions which have treated [interactive computer service] providers and users as publishers or speakers of content that is not their own because they have restricted access to objectionable material."); see also Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC, 521 F.3d 1157, 1163-64 (9th Cir. 2008) (en banc); Zeran v. Am. Online, Inc., 129 F.3d 327, 331 (4th Cir. 1997).

To further these goals, Congress declined to extend traditional defamation law, as applied to classical information providers such as newspapers, magazines, television, and radio stations to the Internet.  Gucci Am., Inc. v. Hall & Assocs., 135 F. Supp. 2d 409, 415 (S.D.N.Y. 2001). Section 230(c)(1) or the "good samaritan" provision of the CDA, shields a "provider" or "user" of an "interactive computer service" from liability when either of them publish material provided by a third-party "information content provider."  47 U.S.C. § 230(c)(1); see Zeran, 129 F.3d at 330 (concluding that "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred" by the CDA); Green v. Am. Online, 318 F.3d 465, 471-73 (3d Cir. 2003) (noting that under the CDA the defendant internet service provider is not liable for failing to monitor, screen, or delete allegedly defamatory content from its site).  Section 230(e)(3) provides teeth to § 230(c)(1) by barring all state based suits "inconsistent" with the statute.[27]  See e.g., Almeida v. Amazon.com, Inc., 456 F.3d 1316, 1321 (11th Cir. 2006); Green, 318 F.3d at 471.

---

[27]  Section 230(e)(3) provides:

> Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

In one of the earliest cases involving the CDA, the Fourth Circuit interpreted § 230(e)(3) to bar all state suits sounding in tort.  Zeran, 129 F.3d at 330.  The court observed that Congress did not want to "deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages."  Id. at 330-331.  The court went on to state:

> Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium. The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the [new] medium to a minimum.

Id. at 330.  The reasoning of Zeran is now accepted by courts across the country, and "[t]he broad reach of the CDA to bar a panoply of torts is supported by other courts that have considered the CDA's reach."  See, e.g., Asia Econ. Inst., 2011 WL 2469822, at *7 (collecting cases)

## 2. Interactive Computer Service

Critical to understanding whether Section 230 applies here is determining whether PissedConsumer is an "interactive computer service" or "information content provider," or both.  Courts have different understandings of what Congress intended by the phrase "interactive computer service" but generally apply it broadly.  Section 230(f)(2) defines an "interactive computer service" as any:

> information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

Courts generally conclude that a website falls within this definition.  See, e.g., Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (consumeraffairs. com, a

website allowing computer users to post reviews of businesses and products on it, constitutes an interactive computer service); Roommates.com, 521 F.3d at 1162 n.6 ("Today, the most common interactive computer services are websites."); Universal Commc'ns Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 419 (1st Cir. 2007) ("[W]eb site operators . . . are providers of interactive computer services" because "[a] web site . . . enables computer access by multiple users to a computer server, namely, the server that hosts the web site." (internal quotation marks omitted)); Batzel v. Smith, 333 F.3d 1018, 1030 n.16 (9th Cir. 2003) (recognizing that several courts have concluded that a website meets the definition of an "interactive computer service"); Levitt v. YelpA Inc., Nos. C–10–1321 EMC, C–10–2351 EMC, 2011 WL 5079526, at *6 (N.D. Cal. Oct. 26, 2011) (Yelp, a website allowing computer users to post reviews of businesses and products on it, constitutes an interactive service provider).

The Court thus adopts the view that a website such as PissedConsumer constitutes an "interactive computer service." Moreover, because the individual defendants in this action are officers of PissedConsumer who operate the site, they constitute "providers" of an interactive computer service under Section 230(c). See Whitney Info. Network, Inc. v. Xcentric Ventures, LLC, No. 04 Civ. 47-FtM-34SPC, 2008 WL 450095, at *8 (M.D. Fla. Feb. 15, 2008) (owner and operator of consumer review website immune under CDA as provider of an interactive computer service); cf. Badbusinessbureau.com, 2004 WL 833595, at *10 (no CDA immunity where individual defendant, among other things, was consistently portrayed as an individual who neither owned nor operated defendant website).

### 3. Information Content Provider

A provider of an "interactive computer service," however, may claim immunity only with respect to "information provided by another information content provider." 47 U.S.C. §

230(c)(1); see also Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1123 (9th Cir. 2003)

("Under the statutory scheme, an 'interactive computer service' qualifies for immunity so long as

it does not also function as an 'information content provider' for the portion of the statement or

publication at issue.").  Section 230(f)(3) defines "information content provider" as "any person

or entity that is responsible, in whole or in part, for the creation or development of information

provided through the Internet or any other interactive computer service."  An entity can be both

an "interactive computer service" and an "information content provider."  Roommates.com, 521

F.3d at 1163.  However, "[t]he critical issue is whether . . . [the interactive computer service] acts

as an information content provider with respect to the information" at issue.  Carafano, 339 F.3d

at 1125 (citation and quotation marks omitted); accord Batzel, 333 F.3d at 1031.

While an overt act of creation of content is easy to identify, determining what makes a

party responsible for the "development" of content under § 230(f)(3) is unclear, and the CDA

does not define the term.  Accordingly, courts often look to the totality of the circumstances in

making the determination.  See, e.g., Roommates.com, 521 F.3d at 1169 (observing that a

website operator who edits in a manner that contributes to the information—such as by removing

the word "not" from a user's message stating "X did not steal the artwork" in order to transform

an innocent message into a libelous one—is directly involved in the development of

information); Doe v. City of New York, 583 F. Supp. 2d 444, 448 (S.D.N.Y. 2008) ("When [the

defendant] Tefft attached his own commentary to his listserv, he ceased to be a passive host of

third-party information [and] Section 230(c)(1) would not immunize defendants with respect to

any information they developed or created entirely by themselves." (internal quotations and

citations omitted)).  Case law also suggests that one is responsible for the "development" of

information when he engages in an act beyond the normal functions of a publisher (such as

deciding to publish, withdraw or modify third-party content) that changes the meaning and purpose of the content.  See Roommates.com, 521 F.3d at 1163.

Applying these principles here, the Court concludes that PissedConsumer is not an "information content provider" under Section 230 with respect to the negative postings concerning plaintiffs at issue in this case.  Classic does not claim or even imply that PissedConsumer creates or authors the negative postings on its website; rather it claims that "PissedConsumer encourages consumers to create negative postings on the PissedConsumer website."  Classic Compl. ¶ 27 (emphasis added).  Ascentive, on the other hand alleges that Pissed Consumer "encourages and creates the most negative postings it can" on its site, Ascentive Compl. ¶ 32.  Such actions, Ascentive contends, constitute the creation of editorial content by PissedConsumer barring immunity under Section 230(c)(1).  Ascentive Reply at 15.

While it is true that "Section 230(c) immunity is not so broad as to extend to an interactive computer service that . . . takes an active role in creating or developing the content at issue," Badbusinessbureau.com, 2004 WL 833595, at *8, plaintiffs have provided no such evidence, nor even sufficiently alleged that PissedConsumer played such a role.  Asserting or implying the mere possibility that PissedConsumer did so is insufficient to overcome the immunity granted by the CDA.  See, e.g., Consumeraffairs.com, Inc., 591 F.3d 250, 259 (4th Cir. 2009) (upholding CDA immunity because "[t]here is nothing but [plaintiff's] speculation which pleads Consumeraffairs.com's role as an actual author in the Fabrication Paragraph"); Yelp, 2011 WL 5079526, at *9 (motion to dismiss claims against consumer review site granted where claim that site "created negative reviews" was not supported by factual allegations in the complaint and claim that site "manipulated third party reviews to pressure businesses to advertise" was barred by Section 230 of the CDA).

Plaintiffs also claim that PissedConsumer acted as an "information content provider" by, among other things, (1) encouraging negative complaints; (2) inviting consumers to post public complaints on its website; (3) displaying those negative postings as prominently as possible absent participation in its RMS; and (4) increasing the prominence of PissedConsumer webpages by various allegedly improper means, including by using plaintiffs' marks. Ascentive Compl. ¶¶ 26, 32, 39-54; Classic Compl. ¶¶ 21, 27, 34-50; Ascentive Reply at 15. This claim is similarly unavailing.

Ascentive cites Badbusinessbureau.com in support of its position but that case involved factual circumstances distinguishable from those here. There, the defendant website—a consumer complaint forum—not only did not dispute that it created, developed, and posted defamatory information concerning plaintiff's business but it also actively encouraged by email a consumer to take photos of a business owner, his car, and his license plate in front of his store, so that the defendant could include these photos on the website beside headings such as "Con Artists," "Scam," and "Ripoff." 2004 WL 833595, at *10 & n.10. Concluding that defendant website had acted as an "information content provider," the court stated:

> The defendants cannot disclaim responsibility for disparaging material that they actively solicit. Furthermore, actively encouraging and instructing a consumer to gather specific detailed information is an activity that goes substantially beyond the traditional publisher's editorial role. The defendants are clearly doing more than making minor alterations to a consumer's message. They are participating in the process of developing information. Therefore, the defendants have not only incurred responsibility for the information developed and created by consumers, but have also gone beyond the publisher's role and developed some of the defamatory information posted on the websites.

Id. Here, PissedConsumer does invite third-party content providers to submit negative reviews; however, its actions are not unlike the targeted solicitation of editorial material engaged in by a narrow genre of publishers and are nothing like those in Badbusinessbureau.com. Indeed, there

is simply "no authority for the proposition that [encouraging the publication of defamatory content] makes the website operator responsible, in whole or in part, for the 'creation or development' of every post on the site. . . . Unless Congress amends the [CDA], it is legally (although perhaps not ethically) beside the point whether defendants refuse to remove the material, or how they might use it to their advantage." Global Royalties, Ltd. v. Xcentric Ventures, LLC, 544 F. Supp. 2d 929, 9333 (D. Ariz. 2008) (consumer review site "ripoffreport.com" not information content provider where plaintiff alleged defendants use reviews as leverage to coerce targeted businesses to pay for defendants' Corporate Advocacy Program, which purports to help investigate and resolve posted consumer complaints, and argued that defendants encourage defamatory postings from others for their own financial gain and, therefore are partly responsible for the "creation or development" of the messages).

Although there may be circumstances where modification of the display of content on a website constitutes the "development" of information, this did not occur here. The fact that the defendants invite postings and then in certain circumstances alter the way those postings are displayed is not the "development" of information for Section 230 purposes. See Yelp, 2011 WL 5079526, at *6 ("[A]llegations of extortion based on [consumer review site] Yelp's alleged manipulation of their review pages—by removing certain reviews and publishing others or changing their order of appearance—falls within the conduct immunized by § 230(c)(1)."); Zeran, 129 F.3d at 330 ("[L]awsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred."). The same is true with respect to PissedConsumer's SEO tactics and its use of plaintiffs' marks to make PissedConsumer's pages appear higher in search engine results list; these actions too do not render PissedConsumer an information content

provider.  See Asia Econ. Inst., 2011 WL 2469822, at *6 (citing Black v. Google Inc., No. 10-02381 CW, 2010 WL 3222147, at *3 (N.D. Cal. Aug. 13, 2010) (defendant consumer report website's deliberate manipulation of webpage code to make certain reports more visible in online search results was immune under Section 230 because "[a]bsent a changing of the disputed reports' substantive content that is visible to consumers, liability cannot be found.").  "At best, increasing the visibility of a website in internet searches amounts to 'enhancement by implication,' which is insufficient to remove" PissedConsumer from the shelter of the CDA.  Id. (quoting Roomates.com, 521 F.3d at 1174-75).  The Court thus has no basis on which to find that PissedConsumer is an "information content provider" ineligible for immunity under the CDA.

For all of the foregoing reasons, Ascentive is unlikely to succeed on its claims for violations of Pennsylvania's unfair trade practices and consumer protection law, and both Ascentive and Classic are unlikely to succeed on their state law claims for interference with contractual and prospective contractual relations and unjust enrichment.  Likewise, for the same reasons, plaintiffs have failed to establish sufficiently serious questions going to the merits of these claims to make them a fair ground for litigation

### D.   RICO Claims

The Court next turns to whether plaintiffs are likely to succeed on their claims that PissedConsumer committed substantive RICO offenses in violation of 18 U.S.C. § 1962(c) and conspired to violate RICO in violation of 18 U.S.C. § 1962(d).  The crux of plaintiffs' RICO claims is that by encouraging and publishing negative consumer complaints and manipulating the way the complaints appear on PissedConsumer in exchange for fees, PissedConsumer is engaged in a pattern of "extortion, bribery, and other fraudulent behavior that is prohibited by [RICO]." Ascentive Mem. at 13; Classic Mem. at 14-17.

PissedConsumer responds that plaintiffs are unlikely to succeed on these claims for several reasons: that (1) plaintiffs have suffered no damages as a result of the alleged racketeering activity; (2) their complaints allege only one predicate act of racketeering—the scheme to "extort" plaintiffs as a condition of removing negative comments about its products; (3) the complaints fail to sufficiently allege continuity of the predicate acts; and (4) the underlying predicate acts are not satisfied. Def. Opp'n at 28-31. The Court agrees that plaintiffs are unlikely to succeed on their RICO claims.

A substantive civil RICO claim has three elements: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962. Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008).[28] To plead a violation of Section 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" for each individual defendant. DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001) (citations omitted).

Most fundamentally, plaintiffs RICO claims are unlikely to succeed because plaintiffs have not sufficiently alleged, let alone established, that PissedConsumer committed the alleged RICO predicate acts of commercial bribery or extortion.[29] As for commercial bribery, Ascentive relies on 18 Pa. C.S.A. § 4108(b) which provides:

> A person who holds himself out to the public as being engaged in the business of making disinterested selection, appraisal, or criticism of commodities or services

---

[28] 18 U.S.C. § 1962(c) makes it unlawful

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

[29] Ascentive contends that it is likely to succeed on its civil RICO claims based on a predicate act of commercial bribery; both Ascentive and Classic contend that they are likely to succeed on their civil RICO claims based on a predicate act of extortion.

> commits a misdemeanor of the second degree if he solicits, accepts or agrees to accept any benefit to influence his selection, appraisal or criticism.

This predicate act is obviously insufficient because PissedConsumer does not hold itself out "making . . . criticism of commodities or services;" instead, it provides a forum for others to make such criticisms.

> With respect to extortion, plaintiffs rely on the Hobbs Act, which provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). Extortion means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Id. § 1951(2). The elements of a claim for extortion under the Hobbs Act are that the defendant "'(1) induced [the victim], with [the victim's] consent, to part with property, (2) through the wrongful use of actual or threatened force, violence or fear (including fear of economic loss), (3) in such a way as to adversely effect interstate commerce.'" United States v. Int'l Longshoremen's Ass'n, 518 F. Supp. 2d 422, 483 (E.D.N.Y. 2007) (quoting McLaughlin v. Anderson, 962 F.2d 187, 194 (2d Cir. 1992)).

Plaintiffs allege that PissedConsumer attempted to obtain membership in its RMS program by encouraging, controlling, and approving negative website content that caused fear of economic loss. Ascentive Compl. ¶ 105-08; Classic Compl. ¶ 91-93. Yet plaintiffs fail to articulate how PissedConsumer's actions constitute extortion. Ascentive's counsel acknowledged at its preliminary injunction hearing that there is nothing that requires a website such as PissedConsumer to post responses to complaints on its site. Ascentive. Tr. at 107. And plaintiffs have failed to establish that any law forbids PissedConsumer from allowing companies

to post responses to the complaints for a price or that doing so constitutes extortion. Nor have plaintiffs established that they have a right to pursue their business interests free from PissedConsumer's activities; indeed, plaintiffs do not have the right to operate free from criticism—that which they claim is causing them fear of economic loss. See, e.g., Cintas, 601 F. Supp. 2d at 578 (dismissing civil RICO claim predicated on alleged Hobbs Act extortion where defendants operated site critical of plaintiff that, among other things, sought to organize plaintiff's employees in a union). Accordingly, because plaintiffs have failed to sufficiently allege that PissedConsumer committed any alleged RICO predicate act, plaintiffs are unlikely to succeed on their civil RICO claims and have failed to establish sufficiently serious questions going to their merits to make them a fair ground for litigation.[30]

Plaintiffs thus have established neither a likelihood of success on any of their claims nor sufficiently serious questions going to the merits of their claims to make them a fair ground for litigation. Consequently, the Court need not address whether the balance of hardships tip decidedly in plaintiffs' favor, whether plaintiffs will suffer "irreparable injury in the absence of an injunction," or whether an injunction is in the public interest, see Salinger, 607 F.3d at 79-80, and plaintiffs' motion for a preliminary injunction is denied.


III.     CONCLUSION

For all of the foregoing reasons, plaintiffs' motions for a preliminary injunction are hereby DENIED. This decision is without prejudice to plaintiffs' opportunity to seek a permanent injunction after the parties have had the benefit of full discovery. While the Court finds some aspects of PissedConsumer's business practices troubling and perhaps unethical, it

---

[30] In light of this conclusion, the Court need not address PissedConsumer's other contentions regarding the deficiency of plaintiffs' civil RICO claims.

has been unable to find a legal remedy for conduct that may offend generally accepted standards of behavior. "[Ethical] obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp." <u>The Western Maid</u>, 257 U.S. 419, 434, 42 S. Ct. 159 (1922) (Holmes, J.) (citing <u>The Siren</u>, 74 U.S. 152, 19 L. Ed. 129 (1868)).

      SO ORDERED.

Dated:      Brooklyn, New York
              December 13, 2011

                                _____/s/_____

                                I. Leo Glasser
                                Senior United States District Judge